**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

SONJA PENNELL ET AL.,         )
                                    )
         Plaintiffs,         )
                                    )
         v.               )     No.  1:18-cv-3304-JRS-TAB
                                    )
LVNV FUNDING, LLC &      )
RESURGENT  CAPITAL SERVICES, L.P., )
                                    )
         Defendants.      )

<u>**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF SUMMARY JUDGMENT**</u>

Defendants, LVNV Funding, LLC ("LVNV") and Resurgent Capital Services, L.P. ("RCS"), by and through their undersigned counsel, hereby submit this Memorandum of Law in Support of their Motion for Summary Judgment as follows:

## BACKGROUND

The thirty-three (33) Plaintiffs[1] in this case all defaulted on credit card debts owed to various creditors. *See* Dkt. #24 at ¶¶10, 14, 18, 22, 26, 31, 35, 39, 47, 51, 58, 62, 69, 74, 82, 90, 94, 97, 101, 106, 110, 114, 118, 122, 126, 130, 134, 138, 142, 146, 150, 154, 158, 162. Plaintiffs contend that following their respective defaults, they each sought the assistance of the legal aid attorneys at the Chicago Legal Clinic's Legal Advocates for Seniors and People with Disabilities program ("LASPD") regarding their respective debt problems. *See id.*; *see also id.* at ¶3. With the exception of Plaintiff Sonja Pennell ("Pennell"), Plaintiffs claim that LASPD sent their respective original creditors letters stating that they were represented by counsel and refused to pay the debts at issue. *See id.* at ¶¶15, 19, 23, 27, 32, 36, 40, 48, 52, 55, 59, 63, 66, 70, 71, 75, 79, 83, 91, 94, 98, 102, 107, 111, 115, 119, 123, 127, 131, 135, 139, 143, 147, 151, 155, 159,

---

[1] Two Plaintiffs, Pedro Delgado and Sandy Martin, were dismissed with prejudice during the course of this litigation following their respective deaths. *See* Dkt. #35; Dkt. #50.

163. Subsequently thereto, Plaintiffs contend that LVNV purchased their respective debts and via its servicer, RCS, hired various debt collection agencies (the "Debt Collectors") to collect the debts, which Debt Collectors sent collection communications directly to Plaintiffs. *See id.* at ¶¶16, 20, 24, 28, 33, 37, 41, 49, 53, 56, 60, 64, 67, 72, 76, 80, 84, 92, 95, 99, 103, 108, 112, 116, 120, 124, 128, 132, 136, 140, 144, 148, 152, 156, 160, 164. Plaintiffs further claim that thereafter, LASPD notified the Debt Collectors of the claimed representation and refusal to pay by sending letters directly to the Debt Collectors. *See id.* at ¶¶17, 21, 25, 29, 34, 38, 42, 50, 54, 57, 61, 65, 68, 73, 77, 81, 85, 93, 96, 100, 104, 109, 113, 117, 121, 125, 129, 133, 137, 141, 145, 149, 153, 157, 161, 165. Notably, Plaintiffs do not allege LVNV or RCS ever contacted Plaintiffs directly, nor do they allege -- with the exception of Plaintiffs Laura Jean Stewart ("Stewart"), Maralene Hundley ("Hundley") and Valerie Weaver ("Weaver") -- that they were ever contacted after LASPD purportedly contacted the Debt Collectors. *See generally* Dkt. #24. As for Pennell, she contends that she notified Defendants of representation and cease request via a debt collector engaged by RCS and that thereafter another debt collector contacted her. *See id.* at ¶¶11-12. As for Stewart, Hundley and Weaver, each allege to have received a second collection communication after a debt collector retained by RCS was notified of representation by LASPD. *See id.* at ¶¶30, 78, 105. At issue is whether Defendants violated § 1692c(a)(2) and § 1692c(c) of the Fair Debt Collection Practices Act ("FDCPA") as a result of the communications claimed to have been made on their behalf by the Debt Collectors. *See id.* at ¶¶173-180.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

### THE ACCOUNTS GENERALLY

1.  Plaintiffs Pennell, Stewart, Hundley, Weaver, Kenneth Chappelle, James Lee, Patricia Smith, Joan Martin, Diane Benjamin, Barbara Staluppi, Roberta Salav, Louise Reitz, Francis

Emery, Luz Senquiz, Mirta Alvarado, Donna Lindsey, Joyce Young, Debra Pray, Anita Rivera, Earnestine Jones, Estela Munguia, Robert Morin, Valicia Gentry, Francis Spininello, Jr., Renee Stasik, Rita McBride, Robert Martin, Sherry Key, Albert DiCresce, Jackie Adams, Shelia Mahoney, Gene Side, Jr., and Lewis Shellenberger (collectively, the "Plaintiffs") are residents of Indiana, Iowa, West Virginia, Oklahoma, South Carolina, North Carolina, Michigan, Mississippi, New York, Florida, Florida, Florida, Florida, New Jersey, New Jersey, Pennsylvania, Ohio, Connecticut, Texas, Arkansas, California, Oregon, Ohio, South Carolina, Pennsylvania, Mississippi, Mississippi, Kentucky, Nevada, Utah, Massachusetts, Mississippi, and Colorado, respectively. *See* Dkt. #24 at ¶3.

2.  Various credit card companies originated credit cards to the respective Plaintiffs (the "Accounts") and the Plaintiffs defaulted on the Accounts. *See* Dkt. #24 at ¶¶10, 14, 18, 22, 26, 31, 35, 39, 47, 51, 58, 62, 69, 74, 82, 90, 94, 97, 101, 106, 110, 114, 118, 122, 126, 130, 134, 138, 142, 146, 150, 154, 158, 162.

3.  Subsequent to default, LVNV purchased all rights, title and interest in the Accounts. *See* Dkt. #24 at ¶¶16, 20, 24, 28, 33, 37, 41, 49, 53, 56, 60, 64, 67, 72, 76, 80, 84, 92, 95, 99, 103, 108, 112, 116, 120, 124, 128, 132, 136, 140, 144, 148, 152, 156, 160, 164; Affidavit of Anne Herthneck at ¶6, a true and accurate copy of which is attached hereto as **Exhibit A**.

4.  As part of the sale of Accounts, the original creditors supplied account level information to LVNV, but said information did not include copies of any letters purportedly sent to the original creditors by LASPD. *See* **Exhibit A** at ¶¶7, 11.

5.  However, as a matter of industry pattern and practice, where a seller of accounts has notice of attorney representation, LVNV expects that the seller will identify the attorney in the

account level information provided for the account in a separate line item specifically designated for identifying attorneys (e.g. "AttyName"). *See id.* at ¶9.

6.   Account level information transmitted to LVNV for Plaintiff Frank Emery ("Emery") did identify attorney information; specifically, Edward Grossman was identified as the attorney. *See id.* at ¶10. No address information was provided but a phone number was – 312-263-1633. *See id.* Account level information transmitted to LVNV for the remaining Plaintiffs did not identify any attorney information. *See id.*; *see also* Group Exhibit 1 to **Exhibit A**.

7.   LVNV has no employees and as such relies on its master servicer, RCS, to service the accounts it purchases, including the Accounts. *See* **Exhibit A** at ¶4. RCS typically engages various third-party debt collectors to collect the accounts it services. *See id.*

<u>PENNELL ACCOUNT</u>

8.   Account level documentation transmitted by the original creditor to LVNV at the time of purchase of Pennell's account included two (2) letters both dated December 30, 2017 purportedly sent by Pennell to the original creditor, instructing the original creditor to contact her only by written letter directed to her home address. *See id.* at ¶18.

9.   Plaintiff denies having sent the two (2) letters and does not know who may have sent them, although she acknowledges that a debt relief company may have done so without her knowledge.[2] *See* Pennell Dep. Trans. at 32:14-33:18, a true and accurate copy of the Trans. and Exhibit 6 to the Trans. are attached hereto as **Exhibit B**.

10. On October 24, 2017, RCS placed Pennell's account with third-party debt collector Credit Control, LLC ("Credit Control"). *See* **Exhibit A** at ¶19. Credit Control only serviced Pennell's account from October 24, 2017 to January 16, 2018. *See id.*

---

[2] Notably, one of the debt relief companies utilized by Pennell -- Lexington Law -- has previously been accused of generating and sending letters without the consumer's knowledge or consent. *See* **Exhibit B** at 33:14-16; *CBE Grp., Inc. v. Heath*, 2020 U.S. Dist. LEXIS 20947, *3-4 (N.D. Tex. Feb. 6, 2020).

11. On January 30, 2018, notwithstanding that Credit Control no longer serviced Pennell's account, Credit Control forwarded to RCS a letter it had received from LASPD dated January 29, 2018 pertaining to Pennell. *See id.* at ¶20.

12. On or about January 30, 2018, RCS coded Pennell's account as subject to attorney representation and updated the account information for Pennell to include the attorney information included in the January 29, 2018 letter. *See id.* at ¶21. Specifically, RCS updated the account to reflect that Edward Grossman of Legal Advocates for Seniors with an address of 211 W. Wacker Drive, Ste. 750, Chicago, IL 60606 represented Pennell. *See id.*

13. On February 12, 2018, Pennell's account was placed with another third-party debt collector, Lloyd & McDaniel ("L&M"). *See id.* at ¶22; Affidavit of Rich Alphin at ¶4, a true and accurate copy of which is attached hereto as **Exhibit C**. Attorney information was supplied to L&M at the time of placement. *See id.*

14. On or about February 27, 2018, L&M mailed its first dunning letter on the Pennell account, which letter was directed to Grossman at 211 W. Wacker Drive, Suite 750 Chicago, IL 60606. *See* **Exhibit C** at ¶5. The February 27, 2018 letter specifically stated:

> We believe you are representing Sonja Pennell in regards to the debt owed to LVNV Funding, LLC. If we are mistaken in this regard, and you are not acting as an attorney for Sonja Pennell, please advise us of that immediately. If we do not hear from you within 30 days, we will assume that you do not represent Sonja Pennell.

