**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION**

| | | |
|---|---|---|
| SONJA PENNELL, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 1:18-cv-3304-JRS-TAB |
| | ) | |
| LVNV FUNDING, LLC & RESURGENT | ) | |
| CAPTIAL SERVICES, L.P., | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANTS' COMBINED REPLY IN SUPPORT OF SUMMARY JUDGMENT
& RESPONSE TO PLAINTIFFS' CROSS MOTION**

Defendants LVNV Funding, LLC ("LVNV") and Resurgent Capital Services, L.P. ("RCS"), by and through their undersigned counsel, hereby reply in support of their motion for summary judgment and respond in opposition to Plaintiffs' cross motion for summary judgment:[1]

**RESPONSE TO PLAINTIFF'S STATEMENT OF MATERIAL FACTS**

As made clear from Defendants' below responses, the majority of Plaintiffs' statements of fact are not properly supported by admissible evidence, and as such they cannot be credited.[2] *See* S.D. Ind. L.R. 56-1; *see also Walton v. EOS CCA*, 2017 U.S. Dist. LEXIS 163835, *49 n.29 (S.D. Ind. July 24, 2017) (rejecting contentions of fact made at summary judgment not supported by admissible evidence).

1. This Court has jurisdiction pursuant to § 1692k(d) of the FDCPA, and 28 U.S.C. § 1331, see, 15 U.S.C. § 1692k(d); 28 U.S.C. §1331; Dkt. 24-1; Dkt. 24-2; Dkt. 30 at ¶ 1; Dkt. 31 at ¶ 1.

---

[1] Defendants proceed under the assumption that this brief complies with the page limits set forth in Local Rule 7-1(e)(1) as it is less than the combined total allowed for response and reply briefs. Plaintiffs appear to have operated under a similar assumption having filed a sixty-eight (68) page brief without leave of court.

[2] Plaintiffs similarly fail to refute the majority of Defendants' statements of material fact with admissible evidence. Thus, Defendants' statements should be accepted as true for purposes of ruling on the cross motions. *See* S.D. Ind. L.R. 56-1(f)(1).

**RESPONSE:** Defendants AGREE that Plaintiffs bring their action under the Fair Debt Collection Practices Act ("FDCPA") which would allow for federal question jurisdiction. Defendants DISPUTE, however, that the Non-Testifying Plaintiffs[3] have demonstrated Article III standing to support subject matter jurisdiction over their specific claims. Indeed, none of the "evidence" cited by Plaintiffs in support goes to the issue of standing.

2. Venue is proper in this District because: a) Plaintiff Pennell resides here, see, Dkt. 24-3 at p. 3; Dkt. 24 at ¶ 2; Dkt. 52-3, at p. 10 lns. 4-10; Dkt. 24-1; Dkt. 24-2; Dkt. 30 at ¶ 2; Dkt. 31 at ¶ 2.

**RESPONSE:** Defendants do not challenge venue.[4]

3. Defendant. LVNV Funding, LLC, ("LVNV"), and its master servicer, Defendant Resurgent Capital Services ("Resurgent") are debt collectors, as defined by § 1692a of the FDCPA, because they regularly use the mails and/or the telephone to collect, or attempt to collect, directly or indirectly, defaulted consumer debts that they did not originate, see, Dkt. 24-6; Dkt. 24-7; Dkt. 25; Dkt. 31-5; Def.s' SMF at ¶ 7.

**RESPONSE:** Defendants AGREE that RCS acts as the master servicer for accounts owned by LVNV. Defendants DISPUTE the remainder of ¶3. None of the "evidence" cited by Plaintiffs in support reflects that either RCS or LVNV regularly use the mail and/or telephone to collect debts. Indeed, Dkt. #24-6, Dkt. #24-7 and Dkt. #25 are each comprised of unauthenticated letters which on their face purport to have been sent by entities other than RCS or LVNV. Moreover, Dkt. #31-5 does not exist and ¶7 of Defendants' Statement of Material Facts Not in Dispute ("SMF") tends to support the contrary. Specifically, because LVNV does not have any employees (*see* SMF ¶7) it is illogical to conclude that it regularly uses the mail and/or telephone to collect debts.

---

[3] The Non-Testifying Plaintiffs include Plaintiffs Stewart, Hundley, Weaver, Chappelle, Lee, J. Martin, Benjamin, Staluppi, Salav, Emery, Senquiz, Alvarado, Lindsey, Young, Pray, Rivera, Jones, Munguia, Morin, Gentry, Spininelli, Stasik, McBride, R. Martin, Key, DiCresce, Adams, Mahoney, Side, and Shellenberger

[4] It is worth noting, however, that the mere fact that one (1) of the thirty-three (33) Plaintiffs resides in this District is not evidence that venue is proper. *See* 28 U.S.C. § 1391. Defendants, however, waive any objections to venue.

4. Defendant LVNV is a bad debt buyer and its principal purpose is the collection of consumer debts, see, LVNV's Supp.Resp. to Interog. at ¶ 12, attached as Group Exhibit B; see also, Schafer v. Allied Interstate, 2019 U.S. Dist. LEXIS 108435 at [*3] (W.D. Mich. 2019) (citing admission's [sic] made in a joint statement of material facts, LVNV admitted that: "LVNV's business is to invest in consumer debt and loan assets…Over ninety-nine percent of LVNV's revenues come from licensed third-party debt collectors engaged by Resurgent to undertake collection activities related to such consumer debt and loan assets"); Dkt. 30 at ¶ 6; Fed.R.Civ.P. Rule 30(b)(6) deposition of Defendants (Anne Herthneck), attached as Exhibit A p. 39, lns. 8-15; McAdory v. M.N.S. Assocs., Ltd. Liab. Co., 952 F.3d 1089, 1090 (9th Cir. 2020); Barbato v. Greystone All., 916 F.3d 260, 261 (3rd Cir. 2019); Tepper v. Amos, 898 F.3d 364, 370 (3rd Cir. 2018).

**RESPONSE:** Defendants AGREE that LVNV is a debt buyer whose revenue primarily stems from activity undertaken by licensed third-party debt collectors related to debts owned by LVNV which debts were characterized as defaulted "consumer" debts at the time of purchase. Defendants DISPUTE that LVNV's principal purpose is the collection of consumer debts. Indeed, the very admission and testimony cited by Plaintiffs support that the principal purpose of LVNV is to "invest in consumer debt and loan assets." *See* Dkt. #68-1 (A. Herthneck Dep.) at 39:8-11 (testifying that about 99% of LVNV's business is buying defaulted consumer debts).

5. Defendants LVNV and Resurgent were acting as debt collectors, as that term is defined in the FDCPA, as to the defaulted consumer debts Defendants attempted to collect from Plaintiffs, see, Dkt. 24-6, 24-7; Dkt. 25.

**RESPONSE:** DISPUTED. None of the "evidence" cited by Plaintiffs in support reflects that either RCS or LVNV were acting as debt collectors as that term is defined by the FDCPA or that Defendants attempted to collect debts from Plaintiffs. Indeed, Dkt. #24-6, Dkt. #24-7 and Dkt. #25 are each comprised of unauthenticated letters which on their face purport to have been sent by entities other than RCS or LVNV. Furthermore, absent testimony from the Non-Testifying Plaintiffs, the Non-Testifying Plaintiffs cannot demonstrate that the debts identified in the letters comprising Dkt. #24-6, Dkt. #24-7 and Dkt. #25 were incurred "primarily for personal, family, or household purposes" so as to invoke the FDCPA. *See* 15 U.S.C. § 1692a(5).

6. LVNV has no employees and relies on its master servicer, Resurgent, which engages third-party debt collectors to collect the debts that LVNV owns, see, Def.s' SMF at ¶ 7; see also, Exhibit A, at p. 7, ln. 16-18; p. 11, lns. 3-13; p. 15, lns. 23-24; see also, Schafer, 2019 U.S. Dist. LEXIS 108435 at [*3]; Resurgent collects debts owed to LVNV on its own accord, and also hires other collection agencies to collect debts owed to LVNV, see, Exhibit A, at p. 40, lns. 14-22; see also, Dkt. 24-6, Dkt. 24-7, and Dkt. 25;. [sic]

**RESPONSE:** UNDISPUTED. However, Defendants point out that the testimony cited by Plaintiffs reflects that although RCS "*sometimes* sends" collection communications, "*by and large* [RCS] hires other debt collectors to collect on behalf of LVNV." *See* Dkt. #68-1 (A. Herthneck Dep.) at 40:14-22 (emphasis added).

7. Defendant Resurgent, through a durable power of attorney, is the attorney-in-fact for Defendant LVNV, and anything Defendant LVNV does is done through Defendant Resurgent, see, attached Group Exhibit B, "Limited Power of Attorney" dated June 10, 2009; see also, Exhibit A at p. 10, ln. 15 to p. 11, ln. 13; see also, Schafer, 2019 U.S. Dist. LEXIS 108435 [*3].

**RESPONSE:** UNDISPUTED. Defendants clarify, however, that the power of attorney is limited to actions taken with respect to accounts owned by LVNV. *See* Dkt. #68-2 (POA) at p. 7; Dkt. #68-1 (A. Herthneck Dep.) at 11:3-6 ("Q. And this Limited Power of Attorney says that Resurgent acts on behalf of LVNV for everything; right? A. Resurgent acts as the master servicing agent for LVNV.").

8. All Plaintiffs are consumers who, at all times relevant, were represented by the legal aid attorneys at the Chicago Legal Clinic's ("CLC") Legal Advocates for Seniors and People with Disabilities ("LASPD") program, which is located in Chicago, Illinois, see, Declaration of Edward Grossman, attached as Exhibit C, at ¶ 11; Declaration of Jeff Whitehead, attached as Exhibit D, at ¶ 8; and Declaration of Misha Corbett, attached as Exhibit E, at ¶ 21; see also, Dkt. 24-3, 24-4, 24-5; Dkt. 24-8, Dkt. 24-9, Dkt. 24-10.

**RESPONSE:** DISPUTED. In support, Plaintiffs cite declarations submitted by Chicago Legal Clinic ("Clinic") employees who aver that LASPD does not assist with business debts and that each of the Plaintiffs retained LASPD.[5] That LASPD does not knowingly "accept clients into the

---

[5] Plaintiffs also cite Dkt. #24-3, Dkt. #24-4, Dkt. #24-8, Dkt. #24-9, Dkt. #24-10, which are all comprised of letters purportedly sent by LASPD on Plaintiffs' behalf. Notably, as explained in response to Paragraph 18 *infra*, none of these letters have been properly authenticated as having been sent by LASPD.

program" or "represent or assist clients with debts that were incurred for business purposes" does not establish that the debts at issue were in fact personal, household debts, however. *See* Dkt. #68-3 (E. Grossman Decl.) at ¶11; Dkt. #68-4 (J. Whitehead Decl.) at ¶8. Indeed, having not incurred the debts themselves, Mr. Grossman and Mr. Whitehead lack personal knowledge of the purpose for which the debts were incurred, precluding their testimony on the subject. *See* Fed. R. Evid. 602 ("A witness may testify to a matter *only if* evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." (emphasis added)). Moreover, Mr. Grossman's conclusory and general statement that LASPD clients confirm their debts are consumer debts during the LASPD intake process[6] similarly fails to demonstrate the consumer status of the Plaintiffs as any confirmation provided by Plaintiffs outside of Court to LASPD regarding the purpose of their debts constitutes inadmissible hearsay. *See* Dkt. #68-3 at ¶11; *see also Eisenstadt v. Centel Corp.*, 113 F.3d 738, 742 (7th Cir. 1997) (hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible at trial").

The testimony offered to support that Plaintiffs retained LASPD does not fare any better. "An affidavit or declaration used to support or oppose a motion [for summary judgment] must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also James v. Hale*, 2020 U.S. App. LEXIS 15490, *14 (7th Cir. May 14, 2020). Here, Ms. Corbett has not established that she has personal knowledge regarding Plaintiffs' purported retention of

---

Furthermore, even assuming they were sent, the statements contained therein that LASPD "represent[s] Plaintiffs" constitutes inadmissible hearsay.

[6] Although LASPD purportedly uses intake forms (*see* Dkt. #68-5 at ¶11), those forms are not attached to Ms. Corbett's affidavit nor have they ever been produced in this case. The intake process is also not sufficiently explained, nor are any specifics presented as to the date, content and form of the purported respective confirmations from Plaintiffs.

LASPD and the dates of retention. To the contrary, she avers that other people are involved in the intake process at LASPD and that she "primarily handle[s] communications with creditors and debt collectors" and "communications regarding collection activity." *See* Dkt. #68-5 at ¶2. At best, Ms. Corbett's knowledge stems from applications and retention agreements purportedly signed by Plaintiffs. *See* Dkt. #68-5 at ¶¶2, 11, 14 (mentioning various forms completed by LASPD clients, including an application for representation and retainer contract). These documents are not attached to her declaration, however. *See Waterloo Furniture Components v. Haworth*, 467 F.3d 641, 648-49 (7th Cir. 2006) (if witness's testimony is based on knowledge of a document rather than first-hand knowledge of an event, production of the document is required under the "best evidence rule"). Even if they were attached, there is nothing in the record to suggest that Ms. Corbett has any familiarity with the Plaintiffs' signatures which might permit her to authenticate the documents as having been signed by Plaintiffs. *See also* Dkt. #52-5 (Clinic 30(b)(6) dep.) at 77:11-24 (testifying that no one at LASPD could verify Plaintiffs' respective signatures).

9. CLC was founded in 1981 by Edward Grossman and his law school classmate, Reverend Thomas Paprocki, to help the poor and disadvantaged in the South Chicago neighborhood that had been left devastated by the closure of the steel mills in that area, see, Exhibit C at ¶ 1.

**RESPONSE:** Paragraph 9 includes immaterial facts the consideration of which has no effect on summary judgment.

10. One of the programs that Grossman developed and oversaw during his tenure at CLC is the LASPD program; since its inception, the Clinic's LASPD program has assisted low-income disabled and senior citizens, with little to no assets; LASPD notifies its clients' creditors and debt collectors that they are represented by counsel and are unable to pay their consumer debts, and that their limited income (Social Security, Disability, Veteran's or Retirement income) is protected from collection under federal law. Thus, LASPD asks creditors and debt collectors to leave these disabled and elderly consumers alone, see, Exhibit C, at ¶ 6; Exhibit D at ¶ 2; see also, Dkt. 24-3, 24-4, 24-5; Dkt. 24-8, Dkt. 24-9, Dkt. 24-10.

