UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| SONJA PENNELL, et al. | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 1:18-cv-03304-JRS-TAB |
| | ) | |
| LVNV FUNDING, LLC & | ) | |
| RESURGENT CAPITAL SERVICES, LP | ) | |
| | ) | |
| Defendants. | ) | |

**Order on Motions for Summary Judgment (ECF Nos. 51, 67)**

Defendants LVNV Funding, LLC ("LVNV") and Resurgent Capital Services, LP ("Resurgent") allegedly attempted to collect overdue consumer debts from thirty-two[1] elderly and disabled Plaintiffs who had sought representation from a nationwide legal aid program.  Plaintiffs brought claims under the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. § 1692 *et seq.*  The parties filed cross-motions for summary judgment.  (ECF Nos. 51, 67.)  For the following reasons, Defendants' motion is granted in large part but denied as to Plaintiff Sonja Pennell, and Plaintiffs' motion is denied.

## I.    Legal Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[1] Pedro Delgado, Sandy Martin, and Earnestine Jones died during the course of litigation and were accordingly dismissed with prejudice.  (ECF Nos. 35, 50, 82.)

law." Fed. R. Civ. P. 56(a).  The movant bears the initial burden of production.  *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013).  That initial burden consists of either "(1) showing that there is an absence of evidence supporting an essential element of the non-moving party's claim; or (2) presenting affirmative evidence that negates an essential element of the non-moving party's claim."  *Hummel v. St. Joseph Cnty. Bd. of Comm'rs*, 817 F.3d 1010, 1016 (7th Cir. 2016) (citing *Modrowski*, 712 F.3d at 1169).  If the movant discharges its initial burden, the burden shifts to the non-moving party, who must present evidence sufficient to establish a genuine issue of material fact on all essential elements of his case.  *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 702 (7th Cir. 2009).  "The ordinary standards for summary judgment remain unchanged on cross-motions for summary judgment: [the Court] construe[s] all facts and inferences arising from them in favor of" the non-moving party.  *Blow v. Bijora, Inc.*, 855 F.3d 793, 797 (7th Cir. 2017) (citation omitted).

## II.    Background

Plaintiffs are indigent persons—seniors, people with disabilities, or both—who were unable to pay their debts.  (ECF No. 68-5 ¶ 21.)  They turned to the Chicago Legal Clinic for help.  (*Id.*)  The Chicago Legal Clinic operates a program called Legal Advocates for Seniors and People with Disabilities ("LASPD").  (ECF No. 68-3 ¶ 6; ECF No. 68-4 ¶¶ 2, 8.)  LASPD offers its clients a limited legal representation arrangement by which LASPD will notify a client's creditors or debt collectors that LASPD is representing the client and that the client refuses to pay and requests that

collection communications cease.  (ECF No. 68-3 ¶ 6; ECF No. 68-4 ¶¶ 2, 17.)  However, LASPD informs clients the organization will not represent them in connection with any lawsuit, arbitration, or negotiation arising from their debts.  (ECF No. 68-5 ¶ 14.)  The end goal of all of this is to get creditors and debt collectors to leave the clients alone.  (ECF No. 68-3 ¶¶ 6, 7.)  Although it is based in Chicago, LASPD advertises itself as a "nationwide" legal aid program, (ECF No. 52-5 at 46), and Plaintiffs indeed hail from all over the country, (ECF No. 24 ¶ 3).

Defendant LVNV is a company that purchases defaulted consumer debts.  (ECF No. 68-2 ¶ 12.)  Although LVNV has no employees, Defendant Resurgent acts as LVNV's master servicer by engaging third-party debt collectors to collect debts owned by LVNV.  (ECF No. 52-1 ¶ 4.)  LVNV purchased the thirty-two Plaintiffs' defaulted debts from their original creditors or other predecessors-in-interest, (ECF No. 52-1 ¶ 6), and LVNV's agents subsequently contacted each Plaintiff in an effort to collect his or her debt, (*see generally* ECF Nos. 24-6, 24-7, 25).  Plaintiffs allege that these collection efforts violated the FDCPA, and each Plaintiff brought claims against Defendants under 15 U.S.C. §§ 1692c(a)(2) and 1692c(c).

Because many of the Plaintiffs' claims differ somewhat in pertinent facts and legal issues, more specific information will be discussed as necessary.

### III.   Discussion

Congress enacted the FDCPA to protect consumers from abusive debt collection practices and to ensure that debt collectors engaging in such practices are not competitively advantaged.  *See* 15 U.S.C. § 1692(e).  Each Plaintiff invokes two provisions

of the FDCPA: §§ 1692c(a)(2) and 1692c(c).  First, § 1692c(a)(2) prohibits a debt collector from communicating directly with a consumer if the debt collector knows the consumer is represented by an attorney:

> [A] debt collector may not communicate with a consumer in connection with the collection of any debt . . . if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector . . . .

15 U.S.C. § 1692c(a)(2).  Second, § 1692c(c) prohibits a debt collector from communicating directly with a consumer if the debt collector is notified that the consumer wants the collector to cease communications:

> If a consumer notifies a debt collector in writing that the consumer refuses to pay a debt or that the consumer wishes the debt collector to cease further communication with the consumer, the debt collector shall not communicate further with the consumer with respect to such debt.

15 U.S.C. § 1692c(c).

*A.  LVNV and Resurgent are debt collectors.*

The FDCPA only applies to debt collectors.  The Act lays out two alternative definitions of "debt collector."  Under the first definition, a debt collector is "any business the principal purpose of which is the collection of any debts."  15 U.S.C. § 1692a(6).  Under the second definition, a debt collector is any entity that "regularly collects or attempts to collect, directly or indirectly, debts owed . . . another."  *Id*.  These are known respectively as the "principal-purpose" and "regularly-collects" definitions.  *See Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 466 (7th Cir. 2018).

Defendants contend that Plaintiffs have not established that LVNV and Resurgent are debt collectors subject to the Act. The Court will address each entity in turn.