*See id.* at ¶6; *see also* **Exhibit B** at 41:24-43:21 (stipulating that letter was produced by Plaintiff in this case after obtaining a copy of the letter from LASPD).

15. L&M never received a response to the February 27, 2018 letter. *See* **Exhibit C** at ¶7.

16. On or about April 11, 2018, L&M sent a collection letter directly to Pennell. *See id.*

17. Thereafter on May 23, 2018, L&M received a fax purportedly from Grossman advising that LASPD "represent[s] Sonja Pennell regarding [L&M's] attempts to collect." *See id.* at ¶8.

## HUNDLEY ACCOUNT

18. RCS placed Hundley's account with third-party debt collector Halsted Financial Services, LLC ("Halsted") for collection on or about June 20, 2018. *See* **Exhibit A** at ¶24. Halsted serviced the account until August 31, 2018. *See id.* On August 31, 2018, Halsted returned the account to RCS who thereafter placed the account with Alltran Financial ("Alltran") for collection. *See id.*; *see also* Dkt. #25 at p. 3-4.

19. Halsted never notified RCS of having received any communications from LASPD pertaining to Hundley after Halsted ceased servicing Hundley's account. *See* **Exhibit A** at ¶25.

## STEWART ACCOUNT

20. RCS placed Stewart's account with third-party debt collector Allied Interstate, Inc. ("Allied") for collection on or about April 24, 2018.  *See* **Exhibit A** at ¶26. Allied serviced the account until June 29, 2018. *See id.* On June 29, 2018, Allied returned the account to RCS who thereafter placed the account with American Coradius for collection. *See id.*; Dkt. #25 at p. 2.

21. Allied never notified RCS of having received any communications from LASPD pertaining to Stewart after Allied ceased servicing Stewart's account. *See* **Exhibit A** at ¶27.

## LASPD

22. LASPD is a program of the Chicago Legal Clinic. *See* Steven Blutza Dep. Trans. at 19:11-12, a true and accurate copy of the Trans. is attached hereto as **Exhibit D**; *see also About Us*, LASPD, available at https://www.mylegaladvocates.org/?area=aboutus&lang= (last visited January 7, 2020).

23. Chicago Legal Clinic has an executive director, which was formally Grossman. *See* **Exhibit D** at 11:16-17, 34:12-13. The executive director does not have any day-to-day role in the operations of LASPD. *See id.* at 12:14-13:22., 35:15-17.

24. Grossman retired at the end of 2017 as executive director at which time the role was taken over by Adam Salzman. *See id.* at 35:5-15.

25. Although Grossman did not play any role in the day-to-day operations of LASPD and was the not the attorney sending out letters, his signature continued to appear on LASPD letters for a period of time even after his retirement. *See id.* at 35:5-36:9. In fact, all of the letters alleged by Plaintiffs to have been sent by LASPD in 2018 to the original creditors on the Accounts were all signed by Edward Grossman, who is only licensed to practice law in Illinois.[3] *See* Dkt. #24-3; Dkt. #24-4; Dkt. #24-5; **Exhibit D** at 46:17-24.

26. LASPD has a legal director – Donald Liebsker ("Liebsker") – and a supervising attorney – Jeff Whitehead ("Whitehead"), which are the only attorneys at LASPD apart from the executive director identified *supra*. *See* **Exhibit D** at 11:16-16:2.

27. The supervising attorney oversees LASPD's day-to-day operations with the legal director, only getting involved if and when the supervising attorney alerts the director of a unique problem or issue.  *See id.* at 11:16-16:2, 37:6-9, 90:13-23.

28. Both Liebsker and Whitehead maintain separate law practices outside of LASPD. *See id.* at 19:19-20:2, 93:19-21. Neither Liebsker or Whitehead work full time for LASPD; Whitehead puts in approximately 10-20 hours a week at LASPD, while a week or more can go by without any issues being raised by Whitehead to Liebsker. *See id.* at 19:19-20:2, 93:12-20:95:1.

---

[3] Which included letters sent on behalf of Plaintiffs Donna Lindsey, Debra Pray, Rita McBride, Sherry Key, Jackie Adams, Lewis Shellenberger. *See* Dkt. #24-3; Dkt. #24-4; Dkt. #24-5.

29. The only other staff at LASPD includes approximately five (5) clerical staff and three (3) paralegals. *See id.* at 37:3-11.

30. The paralegals at LASPD typically handle communications with LASPD clients and even make the recommendation as to whether bankruptcy would be advisable for a given consumer. *See id.* at 15:6-3, 16:3-5, 43:10-15

31. Most LASPD clients never even speak to an LASPD attorney. *See id.* at 44:3-17 ("talking to the lawyer is not a big part of the operation"). In fact, here, all of the Plaintiffs admitted they only ever communicated with LASPD paralegals. *See* Plaintiffs' Consolidated Responses to Interrogatories at Request No. 15, a true and accurate copy of which is attached hereto as **Exhibit E** ("Identify each Person who You communicated with at LASPD regarding the debt(s) at issue and when those communications occurred. ANSWER: Plaintiffs state that they have communicated with paralegals, Misha Corbett and Bernadette Fahy."); *see also* **Exhibit B** at 30:4-14 (only spoke to paralegals); Louise Reitz Dep. Trans. at 26:18-25 (never spoke to an attorney), a true and accurate copy of the Trans. is attached hereto as **Exhibit F**

32. As a result of the age and disability status of many of their clients, LASPD knows that some of their clients may not be handling their own mail or finances; in fact, this scenario has become so common, that LASPD invites their clients on the LASPD application to designate a representative for LASPD to communicate with. *See* **Exhibit D** at 46:17-24.63:21-64:17.

33. LASPD promotes itself as a **nationwide** program. *See id.* at 40:6-8; *see also About Us*, LASPD, available at https://www.mylegaladvocates.org/?area=aboutus&lang= (last visited January 7, 2020) ("LASPD is a **nationwide** program") (emphasis in original).

34. LASPD has approximately 1,500 clients at any given time, which clients reside all over the country. *See* **Exhibit D** at 40:12-42:20.

35. At all relevant times, LASPD attorneys were only licensed to practice law in Illinois, with the exception of Whitehead -- who also maintained an active law license in Indiana. *See id.* at 46:17-24, 101:8-22; December 4, 2019 Email, attached hereto as **Exhibit G**.

36. Every LASPD client is required to execute LASPD's form retainer contract, which contract accurately describes the services supplied by LASPD. *See* **Exhibit D** at 76:19-77:1.

37. LASPD is not familiar with Plaintiffs' respective signatures and cannot verify that their signatures appear on any form retainer contract. *See id.* at 77:11-24.

38. LASPD does not provide any services to its clients they could not do for themselves or a lay person could not do on their behalf. *See id.* at 79:21-80:3, 81:2-82:14, 142:7-17; Retainer Contracts, true and accurate copies of which are being filed provisionally under seal as **Exhibit H**; *FAQ*, LASPD, available at https://www.mylegaladvocates.org/?area=faq&lang= (last visited January 7, 2020) ("Can I do this myself? **Yes.**").

39. LASPD does not purport to represent its clients (including Plaintiffs here) regarding all matters concerning their debts. *See* **Exhibit D** at 88:1-8; **Exhibit H**. For example, LASPD does not represent its clients in payment negotiations, settlement negotiations or any legal proceedings. *See id.*

40. LASPD charges a one-time enrollment fee and a monthly fee to its clients. *See* **Exhibit D** at 51:12-15; *FAQ*, LASPD, available at https://www.mylegaladvocates.org/?area=faq&lang= (last visited January 7, 2020).

41. The only service LASPD offers its clients in exchange for the fees it charges is to send a form letter to the client's respective debt collectors and/or creditors telling them to "go away." *See* **Exhibit D** at 60:17-62:11, 88:20-89:5; **Exhibit C** at 28:13-20 ("[T]he only service that LASPD is providing you is to tell your creditors to go away; is that accurate? A. That's

9

correct."); **Exhibit F** at 25:14-20 ("Q. Was there anything else besides sending them those letters that they don't contact me that you thought they were going to do for you? A. No."); **Exhibit H**; Patricia Smith Dep. Trans. at 44:13-19 ("[A]ll I understand LASPD to be providing you is a service that they contact your creditors and tell them to go away. Is that your understanding? A. Yes."), a true and accurate copy of the Trans. is attached hereto as **Exhibit I.**

42. LASPD paralegals and/or clerical staff determine the need for the form go-away letter and prepare and send out the letter typically without discussing it with or obtaining approval from an LASPD attorney. *See* **Exhibit D** at 115:19-116:17, 118:6-10.

43. At all relevant times, Steven Blutza has been the administrative director for the Chicago Legal Clinic and the director for the LASPD program. *See id.* at 9:16-23. Blutza is not an attorney. *See id.* at 10:3-5.