**RESPONSE:** Defendants AGREE that since its inception, the services offered by the Clinic's LASPD program have been limited to: 1) notifying clients' creditors and debt collectors that the

clients are purportedly represented by counsel, that the clients are purportedly unable to pay their

debts and that the clients' income is purportedly protected from collection and 2) asking the

creditors and debt collectors to cease collection efforts. Defendants DISPUTE that LASPD clients

are all low-income disabled and senior citizens whose debts are consumer in nature as the

declarants who offered testimony on this issue lack personal knowledge of such facts and the cited

letters (Dkt. #24-3, #24-4, #24-5, #24-8, #24-9 and #24-10) constitute inadmissible hearsay (i.e.

the letters are being offered to prove the truth of the assertion contained in the letters that "LASPD

provides debt-related services to seniors and people with disabilities who have a fixed and/or

limited income"). *See* Fed. R. Evid. 602 ("A witness may testify to a matter *only if* evidence is

introduced sufficient to support a finding that the witness has personal knowledge of the matter."

(emphasis added)); Fed. R. Evid. 801(c). Presumably, LASPD's belief that their clients are low-

income disabled and senior citizens is itself entirely derived from inadmissible hearsay (e.g.

statements purportedly made by clients in oral or written communications).

11. LASPD offers its legal services to its clients under a limited legal services agreement—as
provided for by ABA Model Rules of Professional Conduct Rule 1.2(c), which has been adopted
verbatim by the Supreme Courts in both Illinois and Indiana, see, Ill.R.Prof.Conduct Rule 1.2(c)
and Ind.R.Prof.Conduct Rule 1.2(c); accordingly, LASPD lets its clients know, at the outset of the
attorney-client relationship that LASPD will not be representing them as to their local state's laws
or in any state court litigation and LASPD's clients acknowledge this limited representation in
LASPD's representation agreement with them, see, Exhibit C, at ¶¶ 9-11; Exhibit D at ¶ 17; Exhibit
E at ¶ 14; see also, Dkt. 53-5 (LASPD Retainer Agreements; see also, Serrano v. Van Ru Credit
Corp., 126 F.Supp.3d 1005, 1009 (N.D. Ill. 2009) (Darrah, J).

**RESPONSE:** Paragraph 11 includes immaterial facts the consideration of which has no effect on

summary judgment.

12. CLC, by notifying its LASPD client's creditors and debt collectors, that they are represented
by the CLC and are unable to pay their debts, tries to get creditors to stop collection efforts due to
their client's financial hardships. CLC also asserts the federal rights of its clients, pursuant to the
Fair Debt Collection Practice Act, 14 U.S.C. § 1692, et seq., ("FDCPA"), to be represented by
counsel and end written and telephonic collection action. In short, CLC asks that its LASPD clients

be left in peace, see, Exhibit C, at ¶ 7; see also, Dkt. 24-3, Dkt. 25-4, Dkt. 24-5, Dkt. 24-8, Dkt. 24-9, Dkt. 24-10.

**RESPONSE:** UNDISPUTED that LASPD's entire business model is to attempt to get creditors to cease collection efforts by notifying its clients' creditors and debt collectors that its clients are purportedly represented by counsel and are purportedly unable to pay their debts. It is further UNDISPUTED that LASPD attempts to assert its clients' rights under the FDCPA to be represented by counsel and to end written and telephonic collection action. Defendants, however, DISPUTE that LASPD satisfies the representation element of § 1692c(a)(2) for the reasons explained in more detail in Argument § IV and § V *infra*.

13. During the applicable time period, LASPD had three attorneys working with the program at all times: Edward Grossman, Executive Director until February, 2017, and Senior Counsel between March, 2017 and December 31, 2018; Donald Leibsker, Legal Director of the LASPD program, and Jeff Whitehead, Supervising Attorney of the LASPD program, see, Exhibit C, at ¶¶ 3, 12; Exhibit D at ¶¶ 5, 15; and Exhibit E at ¶ 6.

**RESPONSE:** UNDISPUTED. *But see* SMF ¶¶23, 27 (explaining Executive Director and Legal Director's limited LASPD roles); Dkt. #52-5 (Clinic 30(b)(6) dep.) at 13:5-22 (explaining Executive Director has no day-to-day role in LASPD, its more oversight), 35:15-17 (same).

14. LASPD has two paralegals, Misha Corbett and Bernadette Fahy, who assist in the administration of the LASPD program; Ms. Fahy primarily handles application-related concerns and also communicates with clients regarding their accounts, while Ms. Corbett primarily handles communications with creditors and debt collectors, and communications with clients regarding collection activity, see, Exhibit C at ¶ 12; Exhibit D at ¶ 10; Exhibit E at ¶ 3. During the applicable time period, LASPD also had two intake specialists: Jim Demos and Catalina Constantin-Shin, as well as Administrative Director of LASPD, Dr. Steven Blutza, and many law student interns, see, Exhibit C at ¶ 12.

**RESPONSE:** UNDISPUTED.

15. Neither Ms. Corbett, nor any of the non-attorney staff, advise clients on whether to file bankruptcy, or take any other action; all such issues are referred to attorneys Jeff Whitehead, Donald Leibsker, or Edward Grossman; non-attorney staff relay information to clients, as directed by LASPD's attorneys, see, Exhibit D at ¶ 10; Exhibit E at ¶ 6; see also, Exhibit C at ¶ 15.

**RESPONSE:** DISPUTED. The cited declarations from Mr. Grossman, Mr. Whitehead and Ms. Corbett directly conflict with the Clinic's 30(b)(6) deposition testimony, wherein Mr. Blutza specifically testified that LASPD paralegals advise consumers whether to file for bankruptcy. *See* Dkt. #52-5 (Clinic 30(b)(6) dep.) at 15:7-15 ("Does LASPD advise consumers that they may want to file for bankruptcy? A. If that's a better option, sure, or a reverse mortgage. We're trying to do what's best for the consumer always. Q. And who typically makes that recommendation? A. One of the paralegals. Q. A paralegal makes that recommendation? A. Yeah, yeah."). "Where deposition and affidavit are in conflict, the affidavit is to be disregarded unless it is demonstrable that the statement in the deposition was mistaken, perhaps because the question was phrased in a confusing manner or because a lapse of memory is in the circumstances a plausible explanation for the discrepancy." *Russell v. Acme-Evans Co.*, 51 F.3d 64, 67-68 (7th Cir. 1995). As no explanation has been provided as to the change in Clinic testimony, the Court should disregard the declarations from Mr. Grossman, Mr. Whitehead and Ms. Corbett on this issue.

16. The LASPD application process requires multiple signatures from the client, as well as a copy of their government-issued photo identification, and proof of income, which are typically Social Security Benefits Statements; as part of their applications, LASPD clients are required to sign the Retainer Contract and the Consent Form for Legal Representation; LASPD intake and paralegal staff verify that signatures are present and consistent, and that identification numbers such as a client's social security number match their proof of income, see, Exhibit E at ¶ 5. Moreover, upon receipt, every application for representation by LASPD is reviewed by Jeff Whitehead, see, Exhibit C at ¶ 4; Exhibit D at ¶ 6.

**RESPONSE:** Paragraph 11 includes immaterial facts the consideration of which has no effect on summary judgment. Presumably, this Paragraph is being submitted to support that the Plaintiffs retained LASPD. However, no one at LASPD can verify the signatures appearing on the Retainer Contracts as belonging to Plaintiffs. *See* Dkt. #52-5 (Clinic 30(b)(6) dep.) at 77:11-24. Thus, it is irrelevant whether LASPD intake and paralegal staff, none of which have been presented as

signature experts, believe signatures contained on Retainer Contracts and Consent Forms are "consistent" with application records that have neither been produced nor authenticated.

17. When LASPD sends out its letter of attorney representation and its clients' refusal to pay, it usually sends them by fax because it is immediate, it offers LASPD proof of receipt and it is far more cost effective than U.S. mail, Certified U.S. mail, or UPS/FedEx; when LASPD first encounters a creditor, debt collector/debt buyer, LASPD staff research for the fax number and use: one that is publicly displayed on their website; that is published on the roster for the Association of Credit and Collection Professionals; that is printed on their letterhead/correspondence; or that is left in a phone message—often, the facsimile numbers LASPD uses are confirmed with the creditor or debt collector/debt buyer, see, Exhibit E at ¶ 15. In fact, many creditors and debt collectors/debt buyers have directed that LASPD use a special fax number, or send notices to a designated email address, see, Exhibit E at ¶ 16.

**RESPONSE:** UNDISPUTED.

18. All of LASPD's letters that are attached to the Amended Complaint in this matter were sent by LASPD to the correct fax number, and LASPD received confirmation that they were successfully transmitted to the creditor and debt collector/debt buyer to whom they were sent, see, Exhibit E at ¶ 20; see also, Dkt. 24-3, Dkt. 25-4, Dkt. 24-5, Dkt. 24-8, Dkt. 24-9, Dkt. 24-10.

**RESPONSE:** DISPUTED. First, it is unclear what the declarant, Ms. Corbett, means by "correct fax number." To the extent she means a fax number approved for use by LASPD, she does not aver or authenticate evidence to support that at the time of sending the respective letters the fax numbers appeared publicly on each recipient's website, were published on the roster for the Association of Credit and Collection Professionals, were printed on letterhead/correspondence from the respective recipients, or were provided by the respective recipients. Next, the cited evidence does not support that the letters were successfully transmitted to the recipients identified in the letters. At best, the cited declaration (and unauthenticated exhibits attached to the Amended Complaint) suggest that LASPD faxed the letters to the fax numbers identified in the letters and received a fax confirmation that the faxes were successfully transmitted to those fax numbers. However, as Plaintiffs have failed to demonstrate that the declarant has personal knowledge of the respective transmissions, even her testimony as to transmission must be disregarded. *See* Fed. R.

Evid. 602 ("A witness may testify to a matter *only if* evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." (emphasis added)).

19. The 33 Plaintiffs in this matter are 12 senior citizens, 13 disabled seniors, and 8 disabled individuals. Sonja Pennell is a senior citizen who resides in Indiana, see, Dkt. 52-3, at p. 10, lns. 4-10; Dkt. 24-3 at p. 3; Exhibit E at ¶ 21; Louise Reitz is a disabled senior citizen who resides in Florida, see, Dkt. 52-7 at p. 8, ln. 11 to p. 9 ln. 8; p. 17, ln. 25 to p. 18, ln. 4; Dkt. 24-3 at pp. 22, 24; Exhibit E at ¶ 21; Joyce Young is a disabled senior citizen who resides in Ohio, see, Dkt. 24-4 at pp. 10, 12; Exhibit E at ¶ 21; Kenneth Chappelle is a disabled man who resides in South Carolina, see, Dkt. 24-3 at p. 6; Exhibit E at ¶ 21; James Lee is a disabled senior citizen who resides in North Carolina, see, Dkt. 24-3 at p. 8; Exhibit E at ¶ 21; Diane Benjamin is a disabled senior citizen who resides in New York, see, Dkt. 24-3 at p. 15; Exhibit E at ¶ 21; Roberta Salav is a disabled senior citizen who resides in Florida, see, Dkt. 24-3 at p. 20; Exhibit E at 21; Luz Senquiz is a disabled senior citizen who resides in New Jersey, see, Dkt. 24-3 at pp. 28, 30; Exhibit E at ¶ 21; Donna Lindsey is a senior citizen who resides in Pennsylvania, see, Dkt. 24-4 at p. 6; Exhibit E at ¶ 21; Debra Pray is a disabled senior citizen who resides in Connecticut, see, Dkt. 24-4 at p. 14; Exhibit E at ¶ 21; Marlene Hundley is a senior citizen who resides in West Virginia, see, Dkt. 24-4 at pp. 2, 4; Exhibit E at ¶ 21; Patricia Smith is a senior citizen who resides in Michigan, see, Dkt. 52-9 at p. 10, lns. 20-24; p. 51, lns. 5-8; Dkt. 24-8 at pp. 13, 15; Exhibit E at ¶ 21; Francis Emery is a senior citizen who resides in Florida, see, DKt. 24-3 at p. 26; Exhibit E at ¶ 21; Barbara Staluppi is a senior citizen who resides in Florida, see, Dkt. 24-3 at p. 26; Exhibit E at ¶ 21; Mirta Alvarado is a disabled senior citizen who resides in New Jersey, see, Dkt. 24-8 at pp. 49, 51; Exhibit E at ¶ 21; Estela Munguia is a senior citizen who resides in California, see, Dkt. 24-4 at p. 22; Exhibit E at ¶ 21; Joan Martin is a senior citizen who resides in Mississippi, see, DKt. 24-3 at p. 13; Exhibit E at ¶ 21; Jackie Adams is a disabled woman who resides in Utah, see, Skt. 24-5 at p. 18; Exhibit E at ¶ 21; Anita Rivera is a disabled woman who resides in Texas, see, Dkt. 24-4 at p. 18; Exhibit E at ¶ 21; Earnestine Jones is a disabled senior citizen who resides in Arkansas, see, Dkt. 24-4 at p. 20; Exhibit E at ¶ 21; Robert Morin is a senior citizen who resides in Oregon, see, Dkt. 24-4 at p. 24; Exhibit E at ¶ 21; Francis Spinelli, Jr. is a senior citizen who resides in South Carolina, see, Dkt. 24-5 at p.4; Exhibit E at ¶ 21; Rita McBride is a senior citizen who resides in Mississippi, see, Dkt. 24-5 at p. 8; Exhibit E at ¶ 21; Sherry Key is a disabled senior citizen who resides in Kentucky, see, Dkt. 24-5 at p. 14; Exhibit E at ¶ 21; Lewis Shellenberger is a senior citizen who resides in Colorado, see, Dkt. 24-5 at pp. 26-28; Exhibit E at ¶ 21; Renee Stasik is a disabled woman who resides in Pennsylvania, see, Dkt. 24-5 at p. 6; Exhibit E at ¶ 21; Albert DiCresce is a disabled senior citizen who resides in Nevada, see, Dkt. 24-5 at p. 16; Exhibit E at ¶ 21; Valerie Weaver is a disabled woman who resides in Oklahoma, see, Dkt. 24-4 at p. 16; Exhibit E at ¶ 21; Valicia Gentry is a disabled woman who resides in Ohio, see, Dkt. 24-5 at p. 2; Exhibit E at ¶ 21; Gene Sides, Jr. is a disabled man who resides in Mississippi, see, Dkt. 24-5 at p. 24; Exhibit E at ¶ 21; Robert Martin is a disabled senior citizen who resides in Mississippi, see, Dkt. 24-5 at pp. 10, 12; Exhibit E at ¶ 21; Sheila Mahoney is a senior citizen who resides in Massachusetts, see, Dkt. 24-5 at pp. 20, 22; Exhibit E at ¶ 21; and Laura Jean Stewart is a senior citizen who resides in Iowa, see, Dkt. 24-3 at p. 11; Exhibit E at ¶ 21; see also, Def.s' SMF at ¶ 1.