First up is LVNV. The parties agree the appropriate question regarding LVNV is whether it fits the principal-purpose definition.[2] LVNV admits that "at all relevant times over ninety-nine percent (99%) of its revenue originated from activity undertaken by licensed third-party collectors engaged by RCS related to debts owned by LVNV which were characterized as defaulted consumer debts at the time of purchase." (ECF No. 68-2 ¶ 12.) LVNV's argument that it is not a debt collector hinges on the fact that it *owns* the debts it seeks to collect. According to LVNV, since LVNV wears the mantles of both debt collector and debt owner, its principal purpose cannot be debt collection.

Although the Seventh Circuit apparently has not confronted the issue, other circuits have uniformly rejected LVNV's argument that a debt owner collecting its own debts cannot meet the principal-purpose definition. *See Tepper v. Amos Fin., LLC*, 898 F.3d 364, 370 (3d Cir. 2018) (finding company whose "admitted sole business is collecting debts it has purchased" to be debt collector under principal-purpose definition); *McAdory v. M.N.S. & Assocs., LLC*, 952 F.3d 1089, 1093 (9th Cir. 2020) (finding entity whose "principal purpose was to buy consumer debts in order to collect on them" to be debt collector under principal-purpose definition), *cert. denied sub nom. DNF Assocs., LLC v. McAdory*, No. 20-376, 2020 WL 6121600 (U.S. Oct. 19, 2020);

---

[2] Because LVNV seeks to collect debts it owns, it cannot fall under the regularly-collects definition of "debt collector." *See Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1721 (2017) (holding that the words "owed . . . another" in the regularly-collects definition prevent persons who collect debts owed to themselves from meeting that definition).

*Reygadas v. DNF Assocs., LLC*, No. 19-3167, 2020 WL 7329111, at *5 (8th Cir. Dec. 14, 2020) (finding entity whose "primary objective is to collect on debt accounts it purchased in order to turn a profit" to be debt collector under principal-purpose definition). These decisions relied on the ordinary meaning of the words "any business the principal purpose of which is the collection of any debts." 15 U.S.C. § 1692a(6). "[A] business's 'purpose' is shown by its actions." *Reygadas*, 2020 WL 7329111 at *4. And cross-referencing the statute with a dictionary confirms that "an entity that has the 'collection of any debts' as its 'most important' 'aim' is a debt collector" under the primary-purpose definition. *Barbato v. Greystone All., LLC*, 916 F.3d 260, 267 (3d Cir.) (citations omitted), *cert. denied sub nom. Crown Asset Mgmt. LLC v. Barbato*, 140 S. Ct. 245 (2019).

LVNV wants the Court to read "the principal purpose" as precluding two equally important purposes—for LVNV, those purposes are debt acquisition and debt collection. Because those activities are equally important to sustain LVNV's business, LVNV argues its business has *no* principal purpose. The Court is not persuaded for two reasons. First, if the Court were to accept LVNV's argument, not even the archetypal repo man would fit the primary-purpose definition, as he could simply say that his business's equally important purposes are (1) obtaining contracts with creditors and (2) collecting debts pursuant to those contracts. There is simply no reason to parse a business's actions so finely. Second, LVNV's argument overlooks what the words "*any* debts" contribute to the principal-purpose definition.

"Any debts" does not distinguish to whom the debt is owed. And it stands in contrast to "debts owed or due . . . another," which limits only the "regularly

6

collects" definition. . . . Asking if [the defendant who buys and collects debt] is a debt collector is thus akin to asking if Popeye is a sailor. He's no cowboy.

*Tepper*, 898 F.3d at 370–71.  As the Third Circuit said, "any debts" surely encompasses debts acquired and owned by the entity doing the collecting.  And surely an entity that collects debts it owns is a "business the principal purpose of which is the collection of [its own] debts."  15 U.S.C. § 1692a(6).  Indeed, LVNV purchased the debts for the principal purpose of collecting on them, and it would not have collected on the debts unless they had purchased them.  Consequently, Plaintiffs have established that LVNV is a debt collector under the principal-purpose definition as a matter of law.

That leaves Resurgent.  For Resurgent, Plaintiffs invoke the regularly-collects definition.  Resurgent has power of attorney to act for LVNV with respect to debts owned by LVNV.  (ECF No. 68-2 at 7.)  Resurgent "sometimes" directly sends collection communications itself, but "by and large [it] hires other debt collectors to collect on behalf of LVNV."  (ECF No. 68-1 at 40:14–22.)  In other words, Resurgent "regularly collects or attempts to collect, directly or indirectly, debts owed . . . [LVNV]."  15 U.S.C. § 1692a(6).  Resurgent's only rebuttal is that, since LVNV is disqualified from the regularly-collects definition after *Henson*, 137 S. Ct. at 1721, and since Resurgent is merely LVNV's attorney-in-fact, Resurgent is disqualified from the regularly-collects definition, too.  The statutory text easily disposes of this rebuttal.  Again, the regularly-collects definition encompasses anyone who "regularly collects . . . debts owed . . . another."  15 U.S.C. § 1692a(6).  The definition does not carve out any exceptions

for an attorney-in-fact.  Resurgent is therefore a debt collector under the regularly-collects definition as a matter of law.

Finally, Resurgent volunteers that it falls under the exception enumerated in § 1692a(6)(B), which removes from the definition of debt collector

> any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts.