44. Blutza is also the sole owner and officer of Heartland Financial Services ("Heartland Financial Services"). *See id.* at 16:24-17:12, 21:1-3. Heartland, through its relationship with debt management companies, is introduced to persons who may be judgment proof and then refers those persons to LASPD. *See id.* at 17:13-19:15, 20:3-18. The majority of LASPD's clients are acquired through this referral program. *See id.* at 20:19-24.

45. In exchange for the referrals Heartland makes to LASPD, Heartland indirectly shares in fees charged by LASPD, despite not employing any attorneys. *See id.* at 21:18-22:1, 23:9-17, 24:22-24. As part of this indirect fee sharing agreement, LASPD first pays fees to Liebsker's law firm, who takes a 50% cut and then transfers the remaining 50% to Heartland. *See id.* at 25:9-26:19.

46. Plaintiffs' attorney David J. Philipps ("Philipps") represents the Chicago Legal Clinic. *See id.* at 31:20-23. LASPD also has a fee sharing agreement with Philipps' law firm as a result

of referrals made by LASPD to Philipps. *See id.* at 55:21-56:8. If Philipps is awarded fees in this litigation, a portion of those fees will go to LASPD. *See id.* at 178:13-16.

47. Per Plaintiff Louise Reitz's own admissions, LASPD did not represent her with respect to either RCS or LVNV's efforts to collect a debt. *See* **Exhibit F** at 56:14-57:16.

BAHNER

48. Michael Bahner ("Bahner") worked as in-house corporate counsel for RCS until March 2018. *See* **Exhibit A** at ¶33. After March 2018, Bahner did not work for RCS or represent RCS in any capacity. *See id.* At no time did Bahner work for LVNV, which, as explained above, has no employees. *See id.*

49. RCS maintains numerous telephone and fax numbers as part of its business operations; however, not all telephone numbers and fax numbers maintained by RCS are in active use at all times. *See id.* at ¶34.

50. Fax number 866-467-0919 (the "Fax Number") has been maintained by RCS as a fax number available for its use since 2007 and was officially disconnected on March 11, 2019. *See id.* at ¶35. The Fax Number has not been in active service by any employee or department at RCS since January 2018, however. *See id.* Moreover, at no time was the Fax Number assigned to Bahner. *See id.*

51. At all relevant times, RCS has maintained a fax number of 1-866-467-0763 for service of communications such as attorney representation or cease requests from consumers. *See id.* at ¶37. At all relevant times, said fax number was prominently displayed in the Contact-Us portion of RCS's website – available at https://www.resurgent.com/contact-us. *See id.*

52. LASPD routinely checks debt collector's websites to determine best contact information for the "go away" letters it sends but never checked RCS or LVNV's website to determine

11

appropriate contact information. *See* **Exhibit D** at 126:2-6, 128:20-24. Rather the Fax Number was supplied to LASPD by Philipps for use in LASPD communications related to LVNV. *See id.* at 121:15-18, 129:9-17, 131:9-20.

53. RCS has no record of having received copies of the LASPD communications attached to the Amended Complaint in this matter which purport to have been faxed to the Fax Number. *See* **Exhibit A** at ¶36.

## RCS POLICIES & PROCEDURES

54. At all relevant times, RCS had a written policy to only communicate with a debtor's attorney after being notified of legal representation and to only contact a debtor for one of the permissible purposes set forth in § 1692c(c) of the FDCPA after receiving a written cease and desist request. *See* **Exhibit A** at ¶12.

55. RCS employees receive regular seminar training on RCS policies, including the aforementioned attorney representation and cease and desist policies. *See id.*

56. RCS also requires that all third-party service providers engaged by RCS comply with RCS policies, RCS Operating Standards and the requirements of federal, state and local laws. *See id.* at ¶13. Specifically, RCS has created an Agency Operations Manual which all third-party service providers are required to follow. *See id.*

57. Copies of the Agency Operations Manual are supplied to each third-party service provider and RCS makes itself available to answer questions the third-party service provider may have regarding the policies and procedures contained therein. *See id.*

58. RCS regularly monitors its third-party service providers to confirm adherence to RCS policies and procedures. *See id.* at ¶14. Service providers that fail to adhere to the RCS' policies and procedures are subject to termination. *See id.*

59. At the time of placement of the Accounts with the Debt Collectors, RCS was not aware of any systemic failure on the part of any of the Debt Collectors to comply with RCS policies and procedures, including attorney representation procedures. *See id.* at ¶15. Had RCS been aware of repeated and/or major departures from RCS policies and procedures on the part of the Debt Collectors, the Debt Collectors would have been terminated as RCS service providers and the Accounts never would have been placed with them. *See id.*

60. Placement of an account with a third-party service provider, such as the Debt Collectors, is accomplished by RCS sending the provider an electronic placement file which includes basic account information. *See id.* at ¶16.

61. Per RCS policy, the placement file is supposed to contain all available attorney information known to RCS. *See id.*

62. Upon receipt of a placement file, per the policies set forth in the Agency Operations Manual, servicers are required to determine if the debtor is represented by an attorney and if so represented, only contact the attorney. *See id.*

63. Moreover, if the servicer learns of attorney information while an account is placed with it for collection, per the policies set forth in the Agency Operations Manual, the servicer is obligated to code the account as attorney representation and forward any representation documentation to RCS. *See id.* Thereafter, the servicer may only communicate with the attorney. *See id.*

64. Similarly, per the policies set forth in the Agency Operations Manual, if a servicer receives a written cease and desist request, the servicer must code the request as a cease and desist request and forward the communication to RCS. *See id.* at ¶17. Upon receipt of a cease

request, the servicer must also systematically stop proactive collection activities in anticipation of RCS imposing the same work restriction and recalling the account. *See id.*

65. However, where a cease request is accompanied by a notice of attorney representation and a request that communications go through the attorney only, the account is not required to be coded cease and desist and should only be coded attorney representation. *See id.* The attorney representation code is intended to ensure that future communications go only through the attorney, consistent with the consumer's request. *See id.*

WEAVER ACCOUNT

66. RCS placed Weaver's account with third-party service provider Credit Control for collection on or about November 21, 2017. *See id.* at ¶28.

67. On August 8, 2018, Credit Control forwarded to RCS an LASPD letter it received dated August 7, 2018 pertaining to Weaver. *See id.* at ¶29; Dkt. #24-9 at p. 16 (August 7, 2018 Letter).

68. Credit Control correctly coded the letter as attorney representation and pursuant to the policies and procedures required to be followed by Credit Control, Credit Control should have communicated only with LASPD after August 7, 2018. *See* **Exhibit A** at ¶¶30-31. Any communications from Credit Control directly to Weaver after August 7, 2018 would be in direct violation of RCS' Agency Operations Manual and subject Credit Control to discipline. *See id.*

**STANDARD**

Summary judgment is appropriate when "the pleadings, deposition, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "No genuine issue of material fact exists when a rational trier of fact could not find for

the nonmoving party even when the record as a whole is viewed in the light most favorable to the nonmoving party." *Ritchie v. Glidden Company*, 242 F.3d 713, 720 (7th Cir. 2001). Once the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986). If the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial, summary judgment must be granted. *Celotex*, 477 U.S. at 322-23.

## ARGUMENT

### I. THE NONTESTIFYING PLAINTIFFS CANNOT ESTABLISH ESSENTIAL ELEMENTS OF THEIR CLAIMS.

It is Plaintiffs' burden to establish each element of their respective FDCPA claims. *See Burton v. Kohn Law Firm., S.C.*, 934 F.3d 572, 579 (7th Cir. 2019). To establish a prima facie case under the FDCPA, Plaintiffs must prove: (1) that they are each a consumer who was harmed; (2) that the debts sought to be collected arose from a transaction entered primarily for personal, family or household purposes; (3) that defendants are debt collectors; and (4) that defendants violated a provision of the FDCPA. *See Pantoja v. Portfolio Recovery Assocs., LLC*, 78 F. Supp. 3d 743, 745 (N.D. Ill. 2015). As explained in more detail below, Plaintiffs' testimony is necessary to establish the first, second, and fourth elements. Because Stewart, Hundley, Weaver, Kenneth Chappelle, James Lee, Joan Martin, Diane Benjamin, Barbara Staluppi, Roberta Salav, Francis Emery, Luz Senquiz, Mirta Alvarado, Donna Lindsey, Joyce Young, Debra Pray, Anita Rivera, Earnestine Jones, Estela Munguia, Robert Morin, Valicia Gentry, Francis Spininello, Jr., Renee Stasik, Rita McBride, Robert Martin, Sherry Key, Albert DiCresce, Jackie Adams, Shelia Mahoney, Gene Side, Jr., and Lewis Shellenberger (collectively,

the "Non-Testifying Plaintiffs") are barred from testifying in this matter, these thirty (30) Plaintiffs cannot establish the necessary elements. *See* Dkt. #44. Thus, judgment is warranted in Defendants' favor as to each of the Non-Testifying Plaintiffs' claims.