**RESPONSE:** UNDISPUTED as to the state of residency of each Plaintiff. DISPUTED as to the

elderly and/or disabled status of each Plaintiff. Simply speaking, the records cited in support – the

declaration of Ms. Corbett (an LASPD paralegal) and letters purportedly sent by LASPD – are

inadmissible for purposes of proving the age and/or health status of each Plaintiff. With respect to

the declaration of Ms. Corbett, Plaintiffs have failed to demonstrate that Ms. Corbett has personal

knowledge regarding these facts. As for the letters, same constitute inadmissible hearsay as they

are presumably being offered to prove the truth of the assertion contained in the letters that

"LASPD provides debt-related services to seniors and people with disabilities." *See* Fed. R. Evid.

801(c).

20. Each of the debts at issue, as verified through the application process for LASPD's services, was a consumer debt and was solely incurred by each Plaintiff for consumer/household purchases; indeed, LASPD does not represent or assist clients with business debts, see, Exhibit C at ¶ 11, Exhibit D at ¶ 8; see also, Deposition of Sonja Pennell, Dkt. 52-3 at p. 15, lns. 14-29; Deposition of Louise Reitz, Dkt. 52-7 at p. 17, lns. 18-21; Deposition of Patricia Smith, Dkt. 52-9, at p. 22, ln. 21 to p. 23, ln. 11.

**RESPONSE:** UNDISPUTED that the record supports the debts owed by testifying Plaintiffs

Sonja Pennell, Louis Reitz and Patricia Smith were incurred for consumer/household purposes.

DISPUTED that the record supports that the debts incurred by the Non-Testifying Plaintiffs were

incurred for such purposes. As explained *supra*, that LASPD does not knowingly "accept clients

into the program" or "represent or assist clients with debts that were incurred for business

purposes" does not establish that the debts at issue were in fact personal, household debts.  *See*

Dkt. #68-3 (E. Grossman Decl.) at ¶11; Dkt. #68-4 (J. Whitehead Decl.) at ¶8. Indeed, having not

incurred the debts themselves, Mr. Grossman and Mr. Whitehead lack personal knowledge of the

purpose for which the debts were incurred, precluding their testimony on the subject. *See* Fed. R.

Evid. 602. Moreover, Mr. Grossman's conclusory and general statement that LASPD clients

confirm their debts are consumer debts during the LASPD intake process similarly fails to

demonstrate the truth of ¶20 as any confirmation provided by the Non-Testifying Plaintiffs outside

of court to LASPD regarding the purpose of their debts constitutes inadmissible hearsay. *See* Dkt.

#68-3 at ¶11.

21. Each of the Plaintiffs fell on difficult times—whether as a consequence of the deterioration of their own health, of the health or death of a family member—that caused them to be unable to pay their debts, see, Exhibit C at ¶ 10; Exhibit E at ¶ 8; see, e.g., Dkt. 52-3 at p. 54, ln. 18 to p. 56, ln. 23 (Ms. Pennell had to quit working to take care of her elderly mother, then her husband developed serious health issues, including a series of strokes); Dkt. 52-7 at p. 17, ln. 22 to p. 19, ln. 1 (Ms. Reitz developed health problems); Dkt. 52-9, at p. 11, lns. 9-21; at p. 13, ln. 21 to p. 14, ln. 19; p. 16, lns. 2-17 (Ms. Smith's husband developed cancer and died, plus her daughter was killed in a car accident and she was raising her three granddaughters).

**RESPONSE:** Paragraph 21 includes immaterial facts the consideration of which has no effect on

summary judgment. Notwithstanding, Defendants DISPUTE that the record evidences that the

Non-Testifying Plaintiffs "fell on difficult times . . . that caused them to be unable to pay their

debts" as the declarants, whose testimony is cited, lack personal knowledge of such facts and any

knowledge within their possession with respect to said facts could only come from inadmissible

hearsay (i.e. statements made by Non-Testifying Plaintiffs out of court). *See* Dkt. #68-3 (E.

Grossman Decl.) at ¶10 (declaring that if LASPD accepts a client it is because he or she is unable

to pay his/her debts); Dkt. #68-5 (M. Corbett Decl.) at ¶8 (declaring that "most clients" are

overwhelmed by a hardship and have fallen on difficult times).

22. Each of the Plaintiffs retained the attorneys at LASPD to represent them as to the unsecured consumer debts they were unable to pay, see, Dkt. 24-3, 24-4; 24-5; Dkt. 53-5; Exhibit E at ¶¶ 20, 21.

**RESPONSE:** DISPUTED. Plaintiffs cite three (3) categories of records in support:[7] 1) letters

purportedly sent by LASPD to creditors (Dkt. #24-3, #24-4, and #24-5); 2) Retainer Contracts

(Dkt. #53-5); and 3) the declaration of Misha Corbett (Dkt. #68-5). With respect to the letters, the

---

[7] None of the cited records address whether Plaintiffs' debts are consumer in nature or whether Plaintiffs were unable to pay those debts. For the reasons explained in response to Paragraphs 20-21 *supra*, however, Defendants dispute these facts are supported by the record as to the Non-Testifying Plaintiffs.

statements therein that LASPD "represent[s]" each Plaintiff do not prove retention as such statements constitute inadmissible hearsay. *See* Fed. R. Evid. 801(c). As for the Retainer Contracts, as explained *supra*, no one at LASPD can verify the signatures appearing on the Retainer Contracts belong to Plaintiffs (*see* Dkt. #52-5 (Clinic 30(b)(6) dep.) at 77:11-24) and the Non-Testifying Plaintiffs are precluded from verifying signatures or otherwise testifying that they retained LASPD (*see* Dkt. #44). Finally, as for the declaration of Ms. Corbett, as explained *supra*, Ms. Corbett has not established that she has personal knowledge regarding Plaintiffs' purported retention of LASPD. To the contrary, she avers that other people are involved in the intake process at LASPD and that she "primarily handle[s]" other LASPD matters. *See* Dkt. #68-5 at ¶2. At best, Ms. Corbett's knowledge stems from the cited Retainer Contracts; but again, neither she nor anyone else at LASPD can verify that Plaintiffs in fact executed those agreements.

23. LASPD sent letters to Plaintiffs' creditors, and, in a few instances to their collectors and to LVNV and Resurgent directly, informing them that each of the Plaintiffs was represented by counsel and refused to pay the debt at issue, and also directing those creditors to cease contacting the Plaintiffs directly regarding collection of the debts at issue; these notices included affidavits documenting the income and expenses of each Plaintiff, demonstrating that their assets were exempt from collection, see, Dkt. 24-3, 24-4; 24-5; see e.g., Exhibit N.

**RESPONSE:** DISPUTED. The records cited do not support ¶23 as they are comprised of nothing more than unauthenticated correspondence. "The Court is entitled to rely upon the parties to present clearly their cases for summary judgment and will not 'scour the record' on behalf of either parties' position." *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1055 (S.D. Ind. 2011). Moreover, as explained *supra*, at best, Plaintiffs' cited evidence suggests that LASPD successfully faxed letters to the fax numbers identified in respective fax confirmations attached to the Amended Complaint. Absent evidence that the fax numbers contained in the fax confirmations belonged to the creditors or debt collectors to whom the faxes were addressed, however, Plaintiffs have failed to establish that they were in fact sent to those persons. *But see* Response to ¶24 *infra*.

14

Furthermore, as set forth in SMF ¶¶48-53, RCS has no record of receiving copies of the LASPD communications attached to the Amended Complaint which purport to have been faxed to 866-467-0919.

24. The notices of attorney representation, cease contacts demands, and refusals to pay, which LASPD sent to LVNV's creditors/predecessors-in-interest on Plaintiffs' behalf, were received by those parties, as evidenced by the successful fax confirmations LASPD received, see, Group Exhibit Dkt. 24-3, 24-4; 24-5 (fax confirmations); see also, Exhibit E at ¶ 20; moreover, LVNV's predecessors-in-interest on the debts at issue have admitted to having many of these letters on file, see, attached Group Exhibit F, excerpt of subpoena response from CreditOne Bank (as to Plaintiffs Chappelle, Lee, Benjamin, Salav, Reitz, Senquiz, Hundley, Young, Lindsey, and Pray); Exhibit G, excerpt of subpoena response from CapitalOne Bank (as to Plaintiffs Staluppi, Emery, and Alvarado), and Exhibit H, excerpt of subpoena responses from Citibank (as to Plaintiffs DiCresce, Riviera, Jones, Munguia, Spinelli, Sides, Adams, Joan Martin, Young, Shellenberger, Reitz, Senquiz, Stasik, McBride, Robert Martin, Morin, Mahoney, and Key).

**RESPONSE:** DISPUTED that all notices attached to the Amended Complaint at Dkt. #24-3, #24-4 and #24-5 were received by the original creditors alleged in the Amended Complaint. Rather the cited evidence in the record only supports that at some point: 1) Credit One received letters from LASPD with respect to Plaintiffs Chappelle, Lee, Benjamin, Salav, Reitz, Senquiz, Hundley Young, Lindsay and Pray (*see* Dkt. #68-6); 2) that Citibank received letters from LASPD with respect to Plaintiffs Staluppi, Emery and Alvarado (*see* Dkt. #68-7); and 3) that Capital One received letters from LASPD with respect to Plaintiffs DiCresce, Riviera, Jones, Munguia, Spinelli, Sides, Adams, J. Martin, Young, Shellenberger, Reitz, Senquiz, Stasik, McBride, R. Martin, Morin, Mahoney and Key (*see* Dkt. #68-8). With respect to Pray, Staluppi and DiCresce, however, the letters received by the original creditors postdate the respective sale of their accounts. *Compare* Dkt. #68-6 at p. 32 (Pray letter is dated April 18, 2018) and Dkt. #24 (Amended Complaint) at ¶98 (allege sent April 18, 2018) *with* Dkt. #52-1 at p. 70-72, 91 (Bill of Sale shows sale date of March 18, 2018); *compare* Dkt. #68-7 at p. 2 (Staluppi letter is dated March 8, 2011) and Dkt. # 24 at ¶40 (allege sent March 8, 2011) *with* Dkt. #52-2 at p. 159-163 (Bill of Sale shows

sale date of April 28, 2008); *compare* Dkt. #68-8 at p. 11 (DiCresce letter is dated August 30, 2017) and Dkt. #24 at ¶147 (allege sent August 30, 2017) *with* Dkt. #52-1 at p. 129-133 (Bill of Sale shows sale date of January 17, 2017).

Moreover, Plaintiffs have failed to cite any evidence to support: 1) that the September 22, 2016 letter alleged to have been sent on behalf of Plaintiff Smith to WebBank (*see* Dkt. #24 at ¶23) was received by WebBank; 2) that the August 23, 2017 letter alleged to have been sent on behalf of Plaintiff Stewart to Capital One (*see id.* at ¶27) was received by Capital One; 3) that the November 28, 2017 letter alleged to have been sent on behalf of Plaintiff Hundley to Capital One (*see id.* at ¶79) was received by Capital One; 4) that the June 6, 2017 letter alleged to have been sent on behalf of Plaintiff Weaver to Capital One (*see id.* at ¶102) was received by Capital One; or 5) that the September 1, 2017 letter alleged to have been sent on behalf of Plaintiff Gentry to Capital One (*see id.* at ¶123) was received by Capital One (particularly considering the letter was addressed to Alliance One Receivables (*see* Dkt. #24-5 at p. 2). To the contrary, the Capital One subpoena response cited by Plaintiffs supports that the aforementioned Stewart, Hundley, Weaver and Gentry letters were not in fact received as they were not included in Capital One's subpoena production despite Plaintiffs' request for same. *See* Dkt. #68-8.

25. After the Plaintiffs' notices of attorney representation, cease contacts demands, and refusals to pay were sent to their creditors, their debts were each transferred/sold to Defendant LVNV in portfolios with hundreds of other defaulted consumer debts, via "forward flow agreements" or "asset purchase agreements", see, Dkt. 52-1 at ¶¶ 5-6 and 52-3. Via these agreements, Defendant LVNV was transferred all rights and limitations associated with each of the debts, through monthly Bills of Sale to Defendants' parent company, Sherman Originator III, and Assignment/Transfer to Defendant LVNV, see, Def.s' SMF at ¶ 3; Dkt. 52-1 at ¶¶ 5-6 and 52-2, Bills of Sale and partial Transfer/Assignment, and Receivables Files (the spreadsheet with account information Defendants acquired from the sellers).

**RESPONSE:** UNDISPUTED that Plaintiffs' accounts were sold to LVNV as reflected in the Bills of Sale and Assignments attached to the affidavit of Anne Herthneck and that such Bills of Sale

and Assignments reflect that all right, title and interest in and to the accounts was sold, transferred, assigned and conveyed to LVNV. *See generally* Dkt. #52-1, #52-2. It is further UNDISPUTED that the transfers were completed upon the terms and conditions set forth in various forward flow agreements and asset purchase agreements (not submitted as evidence by either Plaintiffs or Defendants). DISPUTED that the Bills of Sale or Assignments cited by Plaintiffs make any mention of limitations being transferred. *See id.* It is further DISPUTED, for the reasons explained in response to ¶¶18, 23 and 24 *supra*, that admissible evidence in the record supports that all notices attached to the Amended Complaint were sent by LASPD as alleged and/or that such notices all pre-dated the sale of the accounts.