15 U.S.C. § 1692a(6)(B).  In their complaint, Plaintiffs allege that Resurgent is LVNV's "sister company."  (ECF No. 1 ¶ 5.)  A sister corporation is "[o]ne of two or more corporations controlled by the same, or substantially the same, owners." *Corporation*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Resurgent says that this allegation should be treated as a judicial admission that binds Plaintiffs.  "Judicial admissions are formal concessions in the pleadings, or stipulations by a party or its counsel, that are binding upon the party making them." *Keller v. United States*, 58 F.3d 1194, 1198 n.8 (7th Cir. 1995).  "A judicial admission is conclusive, unless the court allows it to be withdrawn . . . ."  The Court will allow Plaintiffs to withdraw the allegation for two reasons.  First, Defendants themselves specifically denied that LVNV and Resurgent were sister companies in their answers.  (ECF No. 14 ¶ 5; ECF No. 15 ¶ 5).  Second, nothing in the record has proven that Defendants are sister companies. Indeed, so far as the Court can discern, Plaintiffs have not repeated that allegation, which is absent from Plaintiffs' statement of material facts.  The Court will not treat

the complaint's allegation that Defendants are sister companies as a judicial admission since it is not true.  Even if true, though, the Court has already rejected the notion that a "principal business of [LVNV] is not the collection of debts," which negates the exception.  Either way, it follows that there are no facts demonstrating that Resurgent falls within the definitional exception in § 1692a(6)(B).

B. *The twenty-nine Non-Testifying Plaintiffs cannot prove they incurred their debts for consumer purposes.*

The parties stipulated that twenty-nine Plaintiffs[3] ("Non-Testifying Plaintiffs") would not testify in support of their case.  (ECF No. 44.)  Defendants argue that summary judgment should be entered against these Non-Testifying Plaintiffs because they cannot, without testifying, (1) establish standing, (2) establish the consumer nature of their debts, or (3) authenticate their retainer contracts to prove representation by an attorney.  Even if the Court assumes that they could prove standing and representation, after the stipulation, the Non-Testifying Plaintiffs cannot establish the consumer nature of their debts.

The FDCPA protects consumers from abusive debt collection efforts only with respect to *consumer* debts—not business debts.  The Act defines "debt" as "any obligation . . . of a consumer to pay money arising out of a transaction in which the money, property, insurance, or services which are the subject of the transaction are primarily for personal, family, or household purposes."  15 U.S.C. § 1692a(5).  "It follows that, to state a claim under either statute, a plaintiff, who has the burden of proof on each

---

[3] Each Plaintiff other than Sonja Pennell, Louise Reitz, and Patricia Smith is a Non-Testifying Plaintiff.

element of the cause of action, must demonstrate that the debt in question arises out of a transaction incurred for *personal, family, or household purposes*." *Burton v. Kohn Law Firm, S.C.*, 934 F.3d 572, 579 (7th Cir. 2019) (emphasis added).

The Non-Testifying Plaintiffs say they have shown that their debts are personal in nature, for three reasons: (1) there is no evidence that the debts were incurred for business purposes, (2) Defendants are debt collectors specializing in collecting consumer debts, and (3) the Non-Testifying Plaintiffs attested to LASPD during their respective client intake sessions that the debts were consumer debts.  None of these suffices to establish that the Non-Testifying Plaintiffs' debts were consumer debts.

First, the absence of evidence showing the debts were incurred for business purposes certainly is not enough.  To hold otherwise would be to arbitrarily excuse the Non-Testifying Plaintiffs from meeting their burden of proof on the consumer-debt element of their FDCPA claims.  In support of their argument for presuming that their debts' purposes were personal, the Non-Testifying Plaintiffs point to *Pantoja v. Portfolio Recovery Associates, LLC*, 78 F. Supp. 3d 743, 745–46 (N.D. Ill. 2015), *aff'd*, 852 F.3d 679 (7th Cir. 2017).  In *Pantoja*, the plaintiff's debt arose from a credit card's activation fees, annual fees, and late fees, but the plaintiff had never actually used the credit card, which had been issued to him personally.  *Id*. at 745.  The court in *Pantoja* found on this record that the plaintiff had established that the debt was a consumer debt.  *Id*. at 746.  In the course of granting summary judgment to the plaintiff, the court said that there was "no evidence in the record to even remotely suggest that the card was issued for anything other than household purposes," *id*., language

10

the Non-Testifying Plaintiffs read to mean that a court can assume that a debt is personal in nature absent evidence to the contrary. But, in context, this Court reads that language only to mean that the defendant debt collector in *Pantoja* failed to identify a genuine issue of material fact as to the personal purpose of the plaintiff's debt, once the burden of production had shifted from the plaintiff to the defendant. *See Becker v. Tenenbaum-Hill Assocs., Inc.*, 914 F.2d 107, 110 (7th Cir. 1990) ("If the moving party meets its burden, the nonmoving party then has the burden of presenting specific facts to show that there is a genuine issue of material fact.") (citation omitted). Indeed, the Seventh Circuit's most recent discussion of the consumer-debt element of FDCPA claims does not mention any rule about presuming the consumer nature of a debt—to the contrary, the *Burton* opinion engaged in a searching inquiry as to whether the plaintiff met his burden of proving the consumer purpose of the debt. *See* 934 F.3d at 578–85. The Non-Testifying Plaintiffs' argument for a presumed consumer purpose is therefore without merit.[4]

Second, the Non-Testifying Plaintiffs point to Defendants' consistent practice of purchasing and collecting defaulted consumer debts. Specifically, LVNV admitted "that at all relevant times over ninety-nine (99%) of its revenue originated from activity undertaken by licensed third-party collectors engaged by RCS related to debts

---

[4] On this point, Plaintiffs also say that it would be absurd to think that the indigent seniors and people with disabilities comprising the Non-Testifying Plaintiffs would be incurring debts for a business purpose. If the Court were to hazard a guess, it might guess that the Non-Testifying Plaintiffs did not incur debts to start businesses. But a guess is not good enough in a lawsuit, in which a plaintiff must prove every element of the case. Not only is there not enough evidence, even if construed in the light most favorable to Plaintiffs, for such a guess, but the Court will not engage in such discriminatory stereotyping.

owned by LVNV which were characterized as defaulted consumer debts at the time of purchase." (ECF No. 68-2 ¶ 12.) But a debt collector's treatment of a debt does not show the purpose for which a particular debtor incurred a debt. For example, in *Burton*, the plaintiff said the Seventh Circuit panel should infer the personal nature of the debt from the defendant debt collectors' advertisements for their consumer-debt collection services. *See* 934 F.3d at 582. The panel in *Burton* rejected the argument, finding that the marketing materials did not "establish that the debt they attempted to collect *in this case* was a consumer debt." *Id.* (emphasis in original). Likewise, here, Defendants' business model and past business practices do not establish that the debts *in this case* are consumer debts.