### A.  No Evidence of Harm.

"The elements of standing are well settled: the plaintiff must allege an injury in fact that is traceable to the defendant's conduct and redressable by a favorable judicial decision." *Casillas v. Madison Ave. Assocs.*, 926 F.3d 329, 333 (7th Cir. 2019) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). "If the plaintiff does not claim to have suffered an injury that the defendant caused and the court can remedy, there is no case or controversy for the federal court to resolve." *Id.* Importantly, "the fact that Congress has authorized a plaintiff to sue a debt collector who 'fails to comply with any requirement [of the FDCPA],' does not mean that [a plaintiff] has standing." *See id.* (citing *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016)). "Thus, [Plaintiffs] cannot demonstrate standing simply by pointing to [the claimed] procedural violation[s]." *Id.* Rather, they "must show that the violation harmed or presented an appreciable risk of harm to the underlying concrete interest that Congress sought to protect." *Id.* (internal quotations omitted). Here, the Non-Testifying Plaintiffs cannot testify that Defendants' purported actions harmed or posed any real risk of harm to their respective interests under the FDCPA or otherwise affected them. For example, they cannot testify they even read the alleged collection letters[4] or in fact refused to pay the debts. *See id.* at 335 ("[plaintiff] did not allege that she even read the disclosures, much less that she relied on it to her detriment"); *Crabtree v. Experian Info. Sols., Inc.*, 2020 U.S. App. LEXIS 2698, *11-15 (7th Cir. Jan. 28, 2020) (plaintiff must demonstrate statutory violation "affected" her in some way to establish a concrete injury);

---

[4] As a result of the age and disability status of many of their clients, LASPD knows that some of their clients may not be handling their own mail. *See* SMF ¶32. Thus, it is plausible, if not likely, that many of the Non-Testifying Plaintiffs never read or even knew of the debt collection communications at issue.

*Tourgeman v. Nelson & Kennard*, 735 Fed. Appx. 340, 341 (9th Cir. 2018) ("An alleged harm based on letters that [plaintiff] never received, saw, or even knew existed cannot satisfy Article III's concreteness requirement."); *Pozzuolo v. Portfolio Recovery Assocs.*, LLC, 371 F. Supp. 3d 217, 224 (E.D. Pa. 2019) (where plaintiff admitted he was not harmed by letter he lacked standing despite violation of FDCPA). Thus, the Non-Testifying Plaintiffs are left to rely on the claimed procedural injury alone, which is insufficient to satisfy Article III injury requirements.

### B.  Insufficient Evidence a "Debt" was Incurred.

As explained *supra*, Plaintiffs must demonstrate that the obligations incurred on their respective credit cards were primarily for personal, family or household purposes. *See* 15 U.S.C. § 1692a(5). Arguably, the only persons or parties with personal knowledge of the purpose for the purchases are the respective Plaintiffs.[5] *See* Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."). Thus, absent testimony from Plaintiffs as to the intended and ultimate purpose of the unpaid obligations charged to their respective credit cards, Plaintiffs cannot satisfy their burden of establishing a "debt" -- as that term is defined by the FDCPA.

Indeed, that the debts were characterized by the original creditors as defaulted "consumer" debts at the time of sale to LVNV does not conclusively establish the consumer nature of the debts, as Plaintiffs will foreseeably contend. *See Riviere v. Banner Chevrolet*, 184

---

[5] In *Miller*, the Seventh Circuit held the relevant time for determining the nature of the debt is when the debt first arose. *See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols, & Clark, LLC*, 214 F.3d 872, 875 (7th Cir. 2000). In the case of a loan, as was the case in *Miller*, the moment the loan is issued and the moment the debt is incurred are one and the same. *See id.* In that scenario, the creditor is "likely to know whether the debt was personal or commercial." *Id.* A credit card transaction is slightly different, however: no money is owed at the moment the account is opened. Rather, the debt is not incurred until the card is used. Clearly, a credit card issuer cannot foresee a cardholder's future misuse in violation of the terms of the credit card agreement. Consequently, and as explained in more detail *infra*, even the original creditor's characterization of a credit card as "consumer" cannot be dispositive of whether a "debt" – as that term is defined by the FDCPA – was in fact incurred.

F.3d 457, 462 (5th Cir. 1999) ("That the documents relevant to this transaction label it as 'consumer' is not dispositive. The few cases that address this issue look to the substance of the transaction and the borrower's purpose in obtaining the loan, rather than the form alone.");[6] *Bloom v. I.C. Sys., Inc.*, 972 F.2d 1067, 1068 (9th Cir. 1992) ("The fact that a loan is informal or that the lender may have loaned the money for personal reasons does not make it a personal loan under the FDCPA. The Act characterizes debts in terms of end uses, covering debts incurred 'primarily for personal, family or household purpose.' Neither the lender's motives nor the fashion in which the loan is memorialized are dispositive of this inquiry."); *Burton v. Kohn Law Firm S.C.*, 2018 U.S. Dist. LEXIS 62821, *6, 14-15 (E.D. Wisc. Apr. 13, 2018) ("[W]hat matters is the actual charges made that incurred the debt, not necessarily the original credit agreement. For example, if [plaintiff] would have applied for a business credit card, but used it for personal or household use, it would be consumer debt covered under the FDCPA. Thus, the e-mail from Citibank [describing the underlying account as a 'consumer account'] does not provide a factual dispute of whether a consumer debt exists.").[7] Similarly, any treatment of the debts by

---

[6] *Riviere* is a Truth in Lending Act case. However, because the FDCPA was enacted as an amendment to the Consumer Credit Protection Act, 15 U.S.C. § 1601 *et seq.*, courts have been guided by decisions interpreting the term "debt" under other subchapters of the Consumer Credit Protection Act, such as the Truth-in-Lending Act. *See Battye v. Child Support Servs.*, 873 F. Supp. 103, 105 (N.D. Ill. 1994).

[7] *See also Prowell v. Cam Credits, Inc.*, 2015 U.S. Dist. LEXIS 61943, *15 (D. Ore. Mar. 6, 2015) ("When determining the type of debt, courts must treat substance over form. . . .[T]he question is whether the debts were incurred primarily for personal purposes, focusing on the end use of the debt."); *Davis v. Hollins Law*, 968 F. Supp. 2d 1072 (E.D. Cal. 2013) (declining to categorically exempt "business" credit cards from the obligations of the FDCPA because "[t]he fact that the obligation was extended for business purposes is relevant to the inquiry, but is not, as defendant would have it, dispositive. . . . [T]he standard applied herein cuts both ways. An individual who obtains a credit card (or other debt obligation) under the pretense that it is for personal purposes, but uses it primarily to finance business expenditures, cannot then seek the [protections of the FDCPA]."); *Clark v. Brumbaugh & Quandahl, P.C.*, 731 F. Supp. 3d 915, 922 (D. Neb. 2010) ("the Court must focus on the nature of the debt that was incurred, and not the purpose for which the Account was opened"); *Perk v. Worden*, 475 F. Supp. 2d 565, 569 (E.D. Va. 2007) ("[T]he FDCPA is concerned with the substance of the transaction as opposed to the form . . . . the debt at issue was not actually incurred until Plaintiff used the card, as opposed to when Plaintiff applied for the card. Although Plaintiff applied for a corporate card, she did not incur the debt until it was used . . . .

Defendants and/or the Debt Collectors as consumer debts does not evidence that the debts are in fact subject to the protections of the FDCPA. *See Burton*, 934 F.3d at 581-82 ("merely including FDCPA disclaimers on debt collection letters is insufficient evidence that the debt was a consumer debt because debt collectors may be exercising caution and including disclaimers on all communications with debtors simply to avoid any FDCPA liability") (citing *Gburek v. Litton Loan Serv. LP*, 614 F.3d 380, 386 n.3 (7th Cir. 2010) (noting that evidence that letter included disclaimer identifying it as attempt to collect a debt "does not automatically trigger the protections of the FDCPA")).

### C.  Insufficient Evidence to Demonstrate a Violation of the FDCPA.

"Plainly, if [a plaintiff] was not represented with respect to the relevant debt, [a defendant] cannot have violated § 1692c(a)(2)." *See Dore v. Five Lakes Agency, Inc.*, 2015 U.S. Dist. LEXIS 88338, *9 n.6 (N.D. Ill. July 8, 2015); *see also Montgomery v. Shermeta*, 885 F. Supp. 3d 849, 854 (W.D. Mich. 2012) (holding plaintiff "must establish that he was represented by an attorney with respect to the debt" to establish violation of § 1692c(a)(2)); *McKeown v. Mary Jane M. Elliot P.C.*, 2007 U.S. Dist. LEXIS 90481, *17 (E.D. Mich. Dec. 10, 2007) ("the burden is on each Plaintiff to establish that each was represented by an attorney and that Defendant had actual knowledge of the representation" (emphasis added)). Here, absent Plaintiffs' testimony, Plaintiffs cannot establish that LASPD represented them. *See* SMF[8] ¶37 (LASPD cannot authenticate retainer contracts). Moreover, absent proof that LASPD represented

---

Plaintiff may well have violated the terms of the corporate credit card agreement by incurring personal debt with it, but that fact, even if true, cannot change the character of the debt and take it out of the FDCPA's jurisdiction."); *Holman v. West Valley Collection Servs.*, 60 F. Supp. 2d 935 (D. Minn. 1999) (determining debt was commercial when a personal credit card was used to purchase equipment used in business); *Berman v. GC Servs. Ltd. Pshp.*, 1997 U.S. Dist. LEXIS 9558, *4 (N.D. Ill. June 27, 1997) ("The Act characterizes debts in terms of end uses.") (internal quotations omitted).

[8] "SMF" refers to the Statement of Material Facts Not in Dispute set forth *supra*.

them, Plaintiffs cannot establish that they directed collection communications to cease. As such, the Non-Testifying Plaintiffs cannot establish a violation of either § 1692c(a)(2) or § 1692c(c).