26. Defendants purchased multiple of the Plaintiffs' debts in portfolios named "Credit One Legal Recall", followed by six digits that represent the date of sale:
      1) James Lee (see, Dkt. 52-1 at p. 283 through p. 299),
      2) Roberta Salav (see, Dkt. 52-2 at p. 90 through p. 135),
      3) Kenneth Chappelle (see, Dkt. 52-1 at p. 109),
      4) Diane Benjamin (see, Dkt. 52-1 at p. 70 through p. 108),
      5) Debra Pray (see, Dkt. 52-1 at p. 70 through p. 108),
      6) Joyce Young (see, Dkt. 52-1 at p. 70 through p. 108),
      7) Donna Lindsey (see, Dkt. 52-1 at p. 300 through p. 320),
      8) Louise Reitz (see, Dkt. 52-2 at p. 59 through p. 88), and
      9) Luz Senquiz (see, Dkt. 52-2 at p. 59 through p. 88).

**RESPONSE:** Paragraph 26 includes immaterial facts the consideration of which has no effect on summary judgment. Specifically, Plaintiffs have failed to identify the meaning of "Legal Recall" and therefore have not demonstrated that reference to same in sale files has any bearing on these proceedings. Moreover, as Defendants' 30(b)(6) representative testified, "Legal Recall" is a seller defined term and thus, only Credit One knows how it defines the term. *See* Dkt. #68-1 (A. Herthneck Dep.) at 138:7-22 ("The answer is I don't know, and we don't know because that's not our term. It's the original creditor's term. So in order to find out what that means, you're going to have to ask them."); *see also* Dkt. #68-9 (Email) at p. 2 ("With respect to 'Legal Recall,' as Ms.

Herthneck testified in the deposition, that is a seller defined term and no one at Resurgent or LVNV knows how the seller defines the term."). Having failed to obtain evidence from Credit One as to the term's meaning, Plaintiffs have not demonstrated that use of the term is relevant to the summary judgment analysis.

27. Eight of these nine CreditOne portfolios also contained the address and name of Plaintiffs' counsel at LASPD as the "primary address" for Plaintiffs Lee, Salav, Benjamin, Chappelle, Young, Lindsey, Reitz, and Senquiz, see, Dkt. 52-1 at p. 82, 100, 122, 293, 312; Dkt. 52-2 at pp. 72, 81, 129;. [sic]

**RESPONSE:** UNDISPUTED that with respect to the Plaintiffs identified in ¶27 their addresses were reflected in the sale file as "c/o LASPD" followed by LASPD's address. Defendants DISPUTE that the "name of Plaintiffs' counsel at LASPD" was contained in the sale files. *See* Dkt. #52-1 at p. 83, 100, 122, 293, 312; Dkt. #52-2 at p. 72, 81, 129. Responding further, Defendants point out that inclusion of LASPD's address in the address line does not necessarily evidence that Defendants knew those Plaintiffs were represented by an attorney. As the very evidence presented by Plaintiffs reflect: "as a matter of industry pattern and practice where a seller of accounts has notice of attorney representation, it is expected that the seller will identify the attorney in the data string provided for in the account in a separate line item specifically designated for identifying attorneys (e.g. 'AttyName')." Dkt. #68-2 (Interrogatory Responses) at p. 2-3; *see also* SMF ¶5 (citing Dkt. #52-1 at ¶9). Irrespective, the record supports that to the extent Defendants know of attorney representation, that information is electronically passed on to debt collectors upon placement of the account, and the collectors are then required to communicate only with the attorney. *See* Dkt. #68-1 (A. Herthneck Dep.) at 53:6-54:6, 55:24-56:17, 75:2-13, 118:24-119:8, 123:21-126:16; Dkt. #52-1 (A. Herthneck Aff.) at ¶16.

28. Defendants purchased Plaintiff Emery's alleged debt in a portfolio named: "sherman_Sherman-Brands-C&D-POA-Final-0618," where C&D stands for "Cease and Desist" and POA stands for "Power of Attorney", see, Dkt. 52-1 at p. 142; see also, attached Exhibit I,

email from Defendant's counsel, Katherine Olson, regarding abbreviations used in Defendants' document production; LASPD attorney Edward Grossman and his phone number at LASPD were listed as "Attorney name" and "Attorney Phone", see, Dkt. 52-1 at p. 151.

**RESPONSE:** UNDISPUTED that Edward Grossman was identified as the "AttorneyName" and a phone number 312-263-1633 was identified as "AttorneyPhone" in the sale file for Plaintiff Emery. The remainder of ¶28 includes immaterial facts the consideration of which has no effect on summary judgment. Specifically, Plaintiffs have failed to explain or identify the significance of "Cease and Desist" in the portfolio name and the record is devoid of any evidence as to the intended meaning of "Cease and Desist" or any consequence of the phrase being included in a portfolio name.

29. Defendants purchased Plaintiff Smith's alleged debt in a portfolio named: "Gettington SCUSA Receivables Forward Flow-Cease/Desist"; see, Bill of sale and receivables file, attached hereto as Exhibit J; the receivables file spreadsheet plainly shows the address in Chicago for LASPD, see, Exhibit J at p. 10.

**RESPONSE:** UNDISPUTED that the sale file for Plaintiff Smith identifies her address as 211 W. Wacker Dr. Ste. 750 and that LASPD operates at that address. The remainder of ¶29 includes immaterial facts the consideration of which has no effect on summary judgment. Specifically, Plaintiffs have failed to explain or identify the significance of the portfolio name and the record is devoid of any evidence that the portfolio name is of consequence.

30. Defendants purchased Plaintiff Shellenberger's alleged Capital One debt (Capital One Account ending in -9724) in a portfolio named: "20180912_BCDLEP 20180911_Combined_LE", see, Dkt. 52-2 at p. 136-158. "BCLEP_Combined_LE" stands for: Branded Cease and Desist Legally Prohibited Combined Legally Enforceable, see, Exhibit I.

**RESPONSE:** Paragraph 30 includes immaterial facts the consideration of which has no effect on summary judgment. Specifically, Plaintiffs have failed to explain or identify the significance of the portfolio name and the record is devoid of any evidence that the portfolio name is of consequence. *See also* Dkt. #68-1 (A. Herthneck Dep.) at 127:23-130:14 (testifying that "Legal

Prohibited Accounts" as used by Capital One has the meaning identified in Exhibit 18 to the deposition); Exhibit 18 to A. Herthneck Dep., attached hereto as **Exhibit A** (defining term "Legal Prohibited Accounts").

31. The LVNV and Resurgent's production of all documents in their possession regarding Ms. Staluppi's alleged account, contained two prior letters from her counsel at LASPD: a March 8, 2011 fax to Citi Card/Citibank from LASPD, and a March 8, 2013 fax from LASPD to Mike Bahner at LVNV a fax number ending in -0919, and Asset Management Professionals, see, attached Group Exhibit K; see also, Exhibit A, at p. 46 at ln. 3 to p. 50 at ln. 4 (acknowledging that these two LASPD letters sent on behalf of Ms. Staluppi in 2011 and 2013 were in Defendants' files for Ms. Staluppi).

**RESPONSE:** UNDISPUTED.

32. A letter dated February 27, 2018, sent by Lloyd & McDaniel, attempting to collect a debt allegedly owed by Ms. Pennell was received by her counsel at LASPD on March 20, 2018, see, Exhibit E at ¶ 19; this was the sole communication Lloyd & McDaniel attempted to make Ms. Pennell's counsel, see, Id. On May 23, 2018, Ms. Pennell's counsel at LASPD responded to Lloyd & McDaniel to confirm that she was represented by counsel, see, Id.; see also, Dkt. 24-8 at pp. 3-4.

**RESPONSE:** UNDISPUTED except for the portion claiming Ms. Pennell's counsel responded. Plaintiffs cite paralegal Misha Corbett's declaration (Dkt. #68-5) in support of that proposition. However, Ms. Corbett has not established that she has personal knowledge re: the sending of the May 23, 2018 letter. Moreover, her testimony that the letter was sent "at the direction of Jeff Whitehead" constitutes inadmissible hearsay.[8] *See* Dkt. #68-5 ¶19. Her testimony also tends to conflict with the alleged May 23, 2018 letter itself, which purports to have come from Edward Grossman, not Jeff Whitehead. *See* Dkt.  #24-8 at p. 3. Responding further, Defendants point out that it took LASPD two (2) months from the claimed receipt of Lloyd & McDaniel's letter (and three (3) months from when it was sent) for LASPD to finally respond despite the letter clearly

---

[8] To the extent Ms. Corbett's testimony is based on LASPD records because she has neither presented nor authenticated such records, nor have such records ever been produced, the exception to hearsay for records of a regularly conducted activity does not apply. Fed. R. Evid. 803(6).

stating that "[i]f we do not hear from you within 30 days, we will assume that you do not represent

Sonja Pennell." *See* Dkt. #52-4 (R. Alphin Aff.) at ¶¶5-8.

33. After the Plaintiffs sent their notices of attorney representation, refusal to pay, and demands
that collection communications cease, Defendants continued to attempt to collect the debts from
each Plaintiffs, either directly or indirectly through third-party collectors, see, Dkt. 24-6, 24-7.
Defendant LVNV stated, in discovery, that:

> "[LVNV] states that no specific steps are generally taken to ensure that purchased accounts
> are not subject to attorney representation."

See, Exhibit B, at Suppl.Interog. No. 8; see also, at Suppl.Interog. No. 9.

**RESPONSE:** DISPUTED. The evidence cited to support that Defendants attempted to collect

debts from Plaintiffs consists entirely of unauthenticated correspondence.[9] Evidence relied upon

at summary judgment must be admissible; inadmissible evidence does not create a genuine issue

of material fact. *See Gustovich v. AT&T Commc'ns, Inc.*, 972 F.2d 845, 849 (7th Cir. 1992)

("[w]hen acting on a motion for summary judgment the judge considers only evidence that would

be admissible at trial"); *Martin v. Shawano-Gresham Sch. Dist.*, 295 F.3d 701, 713 (7th Cir. 2002)

(noting that inadmissible evidence "cannot create a factual issue"). To be admissible, evidence

must be authenticated. Fed. R. Evid. 901(a). Here, the Non-Testifying Plaintiffs are barred from

authenticating the letters purportedly sent to them by third-party servicers (*see* Dkt. #44) and

Plaintiffs never obtained alternative testimony authenticating the letters.[10] *See also* Dkt. #68-1 (A.

Herthneck Dep.) at 42:20-22 ("The servicers are independent agents. They act on their own behalf.

I don't know if they sent those letters or not."). Thus, the letters cannot be considered at summary

judgment. As for LVNV's quoted statement that it does not take any specific steps to ensure that

purchased accounts are not subject to attorney representation, same is immaterial to the summary

---

[9] *See also* Responses to Paragraphs 18, 23 and 24 *supra* regarding Defendants' dispute that Plaintiffs have
demonstrated that all LASPD correspondence attached to the Amended Complaint was transmitted.

[10] Specifically, Plaintiffs never obtained testimony from the third-party servicers alleged to have sent the
letters.

judgment analysis. Indeed, the FDCPA does not impose any duty on debt buyers to inquire upon purchase whether a debtor is represented by counsel. Notwithstanding, as explained when that statement was made, "it is expected that the seller will identify the attorney in the data string provided for in the account in a separate line item specifically designated for identifying attorneys (e.g. 'AttyName')." Dkt. #68-2 (Interrogatory Response) at p. 2-3.

34. Despite the notices of attorney representation, cease contacts demand, and refusal to pay, Defendants directed third-party collectors to collect the debts at issue in this case, see, Dkt. 24-6, 24-7, 25; Exhibit A at p. 40, ln. 20 to p. 43, ln. 6; see also, Exhibit I.

**RESPONSE:** UNDISPUTED that Defendants placed Plaintiffs' accounts with third-party servicers. DISPUTED that Plaintiffs themselves sent any notices[11] or that Defendants "directed" the third-party services to collect the debts as the cited evidence does not support either contention. To the contrary, the record reflects that the servicers are "independent agents," and thus Defendants do not control the decision to collect. *See* Dkt. #68-1 (A. Herthneck Dep.) at 42:20-22, 53:17-22.

35. A chart summarizing the dates of: 1) each Plaintiffs' notices of attorney representation, cease contacts demand, and refusal to pay; 2) the date of the collection attempts at Defendants' direction; 3) the dates of LASPD's second notices of attorney representation, refusal to pay, cease contacts demands; and 4) the dates of any continued collection communications, is attached hereto as Exhibit I.

**RESPONSE:** The chart attached as Exhibit I is inadmissible hearsay and thus cannot be considered at summary judgment. *See Gustovich*, 972 F.2d at 849 ("[w]hen acting on a motion for summary judgment the judge considers only evidence that would be admissible at trial").

36. Defendants' collection communications made Plaintiffs believe that their demands had been futile and that they did not have the rights that Congress had granted them under the FDCPA. Defendants' actions caused Plaintiffs to question whether they were still represented by counsel as to these debts, which caused stress, guilt, anxiety, and confusion as to whether they were required to pay the debts at issue, see, e.g., Dkt. 52-3 at p. 41, lns. 3-15; p. 45, ln. 21 to p. 46, ln. 8; Dkt. 52-7 at p. 13, ln 20 to p. 14, ln. 1; p. 33, lns. 19-25; p. 34, lns. 7-23; p. 48, lns. 9-13; Dkt. 52-9 at p. 58, lns. 4-15.

---

[11] *See also* Responses to Paragraphs 18, 23 and 24 *supra* regarding Defendants' dispute that Plaintiffs have demonstrated that all LASPD correspondence attached to the Amended Complaint was transmitted.

**RESPONSE:** DISPUTED. The cited testimony merely reflects that: 1) Plaintiff Pennell was upset that LVNV turned over the debt to Lloyd & McDaniel (*see* Dkt. #52-3 at 41:3-15, 45:21-46:2); 2) that Plaintiff Reitz felt guilt that she was unable to fulfill her financial obligations (*see* Dkt. #52-7 at 13:20-14:1, 33:19-25, 34:7-23, 48:9-13); and 3) that Plaintiff Smith was upset because she thought "everything was over" (*see* Dkt. #52-9 at 58:4-15). Moreover, there is no admissible evidence in the record which reflects how the purported collection communications affected the Non-Testifying Plaintiffs, if at all.