Third, the Non-Testifying Plaintiffs claim that the Court can infer their debts were incurred for consumer purposes because, as a policy, LASPD does not accept clients with commercial debts. LASPD attorneys aver that "part of LASPD's intake program requires confirming, with each client, that the defaulted debts that they need help with were for personal or household purposes, and not business debts." (ECF No. 68-3 ¶ 11; ECF No. 68-4 ¶ 8.) The Non-Testifying Plaintiffs' statements to LASPD during the intake process constitute hearsay, as their assertions are out-of-court statements introduced to prove the truth of the matter asserted—that is, that the Non-Testifying Plaintiffs incurred their debts for consumer purposes. *See* Fed. R. Evid. 801(c). The Non-Testifying Plaintiffs have not pointed to any hearsay exception that would permit the Court to consider these assertions, and the Court can think

of none that would apply.  Hence, any assertions by the Non-Testifying Plaintiffs during the LASPD intake process are inadmissible evidence and cannot establish the consumer-debt element of their FDCPA claims.  *See, e.g.*, *Carlisle v. Deere & Co.*, 576 F.3d 649, 655 (7th Cir. 2009) (refusing to consider inadmissible hearsay in reviewing motion for summary judgment).

In sum, the Non-Testifying Plaintiffs cannot establish that their debts were incurred for consumer purposes as required to sustain a claim under the FDCPA.  Accordingly, the twenty-nine Non-Testifying Plaintiffs' claims under §§ 1692c(a)(2) and 1692c(c) are dismissed with prejudice.

## C. The Testifying Plaintiffs

The remaining Plaintiffs, who did testify, are Louise Reitz, Patricia Smith, and Sonja Pennell.

    1.  <u>There is a genuine issue of material fact as to whether LASPD attorneys "represented" Reitz, Smith, and Pennell for purposes of § 1692c(a)(2).</u>

Defendants make several related arguments that Reitz, Smith, and Pennell have not fulfilled the "represented by an attorney" element of § 1692c(a)(2).  Defendants say the § 1692c(a)(2) claims consequently fail as a matter of law.

First, Defendants argue that Plaintiffs were not "represented" within the meaning of § 1692c(a)(2) because LASPD is not practicing law.  "[S]end[ing] a 'go-away' letter to [LASPD's] clients' creditors" is not the practice of law, according to Defendants. (ECF No. 52 at 29.)  The Court is not persuaded by this argument, at least in the form Defendants have presented it.  The practice of law includes "[a]dvising others of their

legal rights and responsibilities." 122 AM. JUR. PROOF OF FACTS 3d 279; *see also Charter One Mortg. Corp. v. Condra*, 865 N.E.2d 602, 607 (Ind. 2007) (distinguishing between "common knowledge" and "legal knowledge," the exercise of which constitutes the practice of law); *United States v. Hardy*, 681 F. Supp. 1326, 1328 (N.D. Ill. 1988) (defining practice of law as rendering advice requiring the use of "any degree of legal knowledge or skill"). The clients seeking LASPD's assistance received unwanted communication from debt collectors and sought a way to stop it. The Court doubts that the unsophisticated consumer contemplated by the FDCPA, *cf. Lox v. CDA, Ltd.*, 689 F.3d 818, 822 (7th Cir. 2012), would know about his rights under federal law. In fact, one of the reasons LASPD was founded was to bridge this deficit by informing clients of their rights under the Act. (ECF No. 68-3 ¶ 6; ECF No. 68-4 ¶ 2.) Advising an unsophisticated consumer of his legal rights under the FDCPA and recommending a course of action to assert those legal rights would seem to be practicing law, albeit minimally so.[5] At least one court that has considered the nature of LASPD's services reached a similar conclusion. *See Serrano v. Van Ru Credit Corp.*, 126 F. Supp. 3d 1005, 1009 (N.D. Ill. 2015) (finding LASPD's limited representation of clients seeking

---

[5] This finding notwithstanding, the Court pauses to express its remaining skepticism about whether sending one "go-away" letter to a debt collector constitutes representation for purposes of the FDCPA. Whether there was an ongoing representation, as opposed to a "one-and-done" act, may also shed light on the reasonableness of the 43-day period discussed below. *See infra* Section III.C.3. Congress's goal in enacting the FDCPA was to end "abusive, deceptive, and unfair debt collection practices," 15 U.S.C. § 1692(a), not to end legitimate collection efforts. In practice, allowing a *pro forma* representation to satisfy § 1692c(a)(2) might accomplish the latter, not simply the former. The Court would be interested in further evidence from the FDCPA's text, structure, or legislative history shedding more light on the meaning of "represented by an attorney" in § 1692c(a)(2). In any event, here, Defendants have not carried their burden of persuasion.

an end to collection communications constituted representation for purposes of § 1692c(a)(2)). Thus, Defendants are not entitled to summary judgment on the remaining § 1692c(a)(2) claims on this basis.