## II. NON-TESTIFYING PLAINTIFFS HUNDLEY, STEWART & WEAVER'S FDCPA CLAIMS FAIL FOR AN ADDITIONAL REASON NOTWITHSTANDING THE SECOND ALLEGED OFFENDING COMMUNICATION.

The record reflects that on September 5, 2018 -- the date LASPD allegedly notified Halsted of Hundley's representation and cease request, Hundley's account was no longer being serviced by Halsted but rather was being serviced by Alltran -- who sent Hundley a letter that same date and thereafter on October 22, 2018. *See* SMF ¶18; Dkt. #24 at ¶¶76-78; Dkt. #24-9 at p. 2; Dkt. #25 at p. 3-4. Similarly, the record reflects that on July 24, 2018 -- the date LASPD allegedly notified Allied of Stewart's representation and cease request, Stewart's account was no longer being serviced by Allied. *See* SMF ¶20; Dkt. #24 at ¶¶28-30; Dkt. #24-8 at p. 17; Dkt. #25 at p. 2. The record is also devoid of any evidence that Defendants received notice from either Halsted or Allied of the alleged representation and cease request. While "[a]n agent's knowledge generally is imputed to the principal," even accepting that debt collectors are agents of those on whose behalf they collect debts,[9] neither Halsted nor Allied was acting on behalf of or for the benefit of Defendants with respect to Hundley or Stewart at the time the LASPD letters were allegedly sent to them. *See Knauer v. Jonathon Roberts Rin. Group, Inc.*, 2002 U.S. Dist. LEXIS 20978, *24 (S.D. Ind. Sept. 30, 2002). Thus, any knowledge they purportedly obtained regarding representation or a cease request cannot be imputed to Defendants. *See United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992) (explaining that agent must be acting within scope of agency -- i.e. for the benefit of the principal -- to impute knowledge to principle).

---

[9] Arguably, debt collectors are independent contractors rather than agents. *See Randolph v. IMBS, Inc.*, 368 F.3d 726, 729 (7th Cir. 2004) ("debt collectors are independent contractors").

The record also does not support that Defendants were otherwise notified of the representation or cease requests purportedly sent on behalf of Hundley and Stewart. Unlike many of the letters at issue in this case which purport to copy Bahner, the letter purportedly sent to Halsted on behalf of Hundley did not copy Bahner. *See* Dkt. #24-9 at p. While Stewart's letter did purport to copy Bahner, as explained *supra*, Bahner was no longer employed by RCS at the time of the claimed communication and the fax number was not in active use by RCS. *See* SMF ¶¶48, 50. Because the record does not support that Defendants were ever notified of Hundley or Stewart's representation or cease request, their §§ 1692c(a)(2) and 1692c(c) claims fail for this additional reason. *See* 15 USC §§ 1692c(a)(2), (c) (prohibiting communications with a consumer "if the debt collector *knows* the consumer is represented by an attorney" and/or "[i]f a consumer *notifies* a debt collector in writing . . . that the consumer wishes the debt collector to cease further communications with the consumer") (emphasis added).

As for Weaver, the second communication alleged to have been sent to her is not on its face "in connection with the collection of any debt." *See* 15 U.S.C. § 1692c. "Generally speaking, a communication from a debt collector to a debtor is not covered by the FDCPA unless it is made 'in connection with the collection of any debt.'" *See Gburek*, 614 F.3d at 382 (citing 15 U.S.C. § 1692c). Here, the second communication alleged to have been sent by Credit Control after it was purportedly notified of representation and a cease request, solely requests hardship documentation and does not demand payment or otherwise attempt to induce payment. *See* Dkt. #25 at p. 5; *Gburek*, 614 F.3d at 385 ("*Horkey* clarifies that a communication need not make an explicit demand for payment in order to fall within the FDCPA's scope; rather, that a communication made specifically to induce the debtor to settle her debt will be sufficient to trigger the protections of the FDCPA.") (citing *Horkey v. JVDB & Associates*, 333 F.3d 769, 774

(7th Cir. 2003)). Rather, the entire purpose and context of the alleged communication – when viewed objectively – reflects only an attempt to obtain additional information about Weaver's claimed inability to pay. *Ruth v. Triumph P'ships*, 577 F.3d 790, 798 (7th Cir. 2009) (holding that the standard for evaluating whether a communication is made in connection with the collection of a debt is an objective one). Moreover, the statement in the letter that the letter was "an attempt to collect a debt" is insufficient on its own to bring the letter within the scope of the statute. *See Gburek*, 614 F.3d at 386 n.3 ("The letter bore a disclaimer identifying it as an attempt to collect a debt, but this does not automatically trigger the protections of the FDCPA, just as the absence of such language does not have dispositive significance.").

## III.   NON-TESTIFYING PLAINTIFF VALICIA GENTRY'S CLAIMS ALSO FAIL FOR AN ADDITIONAL REASON.

Non-Testifying Plaintiff Valicia Gentry's FDCPA claims are entirely contingent on her having provided notice of attorney representation and cease request to the original creditor – Capital One. Despite allegations that LASPD sent a letter to Capital One, the record only reflects that a letter was ever sent to Alliance One Receivables Management, Inc. ("Alliance One"). *Compare* Dkt. #24 at ¶123 *with* Dkt. #24-5 at p. 2. The record is devoid of any evidence to support that notice to Alliance One somehow constituted notice to Capital One. Thus, the facts do not support Plaintiff's theory of liability.

## IV.   THE RECORD DOES NOT SUPPORT A VIOLATION OF THE FDCPA WITH RESPECT TO PENNELL.

Pennell alleges that on January 29, 2018, LASPD notified Credit Control that Pennell was represented by LASPD and that all future communications should be directed to LASPD's office. *See* Dkt. #24 at ¶11; Dkt. #24-3 p. 3. Pennell further alleges that notwithstanding said notice of representation, Defendants had another debt collector, L&M, send Pennell a collection

letter dated April 11, 2018 demanding payment. *See* Dkt. #24 at ¶12. The record, however, reflects that L&M reached out to LASPD first before ever contacting Plaintiff directly, and that LASPD failed to respond to the communication within a reasonable period of time. *See* SMF ¶¶14-15. Thus, Pennell's § 1692c(a)(2) claim fails as a matter of law. *See* 15 U.S.C. § 1692c(a)(2) (prohibiting debt collectors from communicating directly with a consumer known to be represented by an attorney "*unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector*" (emphasis added)).

As to Pennell's § 1692c(c) claim, Pennell cannot establish that she *notified Defendants* in writing that she refused to pay the debt. *See* 15 U.S.C. 1692c(c) (prohibiting communications only when the consumer notifies *the debt collector* in writing). Rather the record only reflects that Pennell ever notified Credit Control of her request that communications cease. *See* Dkt. #24-3 at p. 3. Similar to Weaver and Stewart, Credit Control was not acting on behalf of Defendants at the time LASPD sent Credit Control the letter. *See* SMF ¶¶10-11. Although, admittedly, RCS ultimately obtained a copy of the letter from Credit Control, that does not relieve Pennell of her burden of demonstrating that *she notified* Defendants in writing of the cease request.

Judgment is also warranted in favor of Defendants on Pennell's § 1692c(c) claim because a cease request does not prevent a debt collector from communicating with a consumer's attorney – even in connection with the collection of a debt. *See* 15 U.S.C. 1692c(c) (prohibiting further communications "with the consumer"); *Tinsley v. Integrity Fin. Partners, Inc.*, 634 F.3d 416, 419 (7th Cir. 2011) ("[W]e conclude that § 1692c as a whole permits debt collectors to communicate freely with consumers' lawyers. A debtor who does not want to be pestered by demands for payment, settlement proposals, and so on, need only tell his lawyer not to relay

them.").[10] Here, L&M (and in turn Defendants) did just what LASPD requested, they communicated with LASPD's office. *See* Dkt. #24-3 at p. 3. When LASPD failed to respond and confirm that LASPD in fact represented Pennell with respect to the debt, however, the assumption that the cease request was valid no longer rang true. Simply speaking, if LASPD did not in fact represent Pennell, it had no basis to make the cease request on her behalf. Thus, when the attorney failed to confirm representation, there was no longer any basis for concluding that the cease request came from Pennell. Notably, that the cease request may not have in fact come from Pennell is not that big of a stretch considering other persons or entities had sent instructions on behalf of Pennell without her permission before. *See* SMF ¶¶8-9.

## V.      A CEASE REQUEST TO A CREDITOR HAS NO LEGAL EFFECT.

"A distinction between creditors and debt collectors is fundamental to the FDCPA, which does not regulate creditors' activities at all." *Randolph*, 368 F.3d at 729. As such, a refusal to pay or other cease request directed to an original creditor has no legal effect.[11] *See Zachial v. Cascade Capital, LLC*, 2019 U.S. Dist. LEXIS 167666, *4 (N.D. Ill. Sept. 30, 2019) (§ 1692c(c) "only restricts a debt collector's communications with the consumer if the consumer 'notifies the ***debt collector*** in writing' that she wants the debt collector to cease contacting her") (emphasis in original) (citing 15 U.S.C. § 1692c(c)). Thus, even to the

---

[10] In *Tinsley*, the plaintiff's lawyer sent the debt collector a letter substantively identical to the LASPD letters at issue, stating that the debtor refused to pay, requesting that all collection activities cease, and asking that all future communications be directed to the lawyer's office. *Tinsley*, 634 F.3d at 416. The debt collector refrained from contacting the debtor but did call the lawyer with a request for payment. *Id.* The debtor sued, alleging that the collector violated § 1692c(c) by contacting the lawyer. *Id.* The Seventh Circuit rejected the debtor's position. *Id.* at 419.