37. Approximately 53 cases (both filed and pre-suit demands) have been brought against LVNV by clients of LASPD alleging similar violations of the FDCPA in the two years preceding the complaint in this matter—24 such cases in 2017 alone; despite repeated notice—via claims made by clients of LASPD—that the debt portfolios which LVNV was purchasing contained refusals to pay and attorney representation notices on behalf of consumers, such as the clients of LASPD, LVNV did nothing in differently when it purchased, and attempted to collect on debts in, such portfolios, see, Exhibit A at p. 51, ln. 7 to p. 52, ln. 20.

**RESPONSE:** Paragraph 37 includes immaterial facts the consideration of which has no effect on summary judgment. Specifically, whether other consumers have previously alleged similar claims that they advised their respective original creditors of attorney representation or a cease request has absolutely no bearing on whether: 1) Defendants knew that *Plaintiffs* themselves were represented by counsel or 2) that Defendants were required to cease collection activity as to *Plaintiffs*. Similarly, that LVNV did not change its purchase practices is irrelevant to the FDCPA claims at issue because the FDCPA does not regulate debt *purchase* practices; rather it only regulates debt *collection* practices. *See* 15 U.S.C. § 1692(e) ("It is the purpose of this subchapter to eliminate abusive debt collection practices by debt collectors . . . .").

23

**ARGUMENT**

**I.    PLAINTIFFS HAVE FAILED TO SATISFY THEIR BURDEN OF DEMONSTRATING DEFENDANTS' STATUS AS DEBT COLLECTORS.**

The FDCPA only applies to "debt collectors" as defined by the statute in § 1692a(6). Section 1692a(6) provides two alternative definitions of a debt collector: (1) "any person who uses any instrumentality of interstate commerce or the mails in any business the principle purpose of which is the collection of any debts" (the "principal purpose" definition) or (2) any person "who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another" (the "regularly collects" definition). 15 U.S.C. § 1692a(6). Plaintiffs have the burden of establishing that Defendants meet the statutory definition of a debt collector to succeed on their FDCPA claims. *Pantoja v. Portfolio Recovery Assocs., LLC*, 78 F. Supp. 3d 743, 745 (N.D. Ill. 2015). Here it is undisputed that LVNV owned Plaintiffs' debts at the time of the alleged communications. Consequently, *Henson* disqualifies LVNV as a debt collector under the regularly collects definition. *See Henson v. Santander Consumer U.S.A. Inc.*, 137 S. Ct. 1718 (2017) (concluding that regularly collects definition excludes all individuals and entities who regularly purchase debts originated by someone else and then seek to collect those debts for their own account). Arguably, RCS is similarly disqualified from the regularly collects definition as the allegations against it stem solely from the fact that RCS acted as LVNV's attorney in fact pursuant to a "Limited Power of Attorney."[12] *See* Plaintiffs' Statement of Material Fact ("PSMF") at ¶7; *see also* Dkt. #68 at p. 44 (characterizing RCS as a predecessor-in-interest to the original creditor).

Moreover, the record evidence does not establish that debt collection – even indirect debt collection – is the principal purpose of either LVNV or RCS' business so as to satisfy the principal

---

[12] Indeed, there is no dispute that RCS did not directly carry out the alleged offensive debt collection activities but rather is named in this lawsuit based solely on Plaintiffs' contention that LVNV acts through RCS. *See* Dkt. #24 (Amended Complaint) at ¶6.

purpose definition. With respect to LVNV, Plaintiffs have set forth evidence that LVNV's business is to *invest in debt and loan assets* and that over 99% of LVNV's revenues come from activity undertaken by licensed third party debt collectors *related to those assets*. *See* PSMF at ¶4. Such evidence clearly establishes that the acquisition of debt is an integral part of LVNV's business. While admittedly if LVNV did not have some way of monetizing the debt it acquired, it would soon go out of business, but the same could be said if LVNV could no longer acquire debts. Thus, the evidence submitted by Plaintiffs supports that both acquisition activities and monetizing activities are integral to LVNV's business. *See also* Dkt. #52-1 at ¶4 ("LVNV's principal business consists of purchasing portfolios of charged-off debt."). An entity can only have one principle purpose, however - that of collecting debt, to satisfy the principal purpose definition. *Skinner v. LVNV Funding, LLC*, 2018 U.S. Dist. LEXIS 2812, *8 (N.D. Ill. Jan. 8, 2018).[13] As the evidence does not allow this Court to conclude which, if either, of LVNV's two (2) activities qualifies as its "principal purpose" Plaintiffs have failed to establish LVNV's status as a debt collector under the principal purpose definition. *See Hunte*, 255 F. Supp. at 726 (explaining that "if [plaintiff] meant to allege that [defendant] had two principal purposes, the allegation would take [defendant] outside the FDCPA's definition of 'debt collector'").

Plaintiffs have similarly failed to establish that debt collection is the principal purpose of RCS' business,[14] but rather, have merely demonstrated that RCS "sometimes" engages in debt collection activity. *See* Response to PSMF at ¶6 *supra*; *see also* Plaintiffs' Response to SMF ¶7. "A party will not be considered a debt collector under the principle purpose definition if collection

---

[13] Indeed, Congress' use of the definite article "the" rather than "a" is a clear indicator that Congress intended to cover only entities having that one principal purpose. *See Hunte v. Safeguard Props. Mgmt.*, 255 F. Supp. 3d 722, 726 (N.D. Ill. 2017).

[14] In fact, Plaintiffs never sought any discovery with respect to RCS' principle purpose.

of debts is merely some of that party's business." *Schlaf v. Safeguard Props., LLC*, 2017 U.S. Dist. LEXIS 161807, *6-7 (N.D. Ill. Aug. 29, 2017). Without any evidence of RCS' operations as a whole, Plaintiffs have failed to establish a significant portion or percentage of RCS' operations involve collection activity so as to demonstrate that its principal purpose is debt collection. Accordingly, as with LVNV, Plaintiffs have failed to establish RCS' status as a debt collector under the principal purpose definition.

Furthermore, as the evidence does not reflect that RCS' principal purpose is debt collection and Plaintiffs allege and admit that RCS is LVNV's "sister company" collecting on behalf of LVNV (*see* Dkt. #24 at ¶6), RCS also falls under the exception to "debt collector" status set forth in § 1692a(6)(B). *See* 15 U.S.C. § 1692a(6)(B); *see also Help at Home, Inc. v. Medical Capital, LLC*, 260 F.3d 748, 753 (7th Cir. 2001) ("It is a well-settled rule that a party is bound by what it states in its pleadings." (internal quotations omitted)); *Keller v. United States* 58 F.3d 1194, 1198 n.8 (7th Cir. 1995) (formal concessions in pleadings constitute judicial admissions which are binding upon the party making them).

## II.   "ALL RIGHT TITLE AND INTEREST" IS NOT THE EQUIVALENT OF ALL KNOWLEDGE.

As this Court previously and correctly held in *Pennell v. Global Trust Mgmt., LLC*, knowledge "is neither a right nor a liability. 2019 U.S. Dist. LEXIS 141827, *4 (S.D. Ind. Aug. 20, 2019). Thus, a corporate predecessor's knowledge is not acquired simply by virtue of an assignment. Moreover, as pointed out in Defendants' motion, which point goes unaddressed by Plaintiffs, even if an original creditor's knowledge of a cease and desist notice is attributed to a successor debt buyer, no § 1692c(c) claim exists as a cease and desist notice to the original creditor, rather than the debt buyer, has no legal effect. *See* 15 U.S.C. § 1692c(c) (plain language limits provision to situations where the consumer "notifies a debt collector in writing"). In other words,

26

because the original creditor was never restricted from contacting the consumer under the FDCPA, no such restriction could have been transferred to the debt buyer upon purchase, even under Plaintiffs' theory of the case.

Furthermore, because the alleged LASPD letters to the original creditor specify that LASPD represents the Plaintiffs only with respect to the original creditors' respective "attempts to collect" the debts, even assuming Defendants had knowledge of same, does not amount to knowledge that Plaintiffs were represented by an attorney with respect to their attempts to collect the debts. *See e.g.*, Dkt. #24-3 ("Please be advised that we represent [Plaintiff] regarding *your firm's attempts to collect* the above referenced debt." (emphasis added)). *Dore* is instructive. In *Dore*, the plaintiff claimed that defendant knew that plaintiff was represented with the respect to the debt because the defendant had knowledge she was represented in a bankruptcy proceeding which included the debt. *Dore v. Five Lakes Agency, Inc.*, 2015 U.S. Dist. LEXIS 88338, *8 (N.D. Ill. July 8, 2015). The district court rejected the argument concluding that knowledge of representation in the bankruptcy proceeding did not amount to knowledge that the attorney represented her in other matters related to the debt. *See id.* Similarly, here, knowledge that LASPD represents Plaintiff's with respect to a specific entity's attempts to collect does not necessarily amount to knowledge that LASPD represents Plaintiffs with respect to efforts undertaken by other entities related to the debt.[15] *See also Polster v. Van Ru Credit Corp.*, 2017 U.S. Dist. LEXIS

---

[15] Similar to contract interpretation, the ambiguities in the letter should be construed against the drafter(s), who specifically chose the language "regarding *your firm's attempts to collect* the above referenced debt" rather than simply stating "regarding the above referenced debt." *See Bourke v. Dun & Bradstreet Corp.*, 159 F.3d 1032, 1036 (7th Cir. 1998) ("any ambiguity in the terms of a contract must be resolved against the drafter of the disputed provision"). In other words, the drafters – purportedly the attorneys at LASPD, should be bound by the specific language they chose for asserting the rights of their clients (*see* PSMF ¶12).

48806, *29 (N.D. Ill. Mar. 31, 2017) ("attorney representation in one capacity does not necessarily entail attorney representation in a separate, albeit related, capacity").

### III.    WHAT DEFENDANTS "SHOULD HAVE KNOWN" IS IRRELEVANT.

Plaintiffs get off on the wrong foot by arguing that Defendants could have and should have ascertained knowledge of attorney representation from the original creditors (Dkt. # 68 at p. 43, 45, 47) as what Defendants "could have" or "should have" known is irrelevant under §1692c(a)(2). *Dore*, 2015 U.S. Dist. LEXIS 88338 at *8 ("What [defendant] 'should have known' is irrelevant because Section 1692c(a)(2) applies only if the debt collector *actually* knows that the consumer is represented." (emphasis in original)) (citing *Randolph v. IMBS, Inc.*, 368 F.3d 726, 729-30 (7th Cir. 2004)). Indeed, the FDCPA does not set forth any affirmative duty on debt buyers to request and obtain attorney information from sellers at the time of purchase. Thus, Plaintiffs' argument that debt buyers must do more than simply trust sellers to provide such information (*see* Dkt. #68 at p. 48-49, 65) is an improper attempt to rewrite the statute and should be rejected. *See Wagoner v. Npas, Inc.*, 2020 U.S. Dist. LEXIS 73381, *22 (N.D. Ind. Apr. 27, 2020) ("[T]he court's job is to enforce the constitutionally valid law Congress has written, not rewrite it – 'to apply, not amend, the work of the People's representatives.") (quoting *Henson*, 137 S. Ct. at 1726).

Plaintiffs' attempts to distinguish *Zachial* also fall flat. The *Zachial* court merely found it was *plausible* at the *pleading stage* that documents transmitted from the original creditor to the debt buyer informed the debt buyer of counsel. *Zachial v. Cascade Capital, LLC*, 2019 U.S. Dist. LEXIS 167666, *7 (N.D. Ill. Sept. 30, 2019). The court in no way concluded that the original creditor's knowledge of attorney representation was attributed to the debt buyer as a matter of law, but rather left the issue of knowledge to be explored in discovery. *See id.* at *8 ("Further discovery may reveal whether (and when) [defendant] in fact knew [plaintiff] was represented by counsel.").

Here, discovery revealed only Plaintiff Emery's sale file identified attorney information and that only Plaintiff Staluppi's original creditor ever forwarded a copy of the LASPD notice it received to Defendants.[16] *See* SMF ¶6; PSMF ¶31. Because there is no evidence to support that Defendants were provided attorney information for any other Plaintiff, there is no evidence that Defendants had actual knowledge the remaining Plaintiffs were represented at or near the time of acquiring their accounts.

While Plaintiffs put much stock in the fact that "c/o LASPD" and LASPD's address was included in Plaintiffs Lee, Salav, Chappelle, Benjamin, Young, Lindsey, Reitz, and Senquiz' respective sale files as the accountholder's primary address,[17] Plaintiffs have failed to present any legal authority or evidence to support that Defendants knew by way of inclusion of LASPD's address and/or "c/o" in the primary address line that Plaintiffs were represented by an attorney.[18] To the contrary, the record reflects that where a person is known to the seller to be represented by counsel, Defendants expect the attorney to be identified by the seller in the sale file in a separate line item specifically intended for identifying attorneys.[19] *See* Response to PSMF ¶27 *supra*.

---

[16] As to Plaintiff Staluppi, admittedly Defendants obtained copies of LASPD's March 8, 2011 fax to Citibank and March 8, 2013 letter to Asset Management Professionals, which letters Defendants produced in this case. Although Plaintiffs do not advance any evidence as to when Defendants obtained the March 8, 2011 or March 2013 letters, even assuming that the letters were transmitted at or near the time that they are dated, Defendants are still entitled to the bona fide error defense as discussed below in more detail. Summary judgment is also warranted in Defendants favor as against both Emery and Staluppi given they are Non-Testifying Plaintiffs who cannot establish other elements of their claims.

[17] Each of these Plaintiffs is barred from testifying; thus, to the extent the Court finds they are unable to prove other elements of their claims, the Court need not even address this issue.

[18] Plaintiffs also contend that the address for LASPD appears in Plaintiff Smith's sale file in lieu of her personal address, but without any mention of LASPD. *See* PSMF ¶29. Plaintiffs have similarly failed to present any legal authority or evidence to support that the mere inclusion of LASPD's address constitutes actual knowledge of representation and therefore have not established a violation as to Smith. Even if they had, as explained *infra*, Defendants are entitled to the bona fide error defense.