Second, Defendants argue that Reitz, Smith, and Pennell were not "represented by an attorney" because, if anything, they were invalidly represented by paralegals or clerical staff rather than attorneys. Defendants' main supporting evidence for this is the deposition of LASPD director Steven Blutza, who testified (1) that paralegals and clerical staff prepare and send notices of representation and cease-communications requests and (2) that, despite their names and signatures appearing on such letters, LASPD attorneys usually do not involve themselves with any particular letter "unless there's something special" about the client's case. (ECF No. 52-5 at 114:20–116:17.) If true, this would likely be the unauthorized practice of law by the paralegals, as paralegals cannot "intake a new client . . . [and] stamp the attorney's signature . . . all without the considered approval of the attorney." *Avila v. Rubin*, 84 F.3d 222, 229 (7th Cir. 1996) (quoting *Clomon v. Jackson*, 988 F.2d 1314, 1321 (2d Cir. 1993)).[6]   However, Blutza's deposition testimony contradicts the declaration of LASPD supervising attorney Jeff Whitehead, who testified that "[e]very non-administrative letter sent out on behalf of the Clinic's LASPD clients is done at the direction and control of one of our attorneys," including the letters at issue in this case. (ECF

---

[6] The fact that LASPD attorneys designed the papers and procedures used by paralegals and staffers does not suffice as attorney supervision of the non-attorneys without at least some personal engagement by the attorneys with each communication sent by LASPD. *Cf. Avila*, 84 F.3d at 225 (although attorney "review[ed] and approve[d] the general form used on letters sent by" law firm, he did not personally engage with vast majority of letters, so firm's letters could not be construed as "from an attorney" under § 1692e(3) of FDCPA).

15

No. 68-4 ¶¶ 18–19.)  Likewise, Blutza's deposition testimony contradicts the declaration of former LASPD executive director and former senior counsel Edward Grossman, who testified consistently with Whitehead regarding the scope of attorney supervision at LASPD.  (ECF No. 68-3 ¶¶ 14–15.)  There is unavoidably an issue of material fact as to whether the remaining Plaintiffs were represented by an attorney or by paralegals and clerical staff.  Reitz's, Smith's, and Pennell's § 1692c(a)(2) claims must proceed to trial, unless the claims fail for another reason.

2. <u>Reitz's and Smith's claims nevertheless fail because they were not validly represented and because their cease-communications requests to their original creditors cannot be imputed to Defendants.</u>

Defendants next argue that, even if LASPD attorneys rather than non-attorneys represented the remaining Plaintiffs, Reitz's and Smith's § 1692c(a)(2) claims still fail because the attorneys engaged in the unauthorized practice of law by practicing in jurisdictions where they were not licensed.  The idea is that the element "represented by an attorney" in § 1692c(a)(2) is not met where a purported attorney lacks authorization under state law to represent a client.  Defendants say Reitz, a resident of Florida, (ECF No. 52-7 at 8:12–13), and Smith, a resident of Michigan, (ECF No. 52-9 at 10:2–22), could not have been validly represented by the attorneys at LASPD, who are licensed only in Illinois and Indiana, (ECF No. 52-5 at 46:17–47:9; ECF No. 52-8).[7]

---

[7] Pennell is not a target of Defendants' argument that LASPD attorneys improperly practiced law in jurisdictions where they were not licensed, as Pennell is a resident of Indiana, (ECF No. 52-3 at 10), where Whitehead is licensed to practice, (ECF No. 52-8).

16

As a matter of statutory interpretation, the Court agrees that "represented by an attorney" must be read to encompass only valid attorney representations as dictated by state law. Otherwise, the word "attorney" would lack any sensible meaning. A debtor could have his plumber send a letter saying the plumber was representing him in order to fulfill the representation element of § 1692c(a)(2)—an obviously absurd result.

To decide whether LASPD's attorneys engaged in the extra-jurisdictional unauthorized practice of law, there is a threshold question of *where* the practice of law occurred. In deciding whether an attorney practiced law in a given state, the primary inquiry is whether the lawyer "engaged in sufficient activities in the state." *Birbrower, Montalbano, Condon & Frank v. Superior Court*, 17 Cal. 4th 119, 128 (1998), *as modified* (Feb. 25, 1998) (analyzing New York law firm's contacts with state to determine whether practice of law occurred "in California" as prohibited by California's unauthorized-practice-of-law statute).[8] "Mere fortuitous or attenuated contacts" are insufficient to sustain a finding that an attorney practiced law in a certain state. *Id.* Though potentially relevant, an attorney's physical presence in a state is not dispositive of whether the practice of law occurred within that state. *Id.* Here,

---

[8] *See also Fought & Co. v. Steel Eng'g & Erection, Inc.*, 87 Haw. 37, 47 (1998) (adopting factors considered in *Birbrower* to decide whether unauthorized practice of law occurred "in Hawaii"); *In re Charges of Unprofessional Conduct in Panel File No. 39302*, 884 N.W.2d 661, 666 (Minn. 2016) (analyzing foreign lawyer's contacts to state to determine whether practice of law occurred "in Minnesota"); *In re Babies*, 315 B.R. 785, 791–93 (Bankr. N.D. Ga. 2004) (concluding that attorneys physically present in Illinois practiced law in Georgia by representing Georgia residents with respect to bankruptcy, preparing related documents, and communicating with the Georgians by telephone and mail).

the record shows that the most significant contacts having to do with LASPD's representation of Reitz and Smith were with Florida and Michigan. On the one hand, nothing in the record suggests that the LASPD attorneys were ever physically present in Florida and Michigan. On the other hand, at all relevant times, Reitz and Smith have resided in Florida and Michigan, respectively. In line with LASPD's general practice, (ECF No. 52-5 at 44:18–45:2), LASPD communicated with Reitz by telephone while she was in Florida. (ECF No. 52-7 at 20:12–16.) LASPD also communicated with Smith by telephone while she was in Michigan. (ECF No. 52-9 at 56:8–11.) Moreover, the unwanted debt collection activities that brought Reitz and Smith to LASPD occurred in Florida and Michigan. Third-party debt collectors acting on behalf of Defendants sent collection letters to Reitz's and Smith's homes in Florida and Michigan. (ECF No. 24-6 at 6, 16–17.) Insofar as they sent notices of representation and cease-communications requests on behalf of Reitz and Smith, the LASPD attorneys therefore practiced law in Florida and Michigan. Both Florida and Michigan prohibit the practice of law in state unless the practitioner is licensed or otherwise authorized to practice law by each of those states. *See* Fla. Stat. Ann. § 454.23; Mich. Comp. Laws Ann. § 600.916. And because no attorneys at LASPD are licensed in Florida or Michigan, LASPD's limited representation of Reitz and Smith appears to meet the definition of the unauthorized practice of law in those states.[9]