[11] Indeed, even the representative for LASPD testified he is not aware of any law that would require original creditors to cease collection attempts after receiving the LASPD letters at issue. *See* **Exhibit D** at 113:16-20. Moreover, given the narrow scope of LASPD's representation (*see* § VI *infra*), the cease request on its face does not apply to subsequent purchasers, such as LVNV.

extent this Court were to accept Plaintiffs' argument that by purchasing the debts LVNV assumed the knowledge that came with the LASPD letters purportedly sent to the original creditors, there were no obligations imposed on the original creditors as a result of the claimed refusals to pay. *See id.* ("[B]y its plain language, § 1692c(c) only imposes a duty on a debt collector when the consumer has contacted the debt collector, not when the consumer has contacted the original creditor."); *see also Scott v. Durham*, 772 F. Supp. 2d 978, 980 (N.D. Ind. 2011) ("a valid assignment gives the assignee *neither greater nor lesser rights* than those held by the assignor"). Thus, the twenty-nine (29) Plaintiffs whose § 1692c(c) claims rely entirely on a cease notice having been provided to the original creditor[12] have failed to establish a § 1692c(c) violation as a matter of law.

## VI. NO EVIDENCE TO SUPPORT THAT THE ORIGINAL CREDITORS NOTIFIED DEFENDANTS OF ATTORNEY REPRESENTATION FOR ANY PLAINTIFF APART FROM EMERY.

There is no evidence in this case that the LASPD communications claimed to have been sent to the original creditors were included in the information transmitted by the original creditors to LVNV upon purchase of the subject debts. Plaintiffs will presumably contend that this lack of evidence is irrelevant based on the argument that any knowledge held by the original creditors was imputed to LVNV as the assignee of the debts. Any such argument is contrary to prevailing law, however. While admittedly, "the assignee steps into the shoes of the assignor, assuming his rights as well as his duties," as this Court previously opined in another lawsuit filed by Pennell: knowledge "is neither a right nor a liability; it is a 'state of mind.'" *Pennell v. Global Trust Mgmt., LLC*, 2019 U.S. Dist. LEXIS 141827, *4 (S.D. Ind. Aug. 20, 2019) (quoting *Olvera v. Blitt & Gaines, P.C.*, 431 F.3d 285, 288 (7th Cir. 2005); *Knowledge*, BLACK'S LAW

---

[12] i.e. all Plaintiffs with the exception of Stewart, Hundley, Weaver and Pennell. Pennell's § 1692c claims nonetheless fail for the reasons explained in § IV *supra*; while Stewart, Hundley and Weaver's § 1692c claims fail for the reasons explained in §§ I and II *supra* and § IX *infra*.

DICTIONARY (11th ed. 2019)). Accordingly, "[a] debt purchaser does not acquire the seller's knowledge—or any other state of mind—any more than a homebuyer acquires the seller's neighborly grudges or fond memories of last year's block party." *See id.*

It is well settled in this Circuit that § 1692c(a)(2) is violated only where the debt collector, rather than the creditor, has <u>actual</u> knowledge of the debtor's legal representation. *See Randolph*, 368 F.3d at 729-30 ("the statute asks what the debt collector knows, not what the creditor knows"); 15 U.S.C. § 1692c(a)(2) (prohibiting direct communications "if the ***debt collector knows***" the person is represented) (emphasis added). Thus, courts, including this Court, who have ruled on similar claims have held that absent evidence the defendant debt collectors themselves were notified of the representation of counsel, defendants cannot be held liable under § 1692c. *See e.g.*, *Pennell*, 2019 U.S. Dist. LEXIS 141827 at *4 (granting summary judgment in favor of defendants on nearly identical fact pattern); *Martinez v. Johnson*, 2013 U.S. Dist. LEXIS 35826 (D. Utah Mar. 14, 2013) ("[D]efendants are not presumed to know everything known by Capital One. Absent some evidence that [defendants] were themselves notified that [plaintiff] was represented by counsel, the defendants cannot be held liable under § 1692c for making direct contacts with a represented debtor."); *see also Keisler v. Encore Receivable Mgmt.*, 2008 U.S. Dist. LEXIS 31987, *12 (S.D. Ind. Apr. 17, 2008) ("knowledge in the hands of [the creditor] is not knowledge in the hand of [a debt collector]").

It is further worth noting that a debt collector must have knowledge not just that the debtor is represented by counsel generally, but that he or she is represented in connection with the *specific debt* at issue. *See* 15 U.S.C. § 1692c(a)(2) (prohibiting direct communications "if the debt collector knows the consumer is represented by an attorney ***with respect to such debt***") (emphasis added). Here, the LASPD letters alleged to have been directed to the original creditors

26

and debt collectors by their plain language only advise that LASPD represents the respective Plaintiffs regarding the ***original creditors' and Debt Collectors' respective attempts to collect*** the debts at issue. *See* Dkt. #24-3; Dkt. #24-4; Dkt. #24-5 ("Please be advised that we represent [plaintiff] regarding ***your firm's attempts to collect*** the above-referenced debt.") (emphasis added). Thus, even had Defendants received copies of the LASPD letters from the original creditors and/or Debt Collectors, the LASPD letters do not support that Defendants *knew* Plaintiffs were represented with respect to the Accounts or any other person or entity's attempts to collect the Accounts.

*McKeown* is instructive. The *McKeown* court analyzed similar LASPD letters and concluded based on the letters alone, plaintiffs were unable to demonstrate that defendants had actual knowledge of LASPD's representation "with respect to such debt." *McKeown*, 2007 U.S. Dist. LEXIS 90481 at *15-18 (holding that the evidence viewed in the light most favorable to those plaintiffs whose claims pursuant to § 1692c relied entirely on the LASPD correspondence did "not establish a triable issue of fact that each was represented by an attorney, or that [d]efendant had actual knowledge of same"). In reaching that conclusion, the court reasoned that the letters "are ambiguous at best" as they do not "unequivocally state that [LASPD] represents Plaintiffs with respect to the debt" but rather state that the "objective is to try to persuade [the recipient] to cease any further collection activity. *Id.* at *15.

As to Plaintiff Emery, however, attorney information was admittedly provided to Defendants upon the sale of the Accounts as part of that Plaintiff's respective Sale File.[13] *See* SMF ¶6. But because there is no evidence to support that Defendants were provided attorney information for any Plaintiff apart from Emery, there is no evidence that Defendants knew the

---

[13] As explained *supra*, judgment is nonetheless warranted against Zervos on his § 1692c(a)(2) claim because as a Non-Testifying Plaintiff he cannot prove other essential elements of the claim.

remaining Plaintiffs were represented by an attorney at the time the debts were purchased.  Thus, judgment is warranted as a matter of law in Defendants' favor as to the other twenty-eight (28) Plaintiffs whose § 1692c(a)(2) claims are premised entirely on notice of representation having been supplied to the original creditor.

## VII.   NO VIOLATION AS TO REITZ REGARDLESS.

Regardless of whether this Court finds that notice of representation or cease request to the original creditor constitutes notice to the debt collector, Plaintiffs must nonetheless demonstrate that they are represented by an attorney to establish a violation of § 1692c(a)(2). *See Dore*, 2015 U.S. Dist. LEXIS 88338 at *9 n.6; *McKeown*, 2007 U.S. Dist. LEXIS 90481 at *17. Here, Reitz specifically denies that LASPD represented her with respect to LVNV and/or RCS's collection activities. *See* SMF ¶47. Thus, she cannot establish Defendants violated § 1692c(a)(2) when she was contacted purportedly on Defendants' behalf. Moreover, because LASPD did not represent Reitz as to Defendants' purported collection activities -- LASPD was not her agent for purposes of sending the cease request, and thus Reitz cannot establish that she provided notice of her cease request so as to support her § 1692c(c) claim. *See* 15 U.S.C. § 1692c(c).

## VIII.   <u>LEGAL</u> REPRESENTATION IS AN ELEMENT OF § 1692c(a)(2).

This case raises questions as to the intended meaning of "represented by an attorney" as used in § 1692c(a)(2). "As with all questions of statutory interpretation, we start with the text of the statute to ascertain its plain meaning." *Jackson v. Blitt & Gaines, P.C.*, 833 F.3d 860, 863 (7th Cir. 2016). When interpreting § 1692e(3) -- another FDCPA section involving the term "attorney," the Seventh Circuit interpreted the term to mean a lawyer exercising the functions of a lawyer, including professional judgment.[14] *See Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996).

---

[14] Thus, should this Court agree that LASPD paralegals rather than LASPD attorneys represent LASPD clients (as explained next), judgment should be entered in Defendants' favor on all claims.

The same interpretation should apply to § 1692c(a)(2). *See In re Merchants Grain, Inc.*, 93 F.3d 1347, 1353-54 (7th Cir. 1996) ("according to the conventional rules of statutory construction: absent statutory definitions, we accord words and phrases their ordinary and natural meaning and avoid rendering them meaningless, redundant, or superfluous").