[19] Plaintiffs attack this evidence by claiming Defendants' 30(b)(6) deponent, Anne Herthneck, cannot testify as to "industry practice" as she has not been identified as an expert. Regardless of the merits of this

Moreover, the record supports that to the extent Defendants know of attorney representation for an account, that information is electronically passed on to third-party debt collectors upon placement of the account, and the collectors are then required to communicate only with the attorney. *See id.* Thus, even to the extent Defendants knew that these Plaintiffs were represented by an attorney (and such representation was legitimate and the scope of such representation was related to Defendants themselves), Defendants qualify for the bona fide error defense, as discussed *infra*.

Plaintiffs also place too much value in the fact that the aforementioned Plaintiffs' accounts were sold in portfolios named "Credit One Legal Recall," that Plaintiff Smith's account was sold in a portfolio with "Cease/Desist" in the name, and that Plaintiff Shellenberger's account was sold in a portfolio whose name contained an acronym for "Branded Cease and Desist Legally Prohibited Combined Legally Enforceable." As explained above, because Plaintiffs have failed to explain or identify the significance of the portfolio names and the record is devoid of any evidence that the portfolio names have any legal consequence, these facts are immaterial to summary judgment.

## IV.    LASPD IS NOT ACTING AS AN ATTORNEY.

Plaintiffs contend that Defendants' argument that LASPD does not provide legal services was rejected in *Serrano*. However, in *Serrano*, the legitimacy of the LASPD program was

---

argument, Ms. Herthneck is undoubtedly allowed, as a duly authorized representative of and custodian of records for LVNV, to testify as to LVNV's expectation as to its records. *See* Dkt. #52-1 (A. Herthneck Aff.) at ¶2 ("I am also a duly authorized representative and custodian of records for LVNV, and in such capacity, I am authorized to speak on the company's behalf on the matters contained in this Affidavit."); *see also* Dkt. #68-1 (A. Herthneck Dep.) at 21:1-12 (all LVNV records, including the sale file, are transmitted to and maintained by RCS; there is no separate LVNV system). In the end, only LVNV's understanding and interpretation of its records matters as same goes to whether LVNV had *actual* knowledge of attorney representation. And, despite having long been on notice of Defendants' position as to what LVNV expects, Plaintiffs did nothing to challenge Ms. Herthneck's personal knowledge of LVNV's expectations in her deposition. *Compare* Dkt. #68-2 (July 25, 2019 Interrogatory Responses) *with* Dkt. #68-1 (Dec. 13, 2019 dep.).

challenged solely on the basis of the language in LASPD's letter and the fact that plaintiff alone never spoke to an LASPD attorney. *See* Dkt. #68 at p. 51 (quoting *Serrano v. Van Ru Credit Corp.*, 126 F. Supp. 3d 1005, 1009 (N.D. Ill. 2015) ("Defendant argues that Plaintiff was never represented by an attorney within the meaning of the FDCPA *because the wording of the fax indicted that LASPD only provided 'limited representation,' and that Plaintiff did not speak to an attorney at the organization*.") (emphasis added)). Here, in contrast, Defendants challenge the legitimacy of the LASPD program based on the sworn testimony of the Clinic representative and testifying Plaintiffs as to the services provided by LASPD as well as LASPD's retainer contract. As the *Serrano* court never addressed such evidence,[20] the *Serrano* decision is not on point.[21]

Plaintiffs devote a great deal of their brief discussing LASPD's purported reputation and accolades, but same is unquestionably irrelevant to whether LASPD in fact provides legal services. As to the services provided, contrary to Plaintiffs assertions, Defendants do not "baselessly claim" that the only service provided by LASPD is sending the form letter. *See* Dkt. #68 p. 57. Rather, that is exactly what the Clinic's Rule 30(b)(6) representative's and three (3) testifying Plaintiffs' sworn testimony reflects, as does LASPD's form retainer contracts. *See* SMF ¶41; Dkt. #53-5 (Retainer Contracts); *see also* PSMF ¶12. Regardless, that the staff at LASPD also track correspondence does not change the analysis as imputing information into LASPD's software similarly does not require legal knowledge or skill. *See* Dkt. #68 p. 57. Moreover, there is no evidence to support LASPD attorneys ever advised Plaintiffs of anything, including their rights

---

[20] The subject evidence was similarly never considered in *Zachial*, a decision addressing only the adequacy of pleadings. *See generally Zachial*, 2019 U.S. Dist. LEXIS 167666. Accordingly, *Zachial* similarly does not serve to diminish Defendants' argument.

[21] The district court decision is not binding on this Court, regardless.

under the FDCPA, as it is undisputed that Plaintiffs, like most LASPD clients, have never spoken to an LASPD attorney. *Compare id. with* SMF ¶31.

Furthermore, rather than an attorney deciding whether the form go-away letter should be sent, the record reflects that paralegals make this decision. *See* SMF ¶42. Although Plaintiffs contend that letters are sent at the "direction and control" of an LASPD attorney, this conclusory assertion does nothing to refute the 30(b)(6) representative's testimony that paralegals are preparing and sending these letters bearing attorney signatures without the letters ever coming across an attorney's desk. *Compare* Plaintiffs' Response to SMF ¶42 *with* Dkt. #52-5 (Clinic 30(b)(6) dep.) at 115:19-116:14. Rather, this conclusory assertion of "direction and control" is consistent with testimony that the template and procedure for sending has been approved by an attorney, and that paralegals carry out that procedure in their day-to-day activities. *See* Dkt. #52-5 at 116:3-5; *see also* Dkt. #68-3 (E. Grossman Decl.) at ¶14 ("Any letters sent by the Clinic on behalf of an LASPD's [sic] client are based upon letters that I or one of our other attorneys created and approved and authorized to be sent based upon criteria and policies developed and approved by myself and the Clinic's attorneys, as well as by our paralegals that we have trained and supervised."). Indeed, noticeably absent from both Edward Grossman and Jeff Whitehead's submitted declarations is testimony that they ever reviewed and/or approved the letters attached to the Amended Complaint, which purport to come from them.[22] *See generally* Dkt. #68-3, #68-4. That they did not do so is further supported by the fact that after Edward Grossman stepped down as Executive Director in February 2017 and had no involvement in sending letters, his signature continued to appear on the majority of LASPD letters at issue.[23] *See* Dkt. #68 at p. 24 (Feb. 2017

---

[22] Nor do the affidavits identify any other attorney at LASPD who reviewed and approved the letters.

[23] Although Plaintiffs now refute the Clinic's Rule 30(b)(6) testimony that Edward Grossman did not have any day-to-day role in LASPD before or after stepping down as Executive Director, Plaintiffs noticeably

retirement date); Dkt. #52-5 at 35:18-36:9 ("Q. So Edward Grossman wouldn't have been the one sending out letters on behalf of LASPD to debt collectors or creditors? A. No, no. Now, there was some delay in changing signatures so his signature might have still appeared on some letters.").

In interpreting the FDPCA, the Seventh Circuit has been clear that "whatever correspondence purports to come from a lawyer in his official capacity must be at least passed upon and approved by him." *See Avila v. Rubin*, 84 F.3d 222, at 229 (7th Cir. 1996) (quoting American Bar Association, Formal Opinion 68 (1932)). As in *Avila*, Edward Grossman and Jeff Whitehead were "not the real 'source' of the letters in this case." *Id.* at 230. Nor does the record support that LASPD provided any services that could reasonably be classified as requiring an attorney's professional judgment.24 Thus, Plaintiffs have failed to prove the attorney representation element of § 1692c(a)(2).

## V.    ALTERNATIVELY, LASPD ENGAGES IN THE UNAUTHORIZED PRACTICE OF LAW.

Plaintiffs contend that LASPD's actions are distinguishable from the egregious conduct at issue in the cases cited in footnote 17 of Defendants' motion. Yet, Defendants never claimed that the conduct was analogous. Rather, the citations were presented as support for each State's

---

do not deny or submit evidence to refute that his continued involvement as Senior Counsel after February 2017 did not include sending out letters. *Compare* Dkt. #68 at p. 24 (citing Dkt. #68-3 at ¶¶6-16) *with* Dkt. #52-5 at 35:12-17 ("Q. So no day-to-day hand in LASPD's operations? No. Not – not after he left the executive directorship. And again, it – it's not day-to-day, the executive director of the clinic in terms of LASPD. It's more of an oversight."). With respect to the ninety-two (92) LASPD letters attached to the Amended Complaint at Dkt. #23-3, #24-4, #24-5, #24-8, #24-9 and #24-10, eighty-nine (89) of the letters purport to be signed by Edward Grossman, and of those eighty-nine (89) letters, eighty-three (83) post-date Mr. Grossman stepping down as Executive Director. One of the letters even post-dates Mr. Grossman stepping down as Senior Counsel, in contradiction to Plaintiffs' contention that none of the letters post-date his tenure in that position. *Compare* Dkt. #24-10 at p. 34 (letter dated Jan. 4, 2019) *with* Dkt. #68 p. 25.

24 That some professional judgment may have gone into the application process (i.e. before LASPD's retention) does not negate the fact that the services offered and provided by LASPD as part of its retention, were not in fact legal in nature. In other words, any attorney involvement and professional judgment prior to LASPD agreeing to "represent" an applicant is irrelevant to whether services provided by LASPD to an accepted applicant are legal in nature.

interpretation of the "practice of law" as is evident from the parentheticals accompanying the citations. As Plaintiffs do not refute the accuracy of the parentheticals, this Court should find that each of the States at issue interprets the practice of law to include the giving of legal advice and the rendering of any service requiring use of legal skill or knowledge. Thus, to the extent LASPD engages in such activities, as Plaintiffs contend it does, LASPD does so outside of Illinois and Indiana, without a valid license.

Plaintiffs' attempt to justify LASPD's conduct by equating it to that of attorneys admitted to practice before federal bars is misguided. Admittedly an attorney not licensed to practice law in a State may, if so admitted, practice before a federal bar located within that State. This limited exception does not, however, amount to a general license to provide legal advice and services premised on federal law to persons within that State, but clearly limits the provision of legal services to those related to federal proceedings for which the attorney is admitted. Moreover, the record is clear that LASPD does not represent clients in *any* legal proceedings, including federal court proceedings.[25] *See* Dkt. #53-5 (Retainer Contracts) ("I (we) also understand that LASPD will not represent me (us) in *any* legal proceedings, including formal court proceedings . . . ." (emphasis added)). Thus, any provision of legal services by LASPD attorneys to persons residing in States for which the attorneys do not maintain a license, clearly does not fall under the exception to the unlicensed practice of law proffered by Plaintiffs.

Plaintiffs have also failed to present a convincing case that LASPD services are provided by attorneys rather than paralegals. Plaintiffs attempt to avoid the implications of the Rule 30(b)(6)

---

[25] There is also no evidence in the record to support that LASPD attorneys are admitted to the federal bars located in each of the States at issue. This Court can also take judicial notice that they are not so admitted via the admission searches available through the various district courts. *See e.g.*, *E.D. MI Atty Admission Record Search*, available at https://www.mied.uscourts.gov/index.cfm?pagefunction=AdmissionCheck (last visited June 3, 2020); *see also* Fed. R. Evid. 201.

representative's unqualified testimony that paralegals "make" the recommendation of whether to file for bankruptcy by now claiming in self-serving fashion that such recommendation is made by an attorney and merely *conveyed* by the paralegal. *Compare* Dkt. #68 at p. 60 *with* Dkt. #52-5 at 15:7-15. At best, however, this contradiction creates a question of material fact as to who is giving such legal advice.[26] Moreover, regardless of who in fact makes the recommendation to file for bankruptcy, the record reflects that meaningful attorney supervision is lacking. Simply speaking, that two (2) paralegals, two (2) intake specialists, and several additional unlicensed volunteers are handling and carrying out services for approximately 1,500 clients with the *sole* supervising attorney[27] only making an appearance 10-20 hours each week, is the antithesis of *meaningful* attorney supervision.[28] *See* Plaintiffs' Response to SMF ¶¶28-29, 34. "Absent the imprimatur of meaningful attorney supervision, any legal advice or other legal service provided by a nonlawyer constitutes the unauthorized practice of law." *United States v. Johnson*, 327 F.3d 554, 561 (7th Cir. 2003).

---

[26] At worst, the cited testimony creates a sham issue of fact, which can be disregarded. *See James*, 2020 U.S. App. LEXIS 15490 at *1 ("It is axiomatic that the first step in the summary-judgment process is to ask whether the evidentiary record establishes a genuine issue of material fact for trial. To decide this question, the judge may disregard an affidavit that attempts to create a sham issue of fact.") (internal citations omitted).

[27] Plaintiffs contend that Edward Grossman, Adam Salzman and Donald Liebsker regularly met with LASPD staff to supervise them, yet their cited testimony does not support same. *See* Plaintiffs' Response to SMF ¶27 (citing Dkt. #68-3 ¶16). Rather, the cited testimony, which comes from Mr. Grossman, reflects only that Mr. Grossman, during his tenure as Executive Director, regularly met with staff to supervise them. *See* Dkt. #68-3 ¶16. Notably, Mr. Grossman's tenure ended in February 2017, prior to any of the challenged collection activity. *Id.* at ¶3. Moreover, the evidence in the record reflects that Adam Salzman and Donald Liebsker never played any role in the day-to-day activities of LASPD. *See* SMF ¶¶24-28.

[28] Instead of meaningful supervision, LASPD seemingly relies on a "feedback tool" which they claim ensures, *after the fact*, that clients "were happy" with the services "they received." *See* Plaintiff's Response to SMF ¶27.

## VI.   THE NON-TESTIFYING PLAINTIFFS CANNOT PROVE THEIR CLAIMS.

Plaintiffs (who bear the burden of proving each element of their FDCPA claims) routinely cite exhibits that are unauthenticated either by deposition testimony or affidavit and routinely rely on inadmissible hearsay evidence in claiming that they have satisfied their burden of proof. *See Eisenstadt*, 113 F.3d at 742 ("hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible at trial"). As to the Non-Testifying Plaintiffs, said deficiencies in evidence must preclude summary judgment because unlike the testifying Plaintiffs who may be able to authenticate records at trial or provide admissible testimony, the Non-Testifying Plaintiffs are barred from doing so.