---

[9] Plaintiffs complain that this finding frustrates the enforcement of FDCPA rights because FDCPA cases frequently involve parties from across the country. For instance, a consumer in State A could be indebted to a creditor incorporated in State B and headquartered in State C, who sells his debt to a debt collector incorporated in State D and headquartered in State E. Certainly, there is a tension between the interjurisdictional practice that characterizes the legal field today and having individual states regulate the legal profession. *See*

In response, Plaintiffs contend that, to assert a client's *federal* rights, an attorney need not be licensed in that client's state of residence, so long as he is licensed somewhere.  For that curious proposition, Plaintiffs cite two cases.  First, they cite *State ex rel. York v. West Virginia Office of Disciplinary Counsel*, 231 W. Va. 183 (2013), where an attorney licensed to practice in Ohio and also before the U.S. Patent and Trademark Office (PTO)—but not West Virginia—was being investigated by the West Virginia attorney disciplinary authority for mishandling West Virginia clients' funds.  The West Virginia state supreme court held that the disciplinary body had jurisdiction to investigate the attorney's wrongdoing.  *W. Va. Off. of Disciplinary Couns.*, 231 W. Va. at 194.  Second, Plaintiffs draw the Court's attention to *In re Desilets*, 291 F.3d 925 (6th Cir. 2002), where the Sixth Circuit held that an attorney licensed to practice in Texas and also before federal courts in Michigan did not engage in the unauthorized practice of law by practicing bankruptcy law in the Western District of Michigan.  These cases are conflict preemption cases dealing with state licensing laws that buckled to inconsistent but superior federal authority.  *See W. Va. Off. of Disciplinary Couns.*, 231 W. Va. at 194 (finding PTO regulations regarding persons entitled to

---

*Birbrower*, 17 Cal. 4th at 129 ("Authority to engage in the practice of law conferred in any jurisdiction is not per se a grant of the right to practice elsewhere . . . . However, the demands of business and the mobility of our society pose distinct problems in the regulation of the practice of law by the states." (quoting MODEL CODE OF PRO. RESP. EC 3-9 (AM. BAR ASS'N 1980))).  And the Court is not blind to the fact that indigent clients may face difficulty finding affordable legal aid services from organizations versed in the FDCPA within their states of residence—presumably, that is one reason why LASPD serves clients outside of just Illinois.  Nevertheless, the Court must apply the unauthorized-practice-of-law doctrine as given in Florida and Michigan, not as that doctrine should or would be if the states were more mindful of the multi-jurisdictional nature of legal practice today.  The Court's proper role is "to apply, not amend, the work of the People's representatives."  *Henson*, 137 S. Ct. at 1726.

practice before the PTO did not preempt state law on attorney discipline); *In re Desi-lets*, 291 F.3d at 930–31 (finding local rule of district court permitting practice therein preempted state's licensing law read to prohibit such practice).  Neither of these cases supports Plaintiffs' theory that an attorney can practice within any jurisdiction—licensing laws notwithstanding—so long as he is asserting or vindicating a client's federal rights.  Plaintiffs have not meaningfully raised a preemption theory centered on the FDCPA versus state law in Florida and Michigan.  In any event, such an argument would likely be unavailing because nothing within the FDCPA indicates a Congressional intent to displace states' attorney licensing laws, so far as the Court can discern.  *See* 15 U.S.C. § 1692a (not defining "attorney" or "representation" at all as those terms are used in the subchapter, let alone defining them in a way inconsistent with state law).  Thus, Reitz's and Smith's § 1692c(a)(2) claims fail because they were not validly represented with respect to their debts, as the statute requires.

Reitz's and Smith's § 1692c(c) claims fail, too.  Their theory of liability under § 1692c(c) is that the cease-communications requests sent on their behalf to their original creditors should be construed as being sent to the debt collectors who subsequently purchased their debts.  Returning to the statutory text, a debt collector violates § 1692c(c) only "[i]f a consumer notifies a *debt collector* in writing" that the consumer refuses to pay or wants collection-related communications to stop.  15 U.S.C. § 1692c(c) (emphasis added).  Another district court in the Seventh Circuit had this to say about § 1692c(c), given analogous facts:

> Section 1692c(c), however, only restricts a debt collector's communications with the consumer if the consumer "notifies the ***debt collector*** in writing" that

she wants the debt collector to cease contacting her. . . . Zachial's primary argument for why [the debt collector] nonetheless violated § 1692c(c) is that, as [the original creditor's] assignee, [the debt collector] was "subject to all of the same information on Ms. Zachial's putative debt" that [the original creditor] had. . . . But by its plain language, § 1692c(c) only imposes a duty on a debt collector when the consumer has contacted the debt collector, not when the consumer has contacted the original creditor.  Because the statute's language is plain, this Court must enforce it according to its terms.

*Zachial v. Cascade Capital, LLC*, No. 18-CV-05494, 2019 WL 4750081, at *2 (N.D. Ill. Sept. 30, 2019) (citations and footnotes omitted) (emphasis in original).  For the same reasons expressed in *Zachial*, the Court reads a § 1692c(c) claim to require proof that the consumer sent a cease request to the debt collector; by the statute's plain language, a cease request sent only to the original creditor does not suffice.  Because Reitz and Smith sent their cease requests only to their original creditors, (ECF No. 24-3 at 10, 22, 24), and because nothing in the record suggests the original creditors shared Reitz's and Smith's written cease requests with Defendants,[10] Defendants could not have violated § 1692c(c), which is triggered only by the consumer's written notice to the debt collector.