### A.   *The Services Provided by LASPD are Not Legal in Nature.*

"Practicing law is defined in Illinois as the giving of advice or rendition of any sort of service which requires the use of any degree of legal knowledge or skill." *United States v. Hardy*, 681 F. Supp. 1326, 1328 (N.D. Ill. 1988) ("If the advice offered or service provided requires more than ordinary business intelligence, it constitutes the practice of law."). Likewise, in Indiana absent the exercise of "legal knowledge or discretion" a service is considered nonlegal and does not constitute the practice of law. *Charter One Mortg. Corp. v. Condra*, 865 N.E.2d 602, 606 (Ind. 2007). Here, LASPD does not represent its clients in settlement/payment negotiations or legal proceedings – services which would require legal knowledge and skill. *See* SMF ¶39. Rather, the only service provided by LASPD is to send a form "go-away" letter to its clients' creditors. *See* SMF ¶41. Such services clearly do not require any degree of legal knowledge, skill or professional judgment and as such do not constitute legal services.[15] Because LASPD does not act in any legal capacity on behalf of its clients it does not satisfy the attorney representation element of § 1692c(a)(2).

### B.   *Alternatively, To the Extent Legal Services are Provided, Such Services Seemingly Constitute the Unauthorized Practice of Law.*

At all relevant times, Plaintiffs, with the exception of Pennell, have resided in Arkansas, California, Colorado, Connecticut, Florida, Iowa, Kentucky, Massachusetts, Michigan,

---

[15] Reitz provided notable testimony on this point in explaining the difference between services provided by Philipps and those provided by LASPD. *See* **Exhibit F** at 27:15-28:2 ("Different, yeah, they're different because they're doing legal things, actually doing things representing me . . . Q. So they're actually representing you in a legal sense? A. That's how I feel.  Q. As opposed to LASPD? A. Yes.").

Mississippi, Nevada, New Jersey, New York, North Carolina, Ohio, Oklahoma, Oregon, Pennsylvania, South Carolina, Texas, Utah and West Virginia. *See* SMF ¶1. Each of these states requires membership in its own state bar before a person may practice law there.[16] The practice of law is also interpreted broadly in each of the states to cover any legal services which may have

---

[16] *See Undem v. State Board of Law Examiners*, 266 Ark. 683, 695 (1979) ("The prohibition against engaging in the practice of law applies to all except those who are members of the Bar of the State of Arkansas."); Cal. Bus. & Prof. Code § 6125 ("No person shall practice law in California unless the person is an active licensee of the State Bar."); Colo. R. Prof'l Cond. 5.5 (a lawyer shall not practice law in this jurisdiction without a license to practice law issued by the Colorado Supreme Court); Conn. Gen. Stat. § 51-88 (prohibiting the practice of law by persons not admitted as attorneys); Fla. Stat. § 454.23 ("[a]ny person not licensed or otherwise authorized to practice law in this state who practices law in this state or holds himself or herself out to the public as qualified to practice law in this state . . . commits a felony"); *Bergantzel v. Mlynarik*, 619 N.W.2d 309, 312 (Iowa 2000) ("persons desiring to practice law in Iowa [must] be admitted to the bar"); Ky. Rev. Stat. Ann. § 524.130 ("a person is guilty of unlawful practice of law when, without a license issued by the Supreme Court, he engages in the practice of law, as defined by rule of the Supreme Court"); *Mass. Conveyancers Ass'n v. Colonial Title & Escrow*, 2001 Mass Super. Lexis 431, *11-12 (June 5, 2001) (the privilege of practicing law is extended only to those admitted to practice by the Massachusetts judiciary); MCL § 600.916 ("A person shall not practice law or engage in the law business . . . unless the person is regularly licensed and authorized to practice law in [Michigan]."); Miss. Code Ann. § 73-3-55 (unlawful for any person to engage in the practice of law in Mississippi who has not been licensed according to Mississippi law); Nev. Rev. Stat. § 7.285 ("A person shall not practice law in this state if the person: (a) is not an active member of the State Bar of Nevada or otherwise authorized to practice law in this state pursuant to the rules of the Supreme Court . . . ."); *State v. Bander*, 56 N.J. 196, 200 (1970) (New Jersey constitution limits the practice of law to those admitted by the New Jersey Supreme Court); NY CLS Jud. § 478 (the practice of law is reserved to duly licensed New York attorneys); N.C. Gen. Stat. § 84-4 (unlawful for persons "except active members of the Bar of the State of North Carolina admitted and licensed to practice as attorneys" to hold themselves out as qualified to give legal advice or to furnish the services of a lawyer); Ohio Gov. Bar. R. VII(2)(A) (the unauthorized practice of law is the rendering of legal services for another by any person not admitted to practice in Ohio); 5 OK Stat § 5-12 (the Supreme Court of Oklahoma has exclusive power to admit persons to practice law in the State of Oklahoma); ORS § 9.160 ("a person may not practice law in [Oregon], or represent that the person is qualified to practice law in [Oregon], unless the person is an active member of the Oregon State Bar"); PA Stat. § 2524 (any person who within the Pennsylvania Commonwealth shall practice law or hold himself out to the public as being entitled to practice law without being licensed by Pennsylvania courts commits a misdemeanor); S.C. Code § 40-5-310 ("No person may either practice law or solicit the legal cause of another person or entity in this State unless he is enrolled as a member of the South Carolina Bar pursuant to applicable court rules, or otherwise authorized to perform prescribed legal activities by action of the Supreme Court of South Carolina."); Tex. Gov't Code § 102(a) ("a person may not practice law in this state unless the person is a member of the state bar"); UT Sup. Ct. R. 14-802(a) ("only persons who are active licensed members of the Bar in good standing may engage in the practice of law in Utah"); W. Va. Code § 30-2-4 (unlawful for any person to practice law in West Virginia "without first having been duly and regularly licensed and admitted to practice law" in West Virginia).

been provided by LASPD to the Plaintiffs.[17] Despite not employing attorneys holding a license

in any of those states, however, LASPD claims to have provided services to the out-of-state

---

[17] *See Undem*, 266 Ark. at 692 ("the practice of law is not confined to service by an attorney in a court of justice; it also includes any service of a legal nature rendered outside of courts and unrelated to matters pending in the courts. . . . the giving of legal advice in general constitute[s] the practicing of law"); *Agran v. Shapiro*, 127 Cal. App. 2d Supp. 807, 812 (1954) (""the practice of law . . . includes legal advice and counsel"); *People v. Shell*, 148 P.3d 162, 171 (Colo. 2006) (the practice of law is defined as "acting in a representative capacity in protecting, enforcing, or defending the legal rights and duties of another and in counseling, advising and assisting him in connection with these rights and duties") (internal quotations omitted); *Statewide Griev. Comm. v. Patton*, 239 Conn. 251, 254 (1996) (practice of law includes "the giving of legal advice"); *Fla. Bar Re Advisory Opinion-Activities of Cmty. Ass'n Managers*, 681 So. 2d 1119, 1123 (Fla. 1996) ("[T]he practice of law also includes the giving of legal advice and counsel to others as to their rights and obligations under the law and the preparation of legal instruments, including contracts, by which legal rights are either obtained, secured or given away, although such matters may not then or ever be the subject of proceedings in a court.") (internal quotations omitted); *Iowa Supreme Court Comm'n on Unauthorized Practice of Law v. Sullins*, 2017 Iowa Sup. LEXIS 32, *21, 30 (2017) (practice of law includes "giving of legal advice and counsel to other relating to their rights and obligations under the law" . . . . One who, in a representative capacity, engages in the business of advising clients as to their rights under the law, or while so engaged, performs any act or acts either in court or outside of court for that purpose, is engaged in the practice of law.") (internal quotations omitted); Ky Sup. Ct. R. 3.020 ("The practice of law is any service rendered involving legal knowledge or legal advice, whether of representation, counsel or advocacy in or out of court, rendered in respect to the rights, duties, obligations, liabilities, or business relations of one requiring the services."); *Mass. Conveyancers*, 2001 Mass Super. Lexis 431 at *14 (" [T]he practice of law,' in general, consists of: directing and managing the enforcement of legal claims and the establishment of the legal rights of others, where it is necessary to form and to act upon opinions as to what those rights are and as to the legal methods which must be adopted to enforce them, the practice of giving or furnishing legal advise as to such rights and methods . . . ."); *Grand Rapids Bar Ass'n v. Denkema*, 290 Mich. 56, 62-63 (1939) ("According to the generally understood definition of the practice of law in this country, it embraces . . . all advice to clients and all action taken for them in matters connected with the law."); *Miss. Bar v. Thompson*, 5 So. 3d 330, 337 n.10 (Miss. 2008) ("any exercise of intelligent choice in advising another of his legal rights and duties brings the activity within the practice of the legal profession"); *In re Lerner*, 124 Nev. 1232, 1234 (2008) ("the practice of law is involved when the activity requires the exercise of judgment in applying general legal knowledge to a client's specific problem"); *Stack v. P.G. Garage, Inc.*, 7 N.J. 118, 120-21 (1951) ("The practice of law is . . . engaged in whenever and wherever legal knowledge, training, skill and ability are required."); *In re Rowe*, 80 N.Y.2d 336, 341-42 (1992) ("The practice of law involves the rendering of legal advice and opinions directed to particular clients."); N.C. Gen. Stat. § 84-2.1 (the phrase "practice law" is defined to include performing any legal service for any other person with or without compensation specifically including advising or giving opinion upon the legal rights of any person); *Cincinnati Bar Ass'n v. Telford*, 85 Ohio St. 3d 111, 112-13 (1999) ("The practice of law . . . also encompasses giving legal advice and counsel. . . . As we recently held, the practice of law includes making representations to creditors on behalf of third parties, and advising persons of their rights") (internal quotations omitted); *R.J. Edwards, Inc. v. Hert*, 1972 OK 151, *P20 (1972) (Oklahoma defines the "practice of law" to include: "the rendition of services requiring the knowledge and the application of legal principles and technique to serve the interests of another with his consent."); *Oregon State Bar v. Smith*, 149 Ore. App. 171, 183 (1997) ("the 'practice of law' means the exercise of professional judgment in applying legal principles to address another person's individualized needs through analysis, advise, or other assistance");