The Non-Testifying Plaintiffs first contend that they have clearly demonstrated injury in fact because they "forwarded the letters Defendants had sent to them to LASPD."[29] *See* Dkt. #68 at p. 62. Yet, the Non-Testifying Plaintiffs have not and cannot testify that they in fact forwarded the letters. Nor can LASPD provide such evidence as it lacks personal knowledge of the events. Similarly, the record is devoid of any evidence that the debt collection letters attached to the Amended Complaint were in fact sent to and/or received by the Non-Testifying Plaintiffs. Specifically, there is no testimony from the Non-Testifying Plaintiffs or the third-party servicers alleged to have sent the letters establishing the authenticity of the letters and "a plaintiff may not rely on mere allegations or denials in his complaint when opposing a properly supported motion for summary judgment."[30] *James*, 2020 U.S. App. LEXIS 15490 at *11-12; *see also* Fed. R. Evid.

---

[29] Plaintiffs spend a good deal of time distinguishing *Casillas*, but, true to form, ignore the proposition for which the case was cited by Defendants. Here, *Casillas* was merely cited to explain the necessary elements of standing, which in FDCPA cases, the Seventh Circuit has concluded includes not only reading the challenged communication, but relying on it to one's detriment.  *See* Dkt. #52 at p. 16.

[30] Although testifying Plaintiffs Smith, Pennell, and Reitz do not submit declarations authenticating the letters they claimed to have received, Defendants acknowledge that they authenticated letters in their

901. Having failed to lay an evidentiary foundation for the collection letters purportedly sent to the Non-Testifying Plaintiffs or otherwise establish their admissibility means the letters cannot be considered at summary judgment.[31] *See Steffek v. Client Servs.*, 948 F.3d 761, (7th Cir. 2020) ("Documents must be authenticated by an affidavit that lays a proper foundation for their admissibility, even at the summary judgment stage."); *Little v. Ill. Dep't Pub. Health*, 2020 U.S. Dist. LEXIS 55702, *4 (N.D. Ill. Mar. 31, 2020) ("[e]vidence supporting or opposing summary judgment must be admissible if offered at trial"); *Meridian Fin. Advisors, Ltd. v. Pence*, 763 F. Supp. 2d 1046, 1056 (S.D. Ind. 2011) ("To the extent that designated evidence by either party is inadmissible in this case, the Court disregards that evidence in evaluating the Motion for Summary Judgment."). Without the letters, the Non-Testifying Plaintiffs cannot establish a bare procedural violation let alone concrete injury.[32] Thus, judgment must be entered against the Non-Testifying Plaintiffs in favor of Defendants as a matter of law.

Judgment is also warranted in favor of Defendants as to the Non-Testifying Plaintiffs' claims as the Non-Testifying Plaintiffs have not demonstrated a "debt" as that term is defined by the FDCPA. In opposition to this argument, Plaintiffs contend that *Pantoja* is instructive. In *Pantoja*, however, the undisputed evidence in the record reflected that Plaintiff never used the

---

depositions and could do so at trial. As to the Non-Testifying Plaintiffs, however, as they never sought discovery from any of the third-party collectors (or even identified them as persons with knowledge), and Defendants cannot authenticate the letters, the letters are inadmissible. *See* Dkt. #68-1 (A. Herthneck Dep.) at 42:20-22 ("The servicers are independent agents. They act on their own behalf. I don't know if they sent those letters or not.").

[31] Even if this Court could consider the letters attached to the Amended Complaint, the purported recipients' addresses are redacted in each, and there is no evidence in the record as to each of the Non-Testifying Plaintiffs' addresses regardless. Thus, a fact finder could not reasonably conclude that the letters were sent to Plaintiffs, as opposed to for example, a designated representative or LASPD itself.

[32] Even if a bare procedural violation was established, as explained in Defendants' motion, the Non-Testifying Plaintiffs have not and cannot establish they were harmed in any way by the letters. Moreover, LASPD cannot testify as to any injury purportedly suffered as it lacks personal knowledge of such facts.

credit card issued to him personally but rather the charges incurred stemmed solely from an annual credit card fee, activation fee and late fee. *Pantoja*, 78 F. Supp. 3d at 745-46. As the debt stemmed merely from issuance rather than any charges subsequently incurred, a finding that the fees were incurred for personal, household purposes was warranted. *See id.* In contrast, here, the Non-Testifying Plaintiffs have presented no admissible evidence as to the charges which comprise their respective debts, let alone that said charges stem solely from issuance of their respective credit cards. Moreover, given the substantial balances owed by the Non-Testifying Plaintiffs, an inference that the debts were limited to issuance fees, as was the case in *Pantoja*, is unwarranted. *See e.g.*, Dkt. #52-2 at p. 9 (balance of $3,459.14 for R. Martin); *id.* at p. 17 (balance of $1,782.43 for McBride).

The Non-Testifying Plaintiffs presumably expect this Court to simply agree that their debts were personal in nature because there is no evidence that the debts were incurred for business purposes.[33] This approach ignores that Plaintiffs bear the burden of proving the debts fall under the statute and that there is similarly no evidence that the debts were incurred for personal, household purposes except perhaps the fact that LVNV purchases debts characterized as "consumer" debts.  As argued in Defendants' motion, however, any "consumer" characterization attributed to Plaintiffs' credit cards by the original creditors at the time of sale to LVNV, is not dispositive of whether a "debt" as defined by the FDCPA was in fact incurred. And because Plaintiffs make no effort to challenge this argument, or distinguish any of the numerous cases cited by Defendants in support of this argument, they have waived opposition to the argument. *See Scheinman v. BMW of N. Am., LLC*, 2010 U.S. Dist. LEXIS 106640, *8 (N.D. Ill. Sept. 30, 2010)

---

[33] Notably, had Defendants been allowed to depose the Non-Testifying Plaintiffs they might have discovered such evidence. Thus, the Non-Testifying Plaintiffs should not be allowed to prove a "debt" was incurred by merely claiming that there is no evidence to suggest the contrary.

("failure to address an argument constitutes waiver of opposition").[34] Consequently, this Court should find that a "consumer" characterization is not enough on its own to establish a "debt" and enter judgment in favor of Defendants as to the Non-Testifying Plaintiffs' claims.

Judgement is further warranted in favor of Defendants as to the Non-Testifying Plaintiffs' claims because contrary to Plaintiffs' opposition, LASPD cannot authenticate the retainer contracts as having been entered into by Plaintiffs. At best, LASPD verifies signatures "for consistency" with other documents purportedly provided by their clients. *See* Dkt. #68 at p. 54 n.11; *see also* Plaintiffs' Response to SMF ¶37 ("LASPD intake and paralegal staff verify that signatures are present and consistent"). But because there is no evidence that LASPD can authenticate the documents purportedly supplied as belonging to Plaintiffs or as containing their signatures, this verification process is irrelevant. Moreover, because LASPD's purported knowledge is by admission based on documents, those documents must be produced to satisfy the "best evidence rule." *See Waterloo Furniture Components*, 467 F.3d at 648-49 (if witness's testimony is based on knowledge of a document rather than first-hand knowledge of an event, production of the document is required under the "best evidence rule"); Fed. R. Evid. 1002. As said records were never identified or produced in discovery, nor attached to LASPD's declarations, LASPD's testimony on this issue amounts to nothing more than inadmissible hearsay.

Simply speaking, Plaintiffs' contention that only documentary evidence rather than oral testimony is needed to establish LASPD's representation of Plaintiffs, ignores that evidentiary

---

[34] Additionally, Plaintiffs cannot simply raise any such arguments in their Reply brief as "[i]t is well settled law in this Circuit that arguments raised for the first time in a reply brief are waived." *Wolotka v. School Town of Munster*, 399 F. Supp. 2d 885, 901 (N.D. Ind. 2005). Simple fairness issues justify such a rule because an argument first raised in a reply deprives the opposing party of an opportunity to respond. *Thomas Exxon Mobil Oil Corp.*, 2007 U.S. Dist. LEXIS 9689, *9 (N.D. Ind. Feb. 8, 2007).

foundations must be established for documents before they can be admitted into evidence.[35] *See* Fed. R. Evid. 901 ("To satisfy the requirement of authenticating or identifying an item of evidence, the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is."). Typically, this is done through oral testimony from a person with knowledge. *See* Fed. R. Evid. 901(b)(1). Because the Non-Testifying Plaintiffs are barred from presenting testimony that their signatures appear on the retainer contracts, their only other option was to present testimony from a non-expert familiar with their signatures.[36] *See* Fed. R. Evid. 901(b)(2). As the record does not support that LASPD is familiar with Plaintiffs' signatures, but rather supports the contrary, and the Non-Testifying Plaintiffs have not disclosed any other persons with knowledge of their signatures, the Non-Testifying Plaintiffs have failed to satisfy their burden of proving that they were represented by LASPD. *See* Dkt. #52-5 (Clinic 30(b)(6) dep.) at 77:11-24 (testifying that no one at LASPD could verify Plaintiffs' respective signatures). Consequently, their FDCPA claims fail as a matter of law. Specifically, their § 1692c(a)(2) claims fail because said Plaintiffs have not demonstrated attorney representation and their § 1692c(c) claims fail because absent representation the Non-Testifying Plaintiffs cannot demonstrate that *they* notified a debt collector to cease collections. *See* 15 U.S.C. § 1692c(c) (prohibiting further communications only where the *consumer* notifies the debt collector of the cease request).

---

[35] Although Defendants included the retainer contracts as an exhibit to their motion (*see* Dkt. #53-5), said exhibit was submitted for the limited purpose of proving the content of LASPD retainer contracts - which content is not in dispute. As Defendants have not and cannot authenticate the signatures contained in the exhibit as belonging to Plaintiffs, Plaintiffs must do so if they want a finding that they contracted with LASPD to represent them.

[36] Experts may also authenticate signatures but may only do so by comparing "an authenticated specimen." Fed. R. Evid. 901(b)(3). As Plaintiffs have neither authenticated a specimen nor disclosed any expert, this method of authentication is inconsequential.

Non-Testifying Plaintiffs Pray, DiCresce, Gentry and Weaver's claims fail for additional reasons. Specifically, as to Pray and DiCresce, despite their claims relying entirely on notice having been provided to their respective original creditors prior to the sale of their accounts, the record reflects that the LASPD letters allegedly sent to the original creditors postdate the respective sale of their accounts to LVNV. *See* Response to PSMF ¶24 *supra*. As these Plaintiffs have pointed to no other evidence in the record to support that Defendants knew or had notice of any attorney representation or cease request, Defendants are entitled to judgment as against Pray and DiCresce for this additional reason.

As to Gentry, there is no evidence in the record to support that LASPD notified Capital One that it represented Gentry and/or that Gentry requested collection efforts cease. *See id.* (Capital One did not produce letter in response to subpoena); Dkt. #24-5 at p. 2 (letter purportedly sent to Capital One is actually addressed to Alliance One Receivables Management, Inc.). Indeed, despite this argument being raised in Defendants' motion, Plaintiffs do not oppose the argument in response, thereby waiving any opposition.[37] *See generally* Dkt. #68; *Scheinman*, 2010 U.S. Dist. LEXIS 106640 at *8. Thus, judgment is also warranted in favor of Defendants against Gentry for this additional reason.

Similarly, Plaintiffs fail to address the argument that the communication alleged to have been sent to Weaver after third-party servicer Credit Control purportedly received notice of representation was not a communication made "in connection with the collection of any debt." 15

---

[37] Plaintiffs do, however, repeatedly contend that Gentry's claims do not involve notice to the original creditor. *See* Plaintiffs' Response to SMF ¶¶63, 64, 65. A cursory review of Gentry's allegations refute that contention, however. *See* Dkt. #24 at ¶¶122-23 (alleging that debt was incurred to Capital One and that LASPD notified Capital One on September 1, 2017 that Gentry was represented by counsel). And Gentry cannot assert new claims at summary judgment. *Colbert v. Willingham*, 2016 U.S. Dist. LEXIS 7924, *15 (N.D. Ill. Jan. 19, 2016) ("a plaintiff cannot amend his complaint at the summary judgment stage to add new legal claims with new factual bases").

U.S.C. § 1692c; *see also* Dkt. #68 *generally*. Accordingly, Defendants have likewise waived any opposition to this argument, warranting judgment against Weaver in favor of Defendants on this additional basis.

## VII.   REITZ'S ADMISSION PRECLUDES JUDGMENT IN HER FAVOR.

As argued in Defendants' motion, Plaintiff Reitz' admission that LASPD did not represent her with respect to either LVNV and/or RCS' collection efforts precludes any finding that she was represented by LASPD so as to support her §§ 1692c(a)(2) or 1692c(c) claims. Plaintiffs oppose this argument by simply claiming that said admission was Reitz "*clearly* discussing her understanding of LASPD's representation, whereby they informed her that they would not represent her in court if she were to be sued on a debt." *See* Plaintiffs' Response to SMF ¶47 (emphasis added). Yet, no such qualification can be inferred from her testimony. *See* Dkt. #52-7 (Reitz Dep.) at 56:14-57:16 ("Q. Do you agree that LASPD represented you with respect to LVNV? A. No. . . . Q. As you sit here today, did LASPD represent you with regard to Resurgent's efforts to collect a debt? A. No." (internal objections omitted)). Nor has Reitz submitted a clarifying affidavit or declaration explaining how she interpreted the questions asked of her in her deposition. Accordingly, Reitz is bound by her admission, precluding judgment in her favor.

## VIII.   NO VIOLATIONS AS TO PENNELL.

Plaintiffs do not dispute that following notice of attorney representation the third-party servicer with whom Pennell's account was placed first reached out to LASPD seeking confirmation that LASPD represented Plaintiff and that LASPD did not respond until months later. *See* PSMF at ¶32. As Plaintiffs do not even attempt to argue that the several months it took LASPD to respond constitutes "a reasonable period of time," judgment should be entered in Defendants' favor. 15 U.S.C. § 1692c(a)(2). Indeed, as with so many other arguments, which go unaddressed

by Plaintiffs, Plaintiffs utter failure to address or refute Defendants' arguments surrounding Pennell's inability to establish a violation of either § 1692c(a)(2) or § 1692c(c) constitutes a waiver of opposition. *Compare* Dkt. #52 at p. 22-24 *with* Dkt. #68 *generally*; *Scheinman*, 2010 U.S. Dist. LEXIS 106640 at *8.