Finally, Plaintiffs additionally protest that Defendants knew Smith had sent a cease request to Defendants' predecessor in interest because Defendants purchased her debt as part of a portfolio entitled "Gettington SCUSA Receivables Forward Flow-Cease/Desist."  (ECF No. 68-10.)  But, unlike § 1692c(a)(2), § 1692c(c) requires only that the consumer "notifies [the] debt collector in writing" of the consumer's desire that collection communications cease.  Knowledge alone is not an element of

---

[10] In contrast, because Pennell's written cease request was forwarded to Defendants, *see infra* Section III.C.3, Pennell's § 1692c(c) claim does not fail on the "notifies a debt collector in writing" element.

21

§ 1692c(c). Thus, even if the title of the portfolio containing Smith's debt implies that Defendants knew of her desire that collection communications cease, that knowledge is immaterial to whether Defendants violated § 1692c(c) because it does not change the fact that Smith apparently never "notifie[d] [the] debt collector *in writing*" of her desire that collection communications cease. Accordingly, Reitz's and Smith's § 1692c(c) claims fail as a matter of law.

3. Pennell's claims must be tried.

The only Plaintiff remaining is Pennell. The relevant facts are as follows: (1) On January 29, 2018, LASPD sent a letter to Credit Control stating LASPD was representing Pennell with respect to her debt and stating Pennell wanted direct collection communications to cease, (ECF No. 24-3 at 3); (2) The next day, Credit Control forwarded LASPD's letter to Defendant Resurgent, (ECF No. 52-1 ¶ 20); (3) On February 27, 2018, Defendants' agent Lloyd & McDaniel ("L&M") sent a letter to LASPD asking for confirmation within thirty days that the organization was representing Pennell regarding her debt, (ECF No. 52-1 ¶ 22; ECF No. 52-4 ¶ 4); (4) Having not yet received a response from LASPD and assuming Pennell was not represented, L&M sent a collection communication directly to Pennell on April 11, 2018, (ECF No. 52-4 ¶ 7); (5) On May 23, 2018, LASPD faxed a letter to L&M confirming that LASPD was representing Pennell regarding her debt, (ECF No. 24-8 at 3–4).

First, Pennell's § 1692c(a)(2) claim survives summary judgment. L&M allowed forty-three days to pass with no response from LASPD before assuming Pennell was unrepresented and communicating with her directly regarding her debt. Recall that

22

§ 1692c(a)(2) prohibits a debt collector's direct collection communications with a consumer known to be represented "unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector."   15 U.S.C. § 1692c(a)(2).   Defendants argue there was no violation of § 1692c(a)(2) because LASPD failed to respond within forty-three days, which Defendants claim is a "reasonable period of time" as a matter of law.   Defendants further argue that Pennell forfeited her arguments in response to this theory by failing to directly respond to it. The first argument is entirely conclusory, and Defendants provide no authority saying forty-three days is "reasonable" as a matter of law for purposes of § 1692c(a)(2). Indeed, while a jury may well agree with Defendants, at least one court in this circuit has found otherwise for the purposes of summary judgment. *See Blum v. Fisher & Fisher*, 961 F. Supp. 1218, 1227–28 (N.D. Ill. 1997) (finding genuine issue of material fact with respect to reasonableness under § 1692c(a)(2) of one-month time to respond where consumer argued any time period less than ninety days would have been unreasonable).   Defendants' forfeiture argument also is not persuasive.   Forfeiture is the "failure to raise a timely argument, due to either inadvertence, neglect, or oversight." *Henry v. Hulett*, 969 F.3d 769, 786 (7th Cir. 2020) (citations omitted).   The Court first notes that Defendants' conclusory statement regarding the reasonableness of forty-three days barely constitutes an argument that Pennell was required to oppose.   Even so, Plaintiffs' briefs at least minimally opposed Defendants' argument regarding reasonableness under § 1692c(a)(2) by denying that LASPD failed to timely respond to L&M's February 27, 2018 letter requesting confirmation of representation.

(*See* ECF No. 68 at 19–22.)  Consequently, the Court finds no forfeiture problem here. There is a genuine issue of material fact as to whether forty-three days was a reasonable period of time to wait before reattempting direct collection efforts, so Pennell's § 1692c(a)(2) claim must proceed to trial.[11]

Second, Pennell's § 1692c(c) claim survives summary judgment as well.  Defendants' chief argument for a favorable judgment on this claim is that the requirement in § 1692c(c) that a consumer "notifies [the] debt collector in writing" is not met.  Defendants' theory for why Pennell has not established the "notifies" element is that LASPD sent a cease request only to Credit Control, which Defendants claim was not acting as Defendants' agent when it received the cease request.  (ECF No. 52-1 ¶¶ 19–20.)  However, Credit Control forwarded the cease request to Resurgent the very next day.  (*Id.*)

The issue is whether tendering a cease request that is initially sent to the wrong party but ultimately received by the right party constitutes "notif[ying] a debt collector in writing," as required by § 1692c(c).  To notify is "[t]o inform (a person or group) . . . ."  *Notify*, BLACK'S LAW DICTIONARY (11th ed. 2019).  Even if a debtor initially sent a cease request to the wrong entity, the debtor would nevertheless inform the right entity, in writing, of his desire that collection communications cease if the wrong entity forwarded the written cease request to the right entity.  Thus, Defendants' argument that a forwarded cease request fails to satisfy § 1692c(c) is without merit.

---

[11] Pennell's § 1692c(a)(2) claim also involves a dispute of material fact as to whether she was "represented by an attorney" and not by paralegals or clerical staff.  *See supra* Section III.C.1.

24

Alternatively, Defendants contend they did not violate § 1692c(c) with respect to Pennell's debt because their agent L&M only contacted Pennell directly after a "reasonable period of time" passed without any response from LASPD confirming LASPD's representation of Pennell.  In other words, after forty-three days with no response from LASPD, Defendants say they could presume as a matter of law that Pennell did not really want collection communications to cease.  This is a perplexing argument and one that is unhinged from the statutory text.  Unlike § 1692c(a)(2), § 1692c(c) *does not* contain the clause "unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector."  Simply put, LASPD's supposed failure to respond quickly to L&M is irrelevant to whether a violation of § 1692c(c) occurred.  Defendants' reliance on language in § 1692c(a)(2) is misplaced when we are considering a claim under § 1692c(c).