Plaintiffs and advertised itself as a "nationwide" program. *See* SMF ¶¶33, 35. Thus, to the extent this Court is inclined to find that LASPD services were in fact legal in nature, it should be unwilling to find the go-away letters at issue enforceable as they are the product of the unlawful practice of law. If not the unlawful practice of law by LASPD attorneys,[18] then certainly the unauthorized practice of law by LASPD paralegals. Simply speaking, although a paralegal may possess the skills necessary to do client intake work, paralegals are not qualified to give legal advice, such as recommending bankruptcy. *See* SMF ¶30; *Avila*, 84 F.3d at 229 ("Paralegals do not (or should not) engage in the practice of law."). Yet here, the entire LASPD operation which services approximately 1,500 clients at any given time appears to be run entirely by paralegals – who communicate with the clients, give recommendations, and determine the need for and prepare the go-away letters at issue – with little to no oversight from the sole supervising attorney who is only in the office ten (10) to twenty (20) hours a week. *See* SMF ¶¶28, 30-31, 34, 42. If LASPD wants to avail its clients of the protections set forth in § 1692c(a)(2), LASPD "should at least ensure that an attorney has become professionally involved" with the file:

> Any other result would sanction the wholesale licensing of an attorney's name for commercial purposes, in derogation of professional standard:
>
> [A] lawyer has been given certain privileges by the state. Because of these privileges, letters . . . purporting to be written by attorneys have a greater weight

---

*Childs v. Smeltzer*, 1933 Pa. Dist. & Cnty. Dec. LEXIS 372, *6 (Apr. 18, 1933) ("practice of law" includes "all advice to clients and all action taken for them in matters connected with the law"); *State v. Buyers Serv. Co.*, 292 S.C. 426 (1987) (same); Tex. Gov't Code § 101(a) (practice of law is defined to include "the giving of advice or the rendering of any service requiring the use of legal skill or knowledge"); UT Sup. Ct. R. 14-802(b)(1) ("The 'practice of law' is the representation of the interests of another person by informing, counseling, advising, assisting, advocating for or drafting documents for that person through the application of the law and associated legal principles to that person's facts and circumstances."); *State ex rel. York v. W. Va. Office of Disciplinary Counsel*, 321 W. Va. 183, 188-89 (2013) ("in general, one is deemed to be practicing law whenever he or it furnishes to another advice or service under circumstances which imply the possession or use of legal knowledge and skill").

[18] As the LASPD representative testified "if a lawyer's doing it it's a legal service. And in this context lawyers are doing it." *See* **Exhibit D** at 80:23-81:1.

> than those written by laymen. But such privileges are strictly personal, granted only to those who are found through personal examination to measure up to the required standards. Public policy therefore requires that whatever correspondence purports to come from a lawyer in his official capacity must be at least passed upon and approved by him. He cannot delegate this duty of approval to one who has not been given the right to exercise the functions of a lawyer.

*Avila*, 84 F.3d at 229 (quoting American Bar Association, Formal Opinion 68 (1932));[19] *see also United States v. Johnson*, 327 F.3d 554, 562 (7th Cir. 2003) ("Only under the direct supervision of a licensed attorney may certain [functions of the practice of law] be performed by a paralegal. Absent the imprimatur of meaningful attorney supervision, any legal advice or other legal service provided by a nonlawyer constitutes the unauthorized practice of law.").

The purpose of the prohibition against the unauthorized practice of law is not just to ensure professional competence, but also to protect the public from being counseled, in matters of law, by those who are not answerable to the courts or the state bar where the counseling is directed.[20] *See Undem*, 266 Ark. at 695. To permit the LASPD letters to qualify as notice of representation and cease and desist in this case would be tantamount to affixing this Court's imprimatur of approval on the unauthorized practice of law, in contradiction to public policy.

## IX.   DEFENDANTS ARE ENTITLED TO THE BONA FIDE ERROR DEFENSE AS TO EMERY & WEAVER.

The FDCPA provides an affirmative defense to debt collectors accused of violating the FDCPA known as the "bona fide error defense." *See* 15 U.S.C. § 1692k(c); *Kort v. Diversified Collection Servs., Inc.*, 394 F.3d 530, 536 (7th Cir. 2005). To qualify for the bona fide error

---

[19] Like the attorney in *Avila*, here LASPD attorneys were "not the real 'source' of the letters in this case." *Avila*, 84 F.3d at 230.

[20] LASPD's fee sharing arrangement also seemingly constitutes an unethical sharing of legal fees with a non-attorney in violation of Ill. R. Prof. Conduct 5.4. *See* SMF ¶45. "Improper fee-splitting is a serious transgression that harms both the public and the legal profession." *In re Discipio*, 163 Ill. 2d 515, 529 (1994); *see also O'Hara v. Ahlgren, Blumenfeld & Kempster*, 127 Ill. 2d 333, 342 (1989).

defense, a debt collector must establish that the FDCPA violation was not intentional and resulted from a bona fide error and that it maintained procedures reasonably adapted to avoid such errors. *See Turner v. JVDB & Assocs., Inc.*, 330 F.3d 991, 995-96 (7th Cir. 2003). Here, although Defendants were notified of attorney information for Emery, RCS, as master servicer for LVNV, per written policy, requires both its own employees and third-party service providers to only communicate with a debtor's attorney after being notified of legal representation. *See* SMF ¶¶54-57. Moreover, per RCS policy, all attorney representation information in RCS's possession is to be transmitted to the third-party servicer upon placement of an account for collection. *See id.* at ¶61. Upon placement, servicers are required to determine if the debtor is represented by an attorney, and if so represented, only contact the attorney. *See id.* at ¶62. RCS also regularly monitors its third-party service providers to confirm adherence to RCS policies and procedures. *See id.* at ¶58. At the time of placement of the Accounts, RCS was not aware of any systemic failure on the part of any of the Debt Collectors to comply with RCS policies and procedures, including attorney representation procedures. *See id.* at ¶59. Had RCS been aware of repeated and/or major departures from RCS policies and procedures on the part of the Debt Collectors, the Debt Collectors would have been terminated as RCS service providers and the Accounts never would have been placed with them. *See id.* Based on the foregoing set of undisputed facts, to the extent any debt collector contacted Emery directly, Defendants are nonetheless entitled to the bona fide error defense.

Defendants are similarly entitled to the bona fide error defense to the extent Credit Control communicated directly with Weaver after receiving notice of a cease and desist request and attorney representation. Specifically, per the written policies set forth in RCS' Agency Operations Manual required to be followed by its servicers, where a servicer learns of attorney

information while an account is placed with it for collection, the servicer is obligated to code the account as attorney representation and only communicate with the attorney thereafter. *See* SMF ¶63. Such a procedure reasonably prevents unlawful communications, even where a cease and desist accompanies the attorney representation notice, because communications to the attorneys do not violate the cease request. *See Tinsley*, 634 F.3d at 419. Thus, to the extent Credit Control communicated with Weaver directly after receipt of the August 7, 2018 LASPD letter, same was not an intentional act on the part of Defendants and resulted from a bona fide error notwithstanding the maintenance of reasonable procedures designed to prevent said error.

## <u>CONCLUSION</u>

In conclusion, judgment should be entered in Defendants' favor on the thirty (30) Non-Testifying Plaintiffs' claims as they cannot prove essential elements of their claims without testifying. Judgment is also warranted in favor of Defendants as to testifying Plaintiffs Patricia Smith and Louise Reitz because their purported cease requests to the original creditors had no legal effect and any knowledge of the original creditors with respect to attorney representation is not imputed to Defendants. Finally, judgment is warranted in favor of Defendants against testifying Plaintiff Sonja Pennell because LASPD failed to respond to communications within a reasonable period of time despite requesting that all communications be directed to them.

Respectfully submitted,

**LVNV FUNDING, LLC**
**RESURGENT CAPITAL SERVICES, L.P.**

*/s/ Katherine Maria Saldanha Olson*
Katherine Maria Saldanha Olson
IL Bar #6310080
Messer Strickler, Ltd.
225 W. Washington Street, Suite 575
Chicago, IL 60606
(312) 334-3469

(312) 334-3473 (FAX)
*kolson@messerstrickler.com*
*Attorney for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of March 2020, a true and accurate copy of the foregoing was filed with the Clerk of Court using the ECF system which will send notification of such filing to the attorneys of record.

*/s/ Katherine M. Saldanha Olson*
Katherine M. Saldanha Olson
Messer Strickler, Ltd.
225 W. Washington St., Ste. 575
Chicago, IL 60606
(312) 334-3469
(312) 334-3473 (fax)
kolson@messerstrickler.com

**Attorney for Defendants**