## IX.    DEFENDANTS ARE ENTITLED TO THE BONA FIDE ERROR DEFENSE.

In addition to the aforementioned arguments warranting judgment in Defendants' favor, Defendants are also entitled to the bona fide error defense.[38] As Defendants' Rule 30(b)(6) representative testified in both her affidavit and deposition, the placement file sent to third-party servicers contains all available attorney information known to RCS. *See* Dkt. #52-1 at ¶16; Dkt. #68-1 at 53:24-54:1 (Q. Well, do you tell them that there's an attorney involved? A. If we know, we tell them, yes."). Moreover, as a result of RCS' automated data transfer process, the placement file also contains the information for the account provided to LVNV at the time of purchase, including any attorney information. *See* Dkt. #68-1 at 55:24-56:11, 124:5-126:21 (explaining that account datastring from sale file is electronically transferred into RCS' system which automatically creates the placement file using the data provided by the seller). Furthermore, pursuant to RCS' written agency manual required to be followed by every servicer, upon placement of an account with a third-party servicer, the servicer must determine if the debtor is represented by an attorney. *See* Dkt. #52-1 at ¶16; Dkt. #53-3 (Agency Operations Manual) at p. 139. If attorney information is identified in the placement file or the servicer otherwise learns of attorney involvement, the servicer may only communicate with the attorney, must code the account

---

[38] Plaintiffs do not seemingly challenge whether the alleged violations were unintentional or a result of bona fide error. Rather, Plaintiffs appear to dispute only whether the procedures adopted by Defendants are reasonably adapted to avoid the alleged violations.

for attorney representation and transmit all attorney contact information to RCS.[39] *See* Dkt. #53-3 (Agency Operations Manual) at p. 139-40; *see also* SMF at ¶¶56-57, 62-63; Dkt. #68-1 at 111:20-21. Servicers must also forward/upload any correspondence they receive on an account placed with them to RCS within twenty-four (24) hours of receipt, including attorney representation notices and cease requests. *See* Dkt. #53-3 (Agency Operations Manual) at p. 26, 140-42, 197-200.

Accordingly, to the extent any third-party servicers contacted Staluppi, Smith, Emery, Lee, Salav, Chappelle, Benajmin, Young, Lindsey, Reitz or Senquiz despite attorney information contained in the placement file, they did so in violation of RCS' written policies and servicer requirements.[40] Similarly, to the extent Credit Control sent Plaintiff Weaver a communication in an attempt to collect a debt after it received direct notice of attorney representation, it did so in violation of RCS' established procedures.[41] Thus, Defendants are entitled to the bona fide error defense as to these Plaintiffs.

Plaintiffs challenge such a finding simply because Defendants have not provided any documentation to support Plaintiffs' accounts were coded for attorney representation at the time of placement with the third-party servicers at issue. Yet Plaintiffs' cited evidence does not support that attorney representation codes are necessarily added by RCS *prior* to initial placement. *See* Dkt. #68 at p. 66 (citing Dkt. #68-1 at 111:1-21). Rather, the cited evidence reflects that the codes are added by the third-party servicer *after* placement if it learns of attorney representation. *See*

---

[39] Plaintiffs contend that there is no evidence that the written policy was sent to the third-party servicers, but the 30(b)(6) representative has clearly testified that "[c]opies of the Agency Operations Manual are supplied to each third-party service provider." *See* Dkt. #52-1 at ¶13.

[40] Regardless of the bona fide error defense, judgment is warranted in Defendants' favor as to each of these Plaintiffs, with the exception of Smith, because they are all Non-Testifying Plaintiffs who have failed to establish other elements of their claims.

[41] As explained *supra*, Defendants dispute that the letter sent to Weaver constitutes a "communication" under the FDCPA.

Dkt. #68-1 at 111:1-21; *see also* Dkt. #53-3 (Agency Operations Manual) at p. 139-40. Admittedly, RCS can add the necessary code if it receives a written notice of attorney representation and it is its policy to do so (*see* Dkt. #53-1 (Policies and Procedures) at p. 2, 8), but when it comes to the initial placement of an account with a servicer following purchase, as is alleged to have been the case with Plaintiffs' accounts, the record reflects that the codes are to be added by the servicer as part of its placement investigation. *See* Dkt. #53-3 at p. 140 (requiring servicer upon confirming attorney representation as part of placement investigation to "update the account to an ATT status"). Thus, the absence of an attorney code at the time of placement of these accounts is immaterial.

Plaintiffs further complain that none of the collectors were sanctioned in any way with respect to the aforementioned accounts; however, mistakes may happen for any number of reasons, some of which are not attributable to malfeasance. Plaintiffs have not demonstrated that there was any systemic failure or mal intent on the part of any of the third-party servicers at issue which might justify termination or other sanction. Nor is there any requirement of a "punishment" in asserting a bona fide error defense. Just as the Defendants are entitled to the bona fide error defense, servicers too should not be subjected to harsh sanction as a result of infrequent, bona fide mistakes, which is all that the evidence suggests happened here. *See Jang v. A.M. Miller & Assocs.*, 122 F.3d 480, (7th Cir. 1997) (recognizing "[a]fter all, creditors and debt collectors make mistakes"); *Thomas v. Bowman Heintz Boscia & Vician, P.C., & Ind. Prof'l Corp.*, 2009 U.S. Dist. LEXIS 77305, *12 (S.D. Ind. Aug. 28, 2009) (explaining that even though there is uncertainty as to how the procedures failed, "mistakes can and do occur" just "[a]s the widely regarded national poet of Scotland wrote, 'The best laid schemes o' mice an' men / Gang aft agley.'").

Plaintiffs also attack LVNV's purchasing procedure, claiming that it should do more to ensure that all attorney information for purchased accounts is provided by the seller upon purchase. But as explained *supra*, the FDCPA does not regulate purchase activities. At issue is whether Defendants had reasonable procedures in place to prevent direct collection communications with persons *known* by them to be represented by an attorney. Defendants contend they do based on: 1) their automated system which ensures all information provided by the seller, and any information later discovered by RCS, is contained in the placement file and 2) institution of a detailed written operations manual required to be followed by each servicer, which sets forth the manner and method by which attorney information must be identified and documented as well as the types of communications allowed following receipt of attorney information. While these procedures are certainly not perfect and do result in mistakes from time to time, the bona fide error defense does not demand perfection, only reasonable precaution. *See Kort v. Diversified Collection Servs.*, 394 F.3d 530, (7th Cir. 2005) ("§ 1692k(c) does not require debt collectors to take every conceivable precaution to avoid errors; rather, it only requires reasonable precaution") (citing *Hyman v. Tate*, 362 F.3d 965, 968 (7th Cir. 2004) ("Although [the debt collector] could have done more . . ., § 1692k(c) only requires collectors to adopt reasonable procedures.")).

Next, Plaintiffs challenge the service dates of Hundley and Stewart's accounts, solely on the basis that the cited affiant testimony of Ms. Herthneck in support of those dates is "self-serving." *See* Plaintiffs' Response to SMF ¶¶18, 20. "[A]ffidavits . . . and other written statements by their nature are self-serving." *Hill v. Tangherlini*, 724 F.3d 965, 967 (7th Cir. 2013). But, as the Seventh Circuit has repeatedly emphasized, "the term 'self-serving' must not be used to denigrate perfectly admissible evidence through which a party tries to present its side of the story at summary judgment." *Id.* As Plaintiffs have failed to demonstrate that Ms. Herthneck's testimony as to these

46

facts is inadmissible, the Court should consider her testimony as evidence. Regardless, Plaintiffs' own allegations support that Hundley's Credit One account had already been transferred to Alltran Financial ("Alltran") at the time LASPD purportedly notified Halsted Financial Services ("Halsted") of representation. *See* Dkt. #24 at ¶¶76-78 (alleging LASPD sent letter to Halsted same day as Alltran sent letter to Hundley); *see also* Dkt. #24-9 p. 2; Dkt. 25 p. 3. As the record demonstrates Halsted was not acting on behalf of Defendants with respect to Hundley at the time LASPD is alleged to have contacted Halsted, any knowledge Halsted purportedly obtained regarding representation or a cease request cannot be imputed to Defendants (as argued in Defendants' motion).[42] *See United States v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992) (explaining that agent must be acting within the scope of agency – i.e. for the benefit of the principal – to impute knowledge to principal). Accordingly, Hundley's §§ 1692c(a)(2) and 1692c(c) claims as premised on notice having been provided to Halsted fail as a matter of law, eliminating any need to establish a bona fide error defense to avoid liability. Nonetheless, even if this Court were to infer Halsted's agency status, for the same reasons explained next with respect to Stewart, Defendants also qualify for the bona fide error defense.

As to Plaintiff Stewart, her claims fail regardless of whether Allied Interstate, Inc. ("Allied") was servicing her account at the time LASPD purportedly contacted it.[43] On the one hand, if Allied was not servicing Stewart's account at the time of LASPD's alleged

---

[42] Notably, Plaintiffs do not challenge the legal authority cited in Defendants' motion on this point but rather only challenge whether Halsted was still acting as Defendants' agent at the time of receipt. *Compare* Dkt. # 52 at 20 *with* Dkt. #68 at p. 66. As explained *supra*, Plaintiffs' own allegations support that Halsted was no longer servicing the account on the date of LASPD's purported letter.

[43] Plaintiffs Stewart, Weaver and Hundley's claims also fail because as a Non-Testifying Plaintiffs they cannot establish other essential elements of her claims. Moreover, despite Plaintiffs' contention that judgment is warranted in these Plaintiffs' favor because notice was also provided to the original creditor, Plaintiffs' own cited evidence supports the contrary. *See* Response to PSMF ¶24 *supra* (Capital One subpoena response did not include any letter sent on behalf of Stewart, Weaver or Hundley).

correspondence, Stewart's claims fail because Allied's knowledge cannot be imputed to Defendants. On the other hand, to the extent Allied was still servicing the account, as Plaintiffs contend to have been the case, Defendants are entitled to the bona fide error defense. Simply speaking, because Allied was required pursuant to established policies and procedures to appropriately code the account and provide a copy of the correspondence to RCS following receipt, to the extent it did not do so, Defendants' placement with another servicer without identifying attorney information was a genuine, bona fide error.

That the alleged LASPD letter pertaining to Stewart purports to copy former RCS employee Michael Bahner ("Bahner") via fax does not change the analysis because RCS has no record of having received the LASPD communication and the communication is alleged to have been sent after Bahner no longer worked for RCS.[44] See SMF ¶¶48, 53; Dkt. #24 at ¶29 (alleging letter was sent July 24, 2018); Dkt. #24-8 at p. 17. Moreover, even if RCS received the fax Defendants are still entitled to the bona fide error defense. Indeed, in addition to the evidence in the record demonstrating that RCS has instituted procedures and training designed to prevent direct communications with a consumer after notice of attorney representation, RCS has also adduced evidence that at all relevant times it has maintained a fax number designated for service of communications such as attorney representation or cease requests from consumers, which number

---

[44] Plaintiffs have also failed to establish that Bahner directed LASPD to use the fax number ending in 0919 as the declarant has not established that she has personal knowledge of the purported communication nor has she established an adequate foundation for the communication, such as the parties to the communication, the medium of the communication, or where the communication was made. See Plaintiff's Response to SMF ¶50 (citing Dkt. #68-5 (M. Corbett Declaration) at ¶18). Moreover, the declarant's testimony is refuted by the Clinic's Rule 30(b)(6) representative's testimony that Plaintiff's counsel, David Philipps, supplied the 0919 fax number to LASPD. See Dkt. #52-5 at 121:15-18, 129:9-17.

was prominently displayed in the Contact-Us portion of RCS' website. *See* Dkt. #53-1 (Policies and Procedures) at p. 2, 8; Dkt. 53-2 (Training Manual) at p. 11; SMF ¶51.[45]

In considering what precautions are reasonable, the Seventh Circuit has recognized that "[l]iability would be especially perverse" under the FDCPA if courts were to hold debt collectors liable even when "the plaintiff is the principal author of the harm of which she complains." *Ross v. RJM Acquisitions Funding, LLC*, 480 F.3d 493, 498 (7th Cir. 2007); *see also Holtz v. J.J.B. Hilliard W.L. Lyons, Inc*., 185 F.3d 732, 743 (7th Cir. 1999) (explaining that where the consumer is the "least cost avoider" of the harm of which she complains it may be unfair to hold the debt collector liable). Here, Stewart[46] was the "principle author of the harm of which she complains" as LASPD need only have sent its purported letter to RCS at the fax number displayed on its website. Pursuant to RCS' policies and procedures, had she simply done that, RCS would have noted her account as attorney representation which would alert future services that they should only communicate with the attorney. Thus, to the extent American Coradius contacted Stewart after LASPD's July 24, 2018 fax to Allied, it was the sort of unintentional, bona fide error, for which § 1692k(c) provides safe harbor.

## CONCLUSION

For the numerous reasons explained *supra*, Plaintiffs have failed to make a showing sufficient to establish the existence of all elements essential to their case and on which they will bear the burden of proof at trial. Plaintiffs have also failed to refute with admissible evidence

---

[45] Although Plaintiffs deny whether a fax was maintained and designated for this purpose, they have not cited any evidence to refute Defendants' admissible testimony on this point. *See* Plaintiffs' Response to SMF ¶51. Thus, this fact must be accepted as true for purposes of ruling on the cross motions. *See* S.D. Ind. L.R. 56-1(f)(1).

[46] As well as the other Plaintiffs generally.

Defendants' entitlement to the bona fide error defense. Accordingly, Plaintiffs' request for summary judgment must be denied and judgment should be entered in favor of Defendants.

Respectfully submitted,

**LVNV FUNDING, LLC &**
**RESURGENT CAPITAL SERVICES, L.P.**

*s/ Katherine M. Saldanha Olson*
Katherine M. Saldanha Olson
Messer Strickler, Ltd.
225 W. Washington St., Suite 575
Chicago, IL 60602
(312)334-3444 (direct)
(312)334-3473 (fax)
kolson@messerstrickler.com
*Attorney for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 16, 2020, I electronically filed the foregoing with the Clerk of the District Court using the CM/ECF system, which will send notification of such filing to the attorneys of record.

*s/ Katherine M. Saldanha Olson*
Katherine M. Saldanha Olson
Messer Strickler, Ltd.
225 W. Washington St., Suite 575
Chicago, IL 60602
(312)334-3444 (direct)
(312)334-3473 (fax)
kolson@messerstrickler.com
*Attorney for Defendants*