That leaves the question of whether the cease request had legal effect, triggering the protections of § 1692c(c).  Recall that LASPD sent the cease request on Pennell's behalf; she did not send it herself.  Recall also that there is a factual dispute over whether Pennell was "represented" by LASPD attorneys.  The parties initially argued that the validity of the cease request in Pennell's name turns on whether LASPD paralegals sent the cease request with adequate attorney supervision.  But § 1692c(c) does not contain the words "representation" or "attorney" at all.  To risk sounding like a broken record, § 1692c(c) is triggered so long as a consumer "notifies a debt collector in writing" of a desire that collection communications cease.  From the Court's perspective, the proper question to ask in the context of § 1692c(c) is not whether Pennell

was properly represented by LASPD attorneys, but rather whether LASPD had authority to send a cease-communications request on Pennell's behalf—a question of agency law.  The Court therefore ordered supplemental briefing on the principal-agent relationship between Pennell and LASPD, representation issues notwithstanding.  (ECF No. 83.)

In Indiana, "[a]ctual authority is created 'by written or spoken words or other conduct of the principal which, reasonably interpreted, causes the agent to believe that the principal desires him so to act on the principal's account.'"  *Menard, Inc. v. Dage-MTI, Inc.*, 726 N.E.2d 1206, 1210 (Ind. 2000) (citations omitted).  Whether a principal-agent relationship exists and the scope of granted authority are generally questions of fact.  *Guideone Ins. Co. v. U.S. Water Sys. Inc.*, 950 N.E.2d 1236, 1241 (Ind. Ct. App. 2011).  The parties agree the documents relevant to determining the scope of authority are the retainer contract and consent form Pennell executed.  The relevant parts of those documents—which under Indiana law should be interpreted together, *see Samar, Inc. v. Hofferth*, 726 N.E.2d 1286, 1290 (Ind. Ct. App. 2000)—are as follows:

- It is my (our) understanding that LASPD will communicate directly with my (our) unsecured creditors on my (our) behalf.
- I (we) understand that LASPD will communicate to my (our) creditors that I (we) cannot and have no intention of paying my (our) debt(s). …
- I (we) further understand that *all of LASPD's work is done from their offices in Chicago, Illinois by lawyers* who are in good standing and licensed by the state of Illinois.
- Please allow this form to express my (our) formal consent for Legal Advocates for Seniors and People with Disabilities (LASPD) to provide certain legal representation on my (our) behalf with respect to my (our) debts. LASPD, through its agents, has authority to communicate with all creditors on my (our) behalf.  All communication regarding my (our) debts from any

26

and all of my (our) creditors shall be made only through the agents of
LASPD.

(ECF No. 85-1 (emphasis added).)   Read in the light most favorable to Defendants,
these excerpts could mean that Pennell only granted authority to LASPD *lawyers* to
send a cease-communications request on her behalf, not unsupervised staffers.   If
that is so, then the resolution of Pennell's § 1692c(c) claim turns on whether LASPD
attorneys rather than LASPD paralegals or clerical staff did "all of LASPD's work"
here.   (ECF No. 85-1 at 3.)   This is a factual dispute precluding summary judgment.

A final point: In their supplemental brief, Defendants argue that they deserve
judgment as a matter of law on Pennell's § 1692c(c) claim because of the rule of nullity
under Illinois state law.   That rule renders an agent's actions that constitute the un-
authorized practice of law void and without legal effect.   *See Ford Motor Credit Co. v.
Sperry*, 214 Ill. 2d 371, 390 (Ill. 2005).   But Illinois state law is inapposite to the cease
request sent on behalf of Pennell, who lives in Indiana, where LASPD's practice of
law occurred.   *See supra* Section III.C.2 (finding LASPD's practice of law occurred in
each Plaintiff's state of residence).   Defendants have not asserted that Indiana law
contains a nullity rule like Illinois's.   To the contrary, Indiana court cases concerning
the unauthorized practice of law consistently order remedies other than nullifying
the actions constituting the unauthorized practice of law.   *See, e.g.*, *State ex rel. Ind.
State Bar Ass'n v. Northouse*, 848 N.E.2d 668, 674 (Ind. 2006) (ordering disgorgement
of fees and enjoining future unauthorized practice of law, but not declaring illegally-
prepared will and trust documents void); *State ex rel. Ind. State Bar Ass'n v. United
Fin. Sys. Corp.*, 926 N.E.2d 8, 17 (Ind. 2010) (ordering disgorgement and noting that

27

injunctive relief is the norm in Indiana unauthorized-practice-of-law cases); *Matter of Contempt of Mittower*, 693 N.E.2d 555, 559 (Ind. 1998) (ordering fine). Defendants have not shown that they are entitled to judgment as a matter of law on Pennell's § 1692c(c) claim on this ground. In any event, even if there were a rule of nullity in Indiana, that would only matter if unsupervised LASPD non-attorneys sent the cease request on Pennell's behalf, which is a continuing factual dispute. *See* Section III.C.1.

In sum, there are genuine issues of material fact remaining with respect to Pennell's § 1692c(c) claim. Summary judgment is therefore inappropriate for either of Pennell's claims.

## IV.    Conclusion

Defendants' motion for summary judgment is **granted** with respect to the twenty-nine Non-Testifying Plaintiffs, Reitz, and Smith. Defendants' motion is otherwise **denied**. Plaintiffs' motion for summary judgment is **denied**. To summarize, only Pennell's claims under §§ 1692c(a)(2) and 1692c(c) survive summary judgment, and those claims shall proceed to trial.

**SO ORDERED**.

Date: 2/24/2021

JAMES R. SWEENEY II, JUDGE
United States District Court
Southern District of Indiana

Distribution via CM/ECF.

28